555 F.2d 862
 180 U.S.App.D.C. 390, 1977-2 Trade Cases 61,811
 FEDERAL TRADE COMMISSION, Appellant,
v.
TEXACO, INC.
FEDERAL TRADE COMMISSION, Appellant,
v.
STANDARD OIL COMPANY.
FEDERAL TRADE COMMISSION, Appellant,
v.
The SUPERIOR OIL COMPANY, INC., a corporation.
FEDERAL TRADE COMMISSION, Appellant,
v.
EXXON CORPORATION, a corporation.
FEDERAL TRADE COMMISSION, Appellant,
v.
SHELL OIL COMPANY, a corporation.
FEDERAL TRADE COMMISSION, Appellant,
v.
STANDARD OIL COMPANY OF CALIFORNIA, a corporation.
FEDERAL TRADE COMMISSION, Appellant,
v.
MOBIL OIL CORPORATION, a corporation.
 Nos. 74-1547 to 74-1551, 74-1553 and 74-1554.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc April 19, 1976.
Decided Feb. 23, 1977.
Certiorari Denied June 13, 1977.
See 97 S.Ct. 2939, 2940.
 
 Gerald P. Norton, Deputy Gen. Counsel, F. T. C., Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., Gerald Harwood, Asst. Gen. Counsel, F. T. C. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellant. Robert E. Duncan, William Cerillo, Attys., F. T. C. and John K. Villa, Atty., Dept. of Justice, Washington, D.C., also entered appearances for appellant.
 William Simon, Washington, D.C., with whom Roger C. Simmons, Washington, D.C., and Robert L. Norris, Houston, Tex., were on the brief for appellee in No. 74-1550 also argued for appellees in Nos. 74-1547, 74-1548 and 74-1551. Robert F. McGinnis, New York City, was on the brief for appellee in No. 74-1547. John W. Howard, Chicago, Ill., was on the brief for appellee in No. 74-1548. J. Wallace Adair, Terrence C. Sheehy, Washington, D.C., and Thomas G. Johnson, Houston, Tex., were on the brief for appellee in No. 74-1551. W. C. Weitzel, Jr., New York City, also entered an appearance for appellee in No. 74-1547. Terrence C. Sheehy, Washington, D.C., also entered an appearance for appellee in No. 74-1550.
 Lee Loevinger, Washington, D.C., with whom Raymond E. Vickery, Jr., Washington, D.C., was on the brief for appellee in No. 74-1553. Martin Michaelson, Washington, D.C., also entered an appearance for appellee in No. 74-1553.
 Michael J. Henke, Washington, D.C., with whom Harry M. Reasoner, Houston, Tex., was on the brief for appellee in No. 74-1554.
 Daniel A. Reznick, Washington, D.C., with whom Abe Krash, Washington, D.C., was on the brief for appellee in No. 74-1549.
 Before BAZELON, Chief Judge, and WRIGHT, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges.
 Opinion for the Court filed by BAZELON, Chief Judge.
 Concurring Opinion filed by LEVENTHAL, Circuit Judge.
 Dissenting Opinion filed by WILKEY, Circuit Judge, with whom MacKINNON, Circuit Judge, joins.
 BAZELON, Chief Judge:
 
 
 1
 These consolidated cases are before the court en banc on appeals by the Federal Trade Commission (FTC) from orders of the district court granting enforcement in part and denying enforcement in part with respect to administrative subpoenas duces tecum issued by the FTC to appellees, seven natural gas producers.[1] The subpoenas in question were authorized by the FTC in aid of a formal investigation into the procedures employed by various natural gas producers in reporting their gas reserves an investigation stemming primarily from an unprecedented decline in these reported reserves. That this nation currently is in the midst of an energy crisis, however defined, need not be detailed by this court. The extent of the energy shortage, the reasons for it, and the appropriate governmental and industry responses to the problem are the focus of debate and investigation in various executive agencies and in Congress. Such questions are largely outside the province of the judiciary. In these cases we consider only the propriety of these investigative subpoenas in the context of the limited role assigned to the federal courts in enforcement proceedings.
 
 I. FACTUAL BACKGROUND
 A. The FTC Investigation
 
 2
 The American Gas Association (AGA), a trade association composed of producers, distributors, and marketers of natural gas, is recognized as one of the principal sources of authoritative statistical data concerning the natural gas industry. In 1945 the AGA established a Committee on Natural Gas Reserves to formulate annual estimates of proved reserves[2] for the benefit of the gas industry, the Government, and the general public. To facilitate this task, the Committee has subdivided the United States into ten regions and has assigned a subcommittee of its members to compile the gas reserve estimates for each area. Members of the subcommittees usually are employees of the gas producers, and each subcommittee member generally is assigned fields in which his employer is the major producer or has some other ownership interest.[3]
 
 
 3
 In May of 1969 the AGA for the first time reported a decline in the nation's proved reserves, occurring in 1968. The reported decrease came on the heels of a Federal Power Commission (FPC) order instituting a proceeding to reconsider rates for the offshore portion of Southern Louisiana in light of the supply of gas reserves for that area.[4] The AGA report for 1969, issued in May of 1970, revealed further declines in total reserves for the United States and, this time, in Southern Louisiana reserves as well. The Southern Louisiana area is generally acknowledged to be the most important gas-producing area in the nation, accounting for approximately one-third of our domestic natural gas production.[5]
 
 
 4
 By letter of September 1, 1970 to Commissioner McIntyre of the FTC, Senator Philip A. Hart, chairman of the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee, stated that there were numerous allegations that natural gas producers were withholding information on gas reserves in order to obtain higher rates from the FPC and recommended that the Commission conduct an investigation to determine whether any activities in violation of section 5 of the Federal Trade Commission Act had occurred.[6] On October 13, the Secretary of the Commission replied that "in order that the possibility of collusion or other unlawful conduct in this field may be more fully explored, we have today directed our staff to commence an investigation which will focus principally on the reporting, estimation, and deployment of reserves by the Natural Gas Industry in one selected area of the country."[7]
 
 
 5
 After informal investigative efforts proved inadequate, the Bureau of Competition determined that the issuance of subpoenas would be necessary and so advised the Commission. On June 3, 1971, the FTC issued a resolution directing the use of compulsory process in furtherance of a nonpublic investigation. The nature and scope of the investigation were stated as follows:
 
 
 6
 The purpose of the authorized investigation is to develop facts relating to the acts and practices of . . . (certain named corporations) to determine whether said corporations, and other persons and corporations, individually or in concert, are engaged in conduct in the reporting of natural gas reserves for Southern Louisiana which violates Section 5 of the Federal Trade Commission Act, or are engaged in conduct or activities relating to the exploration and development, production, or marketing of natural gas, petroleum and petroleum products, and other fossil fuels in violation of Section 5 of the Federal Trade Commission Act.[8]
 
 
 7
 During this period of the investigation the AGA cooperated with the FTC on a voluntary basis. Field-by-field estimates of each Southern Louisiana subcommittee member for the years 1966 through 1970 were made available for the Commission's inspection and analysis in October 1971. The FTC staff also obtained data from reports filed with the FPC pertaining to gas reserves in Southern Louisiana. These reports, known as Form 15 reports, are filed by interstate natural gas pipelines and list recoverable, saleable gas reserves committed to, collected by, or held by the reporting pipeline company. With information gained from these sources, as well as from numerous interviews and depositions, the FTC drafted a comprehensive subpoena duces tecum which was issued on November 24, 1971 to eleven natural gas producers.[9]
 
 
 8
 The FTC subpoena is premised on a thorough investigation of the producers' estimation of gas reserves for the Southern Louisiana area, with a view towards comparison of the various estimates used by producers in their internal procedures and business operations with those reported as proved estimates to the AGA. To summarize briefly, Specifications A through F of the subpoena demand background information such as the company's annual reports, subsidiaries, officers, customers, net production, and sales volume. Specification G requests documents and underlying data relating to all reserve estimates for the Southern Louisiana area made by the producers, both for internal purposes and for reports to the AGA, during the period 1962-1970. Specification H requires technical data concerning the location, operations, ownership interests, and drilling status of the fields and leaseholds for which estimates are provided pursuant to Specification G. Specification I seeks documents commenting on or otherwise relating to the preparation of various reserve estimates, the procedures employed therein, and the personnel involved. Specification I also requires, inter alia, documents relating to "lease nominations and bids, any agreements for joint or common leasing, exploration, development, production, purchase or sale, or any cash flow or economic feasibility studies preparatory to leasing, exploring, developing, purchasing or selling, which involve Offshore South Louisiana acreage." Specification J requires various documents pertaining to reports of proved reserves to the AGA. Specification K asks for documents referring to any relation between the reporting of proved reserves and the rates for natural gas permitted by the FPC. Finally, Specification L demands the names of all employees involved in the estimating and evaluating process, together with their areas of responsibility.
 
 
 9
 All eleven gas producers filed motions to quash the subpoenas. On June 27, 1972, the Commission denied the motions. During subsequent negotiations between the Commission's staff and the gas producers, the Commission offered additional confidentiality protection for the information to be provided under Specifications G, H, and I;[10] as a result, two producers agreed to comply in full with the subpoenas and one producer agreed to comply in part. The remaining producers refused to comply. Accordingly, petitions for enforcement were filed in the district court on June 4, 1973.[11] Shortly thereafter, one other firm agreed to comply.
 
 B. The FPC Proceeding
 
 10
 Roughly concurrently with the FTC's investigation, the Federal Power Commission was conducting a ratemaking proceeding for the Southern Louisiana area. Since this proceeding figures prominently in the arguments of the gas producers, it will be discussed at this point. The FPC began considering area rates for Southern Louisiana in the early 1960's, (So La I ), but a final decision was not rendered until 1968.[12] Almost immediately, and while So La I was still under review by the Fifth Circuit, the FPC instituted a new proceeding (So La II ) to reconsider rates for the offshore portion of Southern Louisiana;[13] a few months later, the Commission expanded the proceeding to include the entire area.[14]
 
 
 11
 The FPC was responding to numerous complaints that the supply-demand situation had changed significantly since the record in So La I was closed. The gas producers argued that present supplies were diminishing and that the rates established in So La I were inadequate to stimulate the development of new supplies. Various municipal distributors charged, however, that the producers were understating their reserves in reports to the AGA and were deliberately withholding natural gas. In December 1969 the FPC established procedures for the So La II proceeding and directed that a full evidentiary record be made on the reserve data question.[15] As part of a staff investigation into the accuracy of the AGA data, the FPC ordered producers to furnish data relating to "uncommitted" natural gas reserves in the Southern Louisiana area;[16] these estimates were confirmed by a staff-supervised spot audit. From an analysis of the pertinent Form 15 reports, the results of the uncommitted reserves study, and testimony from AGA officials, the FPC staff concluded that the AGA data was reliable. Following extensive evidentiary hearings before an administrative law judge, the record was certified to the entire Commission.
 
 
 12
 The FPC issued its decision in So La II on July 16, 1971 (shortly after the FTC resolution authorizing compulsory process in its investigation). The Commission discussed in some detail both the staff's investigation and the contentions of several intervenors that producers had underreported their reserves.[17] The Commission concluded that the AGA reserve data was "reasonably reliable for the (ratemaking) purposes used herein."[18]
 
 C. Subsequent Litigation
 
 13
 Pursuant to the FTC's petitions for enforcement of the subpoenas against the seven companies still refusing to comply, the district court held hearings on July 30 and December 13, 1973, and considered extensive briefs and other evidentiary materials filed by the parties. The two orders at issue here were filed on March 22, 1974. One order deals with the subpoenas issued to appellees Texaco, Inc., Standard Oil Co. (Indiana), Standard Oil Co. of California, Mobil Oil Corp., Shell Oil Co., and Exxon Corp.; the other order pertains to the subpoena issued to Superior Oil Co., Inc. The orders granted in part and denied in part the FTC's petitions.
 
 
 14
 The exact basis for each modification made by the district judge is unclear. In the introductory paragraph of the first order, the court noted that the gas producers had contended "that the principles of primary jurisdiction and collateral estoppel preclude the Trade Commission from seeking the demanded documents or data for purposes of determining the validity or accuracy of natural gas reserve estimates, and . . . that certain demands of the subpoenas are irrelevant to any proper subject or area of investigation and are unduly broad and burdensome . . . ." Without specifically ruling on these arguments in relation to each demand in the subpoenas, the court stated that:
 
 
 15
 . . . being of the opinion that the Trade Commission is authorized to pursue the investigation to determine whether there exists any evidence of conspiracy in the reporting of proved natural gas reserve estimates to the American Gas Association by respondents, but that the subpoenas duces tecum are improper insofar as they seek data for the purposes of enabling the Trade Commission to attempt to determine natural gas reserves or the validity or accuracy of natural gas reserve estimates, matters already considered and ruled upon by the Federal Power Commission, and the Court being of the further opinion that the subpoenas are improper in other respects as well and should not be enforced as issued . . . ."
 
 
 16
 In the first order the district court granted enforcement of Specifications A through F, dealing with background data; these specifications were not really contested by the parties. For Specifications G, H, and I, production of documents was limited to the years 1969, 1970, and 1971 and to a random sample of 100 out of approximately 225 offshore Southern Louisiana fields. Most importantly, production was limited to documents containing or underlying proved natural gas reserve estimates; "raw field data, bid calculation data, and bid calculation files" were specifically excluded. The court stated that all production pursuant to these three specifications "shall be made for the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates, and not for the purpose of permitting the Trade Commission to investigate or determine the amount of proved natural gas reserves." In Specifications J and K production was limited to documents relating to proved reserves in only those offshore fields which were included in reports for 1971 by the AGA subcommittee for Southern Louisiana, and to documents from 1966 through 1971 "which were exchanged between or among, or constitute, contain or refer to any agreement, arrangement or communication between or among, respondent or others, including the American Gas Association"; production of intra-corporate documents was foreclosed. Specification L was limited to those employees who "acted with respect to proved natural gas estimates" for offshore Southern Louisiana during the period 1966 through 1971. For all specifications, the court granted the producer the option of producing the documents at the corporate office or field location where they were normally maintained, rather than at the FTC's offices in Washington, D.C.; further, for documents furnished at a producer's offices, the FTC was to bear any costs of reproducing the documents. Finally, the court provided further protection for any documents designated by the producer as confidential, ruling that, unless otherwise ordered by the court, such documents were to be held in the custody of the Commission's Secretary, used only in the current investigation, inspected only by Commission employees assigned to the investigation, and returned to the producer at the completion of the investigation.
 
 
 17
 In the second order, relating to Superior, the district court enforced only Specifications A through F and K through L of the subpoena; Specifications G through J, requiring, inter alia, the production of reserve estimates, were quashed in their entirety. The same confidentiality protection accorded the other six producers also was granted to Superior. While no rationale was stated in the order, the different treatment for Superior apparently reflects an acceptance of Superior's argument that because it had never been a member of the AGA and had not furnished reserve estimates to the AGA, it could not be involved in any conspiracy to underreport reserves.
 
 
 18
 On appeal, a panel of this Court affirmed the district judge's orders, upholding all modifications of the subpoena except the limitation to data from 1969-1971 in Specifications G, H, and I the FTC's demand for documents from 1962-1971 was reinstated. The FTC petitioned for rehearing or rehearing en banc; on February 6, 1976 this court vacated the panel opinion and ordered the
 
 
 19
 cases reheard en banc. II. COURT ENFORCEMENT OF
 
 
 20
 ADMINISTRATIVE SUBPOENAS THE APPLICABLE LEGAL PRINCIPLES
 
 
 21
 The Supreme Court has made it clear that the court's role in a proceeding to enforce an administrative subpoena is a strictly limited one. The seminal case is Endicott Johnson v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). The Endicott Court held that, on application for enforcement of a subpoena issued by the Secretary of Labor in administrative proceedings against the petitioner under the Walsh-Healy Public Contracts Act, the district court lacked authority to determine whether the corporation's activities were covered by the statute. Rather the Court stated, since the evidence sought by the subpoena was not "plainly incompetent or irrelevant to any lawful purpose" of the Secretary, it was the district court's duty to order its production for the Secretary's consideration. Id. at 509, 63 S.Ct. at 343. Shortly thereafter, in Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the Court applied the same principles to the enforcement of subpoenas issued pursuant to an investigation under the Fair Labor Standards Act.[19] Rejecting any power in the district court to adjudicate coverage, the Court ruled that so long as the investigation was for a lawfully authorized purpose, the documents sought were relevant to the inquiry, and the demand was reasonable, the Administrator had a right to judicial enforcement of the subpoenas. See id. at 209, 66 S.Ct. 494. Emphasizing the importance of the administrative mandate to search out violations with a view to securing enforcement of the Act, the Court stated that while the Administrator may not act arbitrarily or in excess of his statutory authority, "this does not mean that his inquiry must be 'limited . . . by forecasts of the probable result of the investigation'. . . ." Id. at 216, 66 S.Ct. at 509 quoting Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919).
 
 
 22
 In a case dealing directly with the investigative powers of the Federal Trade Commission, United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), the Court once again enunciated the standard: ". . . it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." Id. at 652, 70 S.Ct. at 369. In upholding the Commission's order requiring certain corporations to file special reports demonstrating continuing compliance with a cease and desist order, the Court distinguished the judicial process, which does not involve itself in so-called "fishing expeditions" to determine if violations of law have occurred, from the administrative function of investigation:
 
 
 23
 The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law. Id. at 642-43, 70 S.Ct. at 364.
 
 
 24
 Thus, while the court's function is "neither minor nor ministerial," Oklahoma Press Publishing Co. v. Walling, 327 U.S. at 217 n. 57, 66 S.Ct. 494, the scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity. As the Ninth Circuit has noted, the "very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate . . .." FMC v. Port of Seattle, 521 F.2d 431, 433 (9th Cir. 1975).[20]
 
 III. THE ISSUES
 
 25
 With these standards in mind, we turn to the issues at hand. The FTC's allegations of error in the district court's modifications of the subpoenas, and the producers' arguments in response, focus on four general areas: 1) limitations apparently grounded on relevance, 2) application of some form of collateral estoppel to preclude certain aspects of the FTC's investigation, 3) limitations premised on burdensomeness, and 4) conditions on use and possible disclosure of the documents.[21]
 
 A. Relevance Determinations
 
 26
 1. Limitation to Documents Relating to Proved Reserve Estimates
 
 
 27
 The gas producers contend that the district court properly limited production to those documents relating to proved reserves on grounds of relevance.[22] They argue that because the FTC's investigation is targeted on a conspiracy to underreport reserves to the AGA, and only proved reserves are reported to the AGA, only proved reserves can be relevant to the inquiry. The FTC, on the other hand, maintains that its investigation cannot be so circumscribed, and that all reserve estimates made by the producers, both for various internal business purposes and for reports to the AGA, and however denominated, are relevant to access whether violations of section 5 of the Federal Trade Commission Act have taken place.
 
 
 28
 In resolving this controversy, we must determine whether the district judge's limitation comports with the standard of "reasonable relevance."[23] Where, as here, no complaint has yet been formulated and the issues have therefore not yet been crystallized, some courts have concluded that an attenuated standard of relevance is appropriate.[24] In our view, however, the better approach is simply to recognize that in the pre-complaint stage, an investigating agency is under no obligation to propound a narrowly focused theory of a possible future case. Accordingly, the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation. The district court is not free to speculate about the possible charges that might be included in a future complaint, and then to determine the relevance of the subpoena requests by reference to those hypothetical charges. The court must not lose sight of the fact that the agency is merely exercising its legitimate right to determine the facts, and that a complaint may not, and need not, ever issue.[25]
 
 
 29
 Under this frame of reference, the district court's determination that only proved reserve estimates are relevant cannot withstand scrutiny. The relevance of the material sought by the FTC must be measured against the scope and purpose of the FTC's investigation, as set forth in the Commission's resolution.[26] Here, however, the gas producers have posited and the district court has apparently accepted an erroneous interpretation of the scope of the FTC's inquiry, and they have then sought to limit the investigation to the confines of this distorted interpretation. There is no merit to the producers' contention that the FTC is only investigating possible underreporting of proved reserves to the AGA. The FTC's resolution does not even mention either the AGA or proved reserves; further, in addition to "conduct in the reporting of natural gas reserves," the resolution obviously incorporates a broad range of activities "relating to the exploration and development, production, or marketing of natural gas . . . ." Although the FTC has never denied that reporting to the AGA is one aspect of its inquiry, it has repeatedly stated that its investigation cannot be so narrowly defined.[27]
 
 
 30
 Basically, the gas producers would have us believe that all the FTC has in mind is a recomputation of proved reserve estimates submitted to the AGA. On the contrary, the authorized inquiry envisions an examination of all phases of the estimating process. In particular, the FTC seeks to compare estimates prepared for various business purposes with those reported to the AGA. As Specification G of the subpoena indicates, producers may make reserve estimates in connection with bidding on or nominating leases; deciding whether or not to erect permanent platforms; compiling or inventorying total company reserves or supply; negotiating or contracting for the sale of natural gas, or for the joint or common exploration, development, production, purchase, or sale of acreage; obtaining bank loans; or filing depreciation expense schedules with the Internal Revenue Service. While some of these estimates may be labeled proved, some may not. Producers also may refer to certain reserve estimates as, inter alia, speculative, possible, or probable, depending on the stage of development of the field.
 
 
 31
 In order to assess whether proved reserve figures accurately reflect economic reality, reserve estimates with other labels may be important; the same or substantially similar underlying data may give rise to distinctly denominated reserve estimates. In other words, the FTC may fairly inquire whether the companies, through the use of an excessively restrictive approach, have excluded awareness of certain realistic and reliable estimates which are taken into account in making significant business decisions but which are not labeled "proved" and are therefore not included in the AGA reports. As counsel for the FTC stated to the district judge, in explaining the relevance of the requested data,
 
 
 32
 This is relevant in determining whether AGA reserves reflect economic realities. Remember, those reserves are based on a definition of what constitutes a proved reserve but it may be that an examination of the company's practices in the way it computes its reserves would show that the AGA reserve definitions are too restrictive, that in fact the companies themselves by their own conduct show that their reserves are more than what they would report to the AGA as proved reserves, or given a top and down estimate they may pick within a wide range, they may pick a top estimate for purposes where it serves their purposes, and a low estimate for other purposes where it serves their purpose.
 
 
 33
 App. II 368a-369a.
 
 
 34
 Thus, even if the FTC were investigating only the reporting of proved reserves (and we conclude that the inquiry is not so narrow), the analysis would certainly not be limited to whether the gas producers have accurately calculated their proved reserves. It is possible that such calculations are entirely in accord with the AGA's definition of proved reserves, but that, in light of other estimates considered significant by the producers, this definition has an anti-competitive effect. The agreement of the producers, with each other, and with and through the AGA, to use such a restrictive definition as the exclusive method of projecting the industry's position may have the effect and, indeed, the purpose of raising prices through its impact on purchasers and government. The FTC's investigation is for the purpose of enabling it to determine whether the companies' practices constitute an "unfair method of competition." An unfair method of competition may result from concerted action even though there is no conspiracy by the dark of the moon. And as Morton Salt noted, the FTC may investigate either to develop the existence of a violation or to assure itself that none exists. 338 U.S. at 652, 70 S.Ct. 357.[28]
 
 
 35
 It is thus clear that the development and reporting of estimates at various stages of the investment and development process is reasonably relevant to the FTC's purpose. We therefore hold that the district judge's limitation of enforcement of the subpoena to only proved reserve estimates was erroneous.[29]
 
 2. The Bid Files
 
 36
 In addition to ruling that only proved reserve estimates need be produced, the district court specifically found that "bid calculation data and bid calculation files" were irrelevant to the investigation, and therefore need not be produced.[30] Like the district court's general relevance determination, this more specific ruling is also premised upon the court's erroneous delineation of the scope and purpose of the FTC's investigation, and therefore, it, too, cannot be sustained.
 
 
 37
 Bid files are collections of documents developed for and used in nominating and bidding for the right to lease tracts in the federal domain for oil and gas exploration. According to the producers, bid files typically contain speculative reserve estimates, back-up data for such estimates i. e., raw geological data and interpretation thereof, and documents reflecting the calculation of the producer's bid.[31]
 
 
 38
 The producers maintain that bid files are not relevant to the determination of proved reserves, because bid files contain only speculative estimates which are of no further use once the company obtains a lease and begins exploratory drilling. The question, however, is not relevance to the calculation of proved reserves, but relevance to the FTC's investigative purpose. Admittedly, bid file estimates are quickly superseded by more accurate data, are not used to compute proved reserve figures, and may be completely erroneous predictions of the amount of natural gas eventually found. But any estimate of reserves however defined on which a company relies in the course of its business is relevant to the company's practices in estimating and reporting reserves.
 
 
 39
 We agree with the FTC that comparative information of this sort is "reasonably relevant" to its investigation. While, in response to the companies' arguments, the FTC has advanced several examples to demonstrate the relevance of bid files,[32] the Commission emphasized that this approach which requires, in effect, the delineation of a particular theory of violation is inappropriate in the pre-complaint stage; and here, too, we agree. While the FTC has not articulated the specific anti-competitive practices which may be present, it could not reasonably do so without access to the relevant documents.[33] Certainly a wide range of investigation is necessary and appropriate where, as here, multifaceted activities are involved, and the precise character of possible violations cannot be known in advance.
 
 3. The Superior Order
 
 40
 Apparently because Superior is not a member of the AGA and does not report proved reserve estimates to the AGA, the district judge denied enforcement of Specifications G through J in relation to Superior. Again, this ruling misconceives the nature of and unduly limits the FTC's investigation. Superior's argument that it cannot be guilty of a conspiracy to underreport proved reserve estimates to the AGA is not dispositive, because the FTC's investigation is not restricted to this theory. Superior does make reserve estimates for its fields in Southern Louisiana; therefore, it possesses information that could well be relevant to the FTC's inquiry. In point of fact, comparison of Superior's estimating process with that of a producer who does report to the AGA could be a useful analysis. At this stage, whether or not Superior has participated in some conduct that would amount to an unfair trade practice is certainly conjectural, but the Commission need not demonstrate that a complaint is likely to issue against Superior. We hold that the district judge erred in denying enforcement against Superior of major parts of the subpoena.
 
 B. Application of Collateral Estoppel
 
 41
 The gas producers contended in the district court that, because the FPC determined in So La II that the AGA proved reserve data were accurate, the FTC is precluded from relitigating that issue by the principle of collateral estoppel.[34] Further, as we noted in our analysis of the district court's relevancy findings, the producers maintained that accuracy of the AGA's proved reserve estimates is all that the FTC is really trying to investigate.
 
 
 42
 On appeal there is some disagreement among the producers as to whether the district court applied a collateral estoppel theory in modifying the FTC's subpoenas. One group states that the district court "properly applied" collateral estoppel in its ruling;[35] another company, however, claims that collateral estoppel "is not properly an issue in this case,"[36] and still another professes indifference on the ground that it is not affected by the dispute.[37]
 
 
 43
 This confusion results from the district court's order, which did not detail findings of fact and conclusions of law. It is reasonably clear, nonetheless, that the district judge employed a variety of collateral estoppel to restrict the FTC's investigation. The order stated that the subpoenas were "improper insofar as they seek data for the purposes of enabling the Trade Commission to attempt to determine natural gas reserves of the validity or accuracy of natural gas reserve estimates, matters already considered and ruled upon by the Federal Power Commission . . ." (emphasis added). In relation to the modifications of Specifications, G, H, and I, the court emphasized that all production under these specifications was to be made "for the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates, and not for the purpose of permitting the Trade Commission to investigate or determine the amount of proved natural gas reserves." Thus, so far as we can tell, the district judge accepted the producers' theory that in essence the FTC was investigating only a conspiracy to underreport proved reserves to the AGA. While the court professed to acknowledge the FTC's right to determine "whether there exists any evidence of conspiracy in the reporting of (such estimates) to the American Gas Association," the court required the FTC to take as a "given" the accuracy of the AGA data.
 
 
 44
 Although, as we have discussed, the FTC's investigation is not focused exclusively on a mere recalculation of proved reserve estimates, the district court specifically precluded any FTC inquiry which would "determine" or even "investigate" the amount of such reserves. Such a restriction patently hamstrings the FTC's effort to compare various estimates made by the producers and necessitates constant vigilance by the Commission as to whether it has overstepped the bounds delineated by the court. Equally important, the district court's constriction of the FTC's purpose, to determine only the possibility of a conspiracy in the reporting of proved reserves to the AGA, when coupled with the premise that the reliability of the proved reserve data had been conclusively established by the FPC, resulted in the exclusion on relevancy grounds of all data not relating to proved estimates.
 
 
 45
 We have already determined that all of the data requested by the FTC is reasonably relevant to its inquiry. Given that assumption, the question remains whether the FPC's conclusions in a ratemaking proceeding can foreshorten the FTC's investigation; that is, whether the FTC can be collaterally estopped from investigating the "amount of proved natural gas reserves." We conclude that collateral estoppel cannot be invoked to limit enforcement of the FTC's subpoenas.
 
 
 46
 As a general rule, substantive issues which may be raised in defense against an administrative complaint are premature in an enforcement proceeding. The controlling case again is Endicott Johnson, where the Court stated that the petitioner had "advanced many matters that are entitled to hearing and consideration in its defense against the administrative complaint, but they are not of a kind that can be accepted as a defense against the subpoena." 317 U.S. at 509, 63 S.Ct. at 343 (footnote omitted).[38] Moreover, in holding that an administrative subpoena must be enforced if the information is relevant to a lawful purpose of the agency, and not unduly indefinite or unreasonably burdensome, the Supreme Court has clearly rejected other defenses. The reasons for this rule are obvious. If parties under investigation could contest substantive issues in an enforcement proceeding, when the agency lacks the information to establish its case, administrative investigations would be foreclosed or at least substantially delayed.[39] As the Court stated in Oklahoma Press,
 
 
 47
 (P)etitioners' view, if accepted, would stop much if not all of investigation in the public interest at the threshold of inquiry and, in the case of the Administrator, is designed avowedly to do so. This would render substantially impossible his effective discharge of the duties of investigation and enforcement which Congress has placed upon him. 327 U.S. at 213, 66 S.Ct. at 508.
 
 
 48
 No substantive rights are negated by this restriction, for if a formal complaint is issued, subpoenaed parties may assert their defenses in the subsequent administrative proceeding. Further, the agency's final decision in that adjudicatory proceeding is reviewable by a court of appeals.
 
 
 49
 These principles have consistently been applied when jurisdictional defenses have been raised in enforcement proceedings. Two recent cases are illustrative. In FMC v. Port of Seattle, the Ninth Circuit held that the district court erred in limiting enforcement of Maritime Commission discovery orders to only those facts necessary to determine the Commission's jurisdiction to investigate the Port's consolidation services and in refusing to permit the Commission to inquire into the "details" of the consolidation services. 521 F.2d 431, 433-436 (1975). Similarly, the Seventh Circuit held in SEC v. Savage that the Commission was not required to establish its jurisdiction by demonstrating that a company's commodities future contracts were "securities" within the meaning of the Securities Act before the subpoena would be enforced. 513 F.2d 188, 189 (1975). The court emphasized that the company "would require SEC to answer at the outset of its investigation the possibly doubtful questions of fact and law that the investigation is designed and authorized to illuminate." Id.[40]
 
 
 50
 While the defense of collateral estoppel is very much akin to these jurisdictional questions,[41] it is, if anything, even more inappropriate in the investigatory context than questions of statutory coverage. Because a collateral estoppel defense rests on factual identities, an enforcing court to evaluate this defense must preview the ultimate complaint. In the instant case, the court must not only foretell the various theories which the FTC's evidence might support and all issues which conceivably might be raised in a FTC proceeding, but must also define all issues decided by the FPC. The court then must determine if an issue decided in the first proceeding is identical to an issue to be decided in the second proceeding. Such an exercise is unwise, if not impossible, and is in clear violation of the Supreme Court's admonition in Oklahoma Press that an agency's inquiry should not be limited by "forecasts" of the "probable results." 327 U.S. at 216, 66 S.Ct. 494.
 
 
 51
 That the enforcing court should not undercut the agency's investigative function by such hypotheses has been recognized by other courts of appeal. The Sixth and Seventh Circuits recently enforced subpoenas issued by the FTC in an investigation of taxicab companies for possible violations of the FTC Act, despite claims of res judicata and collateral estoppel based upon prior Government actions brought under the Sherman Act. In FTC v. Markin, 532 F.2d 541 (6 Cir. 1976), the Sixth Circuit, analogizing to cases involving a question of agency coverage or jurisdiction, held that such defenses were premature in the enforcement proceeding:
 
 
 52
 Whether or not res judicata or collateral estoppel should be applied in this case depends on a variety of factual determinations which should be made by the Commission in the first instance . . . The basic weakness in respondents' position is that neither the district court nor FTC has sufficient information at the present time to make the factual findings required to resolve the principal issue of res judicata or collateral estoppel. The administrative proceeding should not be interrupted by judicial intrusion before the pertinent facts are determined and assessed by the Commission. Id. at 544.
 
 
 53
 The Seventh Circuit followed the same analysis in FTC v. Feldman, 532 F.2d 1092 (7th Cir. 1976). Noting that interpretation of the factual data sought by the FTC would involve agency expertise and discretion, and that the FTC undoubtedly would consider, among other things, the effect of the prior litigation in deciding whether or not to formulate a complaint, the court concluded:
 
 
 54
 We deem it the more appropriate and orderly procedure for the Commission to proceed with the investigation within its discretion. If it ultimately issues a complaint, appellants will then have an opportunity, depending on the issues raised by the complaint, or the proof thereunder, to assert the defense of res judicata or collateral estoppel, if they see fit. Id. at 1095.
 
 
 55
 In holding that collateral estoppel is not a proper defense to this enforcement proceeding,[42] we do not reach the merits of the allegations that the FTC has intruded into the FPC's territory of expertise[43] and is attempting to relitigate an issue definitively settled by the Power Commission. We note, however, that this is an era of overlapping agency jurisdiction under different statutory mandates. In United States v. RCA, RCA contended that the Federal Communications Commission's approval of a television station exchange collaterally estopped the Justice Department from attacking the exchange in a separate civil antitrust suit. 358 U.S. 334, 338-39, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). The Supreme Court held that collateral estoppel was inapplicable because the FCC has no power to decide antitrust questions: "the issue in controversy before the Commission was whether the exchange would serve the public interest, not whether § 1 of the Sherman Act had been violated." Id. at 352, 79 S.Ct. at 468. Under the principles of RCA, what the FPC found to be consonant with the public interest could still be viewed by the FTC as an unfair method of competition. It therefore appears that a court should approach gingerly a claim that one agency has conclusively determined an issue later analyzed from another perspective by an agency with different substantive jurisdiction.
 
 C. Burdensomeness Determinations
 
 56
 The FTC challenges the district court's limitation of production under Specifications G, H, and I to a random sample of 100 fields out of approximately 220 in Southern Louisiana and to the years 1969 through 1971. The Commission also disputes the district court's provision for production where the documents are located, rather than at FTC headquarters, at the option of the producer, with any reproduction costs to be borne by the FTC. These rulings ordinarily would seem to fall under the rubric of burdensomeness. In line with the Oklahoma Press requirement that the disclosure sought shall not be unreasonable, 327 U.S. at 208, 66 S.Ct. 494, the district court is authorized to impose reasonable conditions and restrictions with respect to the production of the subpoenaed material if the demand is unduly burdensome.[44] It appears that such modifications rest within the discretion of the trial judge and should be reversed by a reviewing court only for an abuse of that discretion.[45] In this case, however, it is clear that determinations of burden were intimately tied to the district court's constricted view of the FTC's investigation; that is, the district court found the subpoenas to be unreasonably broad and burdensome because they were, in the court's view, duplicative of FPC activities.[46] Since these dispositions were colored in substantial measure by an erroneous concept of the FTC's purpose, and rested at least in part on improper applications of collateral estoppel and relevance, we are not bound by an abuse of discretion standard[47] and therefore review these modifications for mere error.[48]
 
 
 57
 We emphasize that the question is whether the demand is unduly burdensome or unreasonably broad. Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest. The burden of showing that the request is unreasonable is on the subpoenaed party.[49] Further, that burden is not easily met where, as here, the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose.[50] Broadness alone is not sufficient justification to refuse enforcement of a subpoena.[51] Thus courts have refused to modify investigative subpoenas unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business.[52]
 
 
 58
 There is no doubt that these subpoenas are broad in scope, but the FTC's inquiry is a comprehensive one and must be so to serve its purposes. Further, the breadth complained of is in large part attributable to the magnitude of the producers' business operations. Although some of the producers have alleged that the time and expense involved in compliance with the subpoenas as presently drawn would be extreme,[53] it is clear that clarification of some misunderstandings and limitation of some back-up data by the FTC staff have alleviated these concerns to some extent. Mobil Oil admits that the alleged burdensomeness of its subpoena was "substantially mitigated" during the course of extensive negotiations with Commission attorneys.[54] Moreover, we cannot ignore the fact that those gas producers who complied with the subpoenas were able to submit the required data without undue effort.[55]
 
 
 59
 We turn now to the specific limitations at issue. The FTC maintains that the random sample limitation would seriously undermine its ability to compare the data supplied by producers who voluntarily complied with the subpoenas with the data from these producers. Comparison of the producers' estimates with all data submitted to the AGA for this region also would be foreclosed to some extent. The Commission notes that other studies have utilized random sampling techniques and that, in its opinion, such studies are inadequate for its purposes. We are reluctant to approve such a limitation in light of the fact that the district court rested its restriction largely on collateral estoppel grounds.[56] We therefore enforce the subpoena as originally conceived, without production on a random sample basis.
 
 
 60
 The district court's limitation of Specifications G through I to the years 1969, 1970, and 1971 also cannot be sustained. The impetus for the FTC investigation was the drop in 1968 and 1969 of proved reserves as reported by the AGA. Clearly data from an earlier period would be necessary for comparative purposes. The Commission's requirement of data beginning in 1962 is reinstated.[57]
 
 
 61
 The FTC argues that the producers' option to release the documents for inspection where they are stored, when coupled with the FTC's required assumption of any reproduction costs, is in derogation of the Commission's subpoena power. We agree. The FTC is specifically authorized to compel production of evidence "from any place in the United States, at any designated place of hearing."[58] While room for accommodation and compromise is certainly available, the district court's placement of the entire burden of travel and expense[59] on the Commission was unwarranted on this record.[60] We enforce the subpoena without this modification.
 
 D. Confidentiality Protection
 
 62
 The district court imposed various conditions on the disclosure by the FTC of any documents designated as confidential by the producers. The producers are, of course, justifiably concerned about the confidentiality of these documents, some of which could be classified as trade secrets; however, the district court's order goes too far in an effort to protect these valid interests.
 
 
 63
 In essence, the order requires that any release or use of the documents beyond the investigation first be cleared with the court. Thus, the Commission apparently could not use the documents in an adjudicatory proceeding without gaining the court's permission. Nor could the Commission exercise its discretion to determine what documents are exempt from public disclosure under the FTC Act or the Commission's rules.[61] Although the FTC's argument that the order would prohibit even the Commissioners from viewing the documents seems somewhat strained, the order would unquestionably place the court in a position of supervision and control over the Commission in the exercise of its statutory duties.
 
 
 64
 At least until the subpoenaed information has been made available to the agency and it has had an opportunity to rule on specific requests for confidential treatment, such a protective order is premature and improper. See FCC v. Schreiber, 381 U.S. 279, 290-1, 295-6, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).[62] Accordingly, we accept with some modifications, the FTC's proposed confidentiality protection which would provide notice to the producers of any FTC decision. Specifically, we order that the FTC not disclose any of the documents produced which a company designates as confidential to any person[63] outside the employ of the FTC (other than an outside consultant retained by the FTC who has agreed not to disclose the documents) without first giving the company ten days' notice of its intention to do so.[64] Such a procedure would, of course, provide an opportunity for judicial review at some later date, if the producers believe that a particular proposed disclosure is improper.
 
 IV. CONCLUSION
 
 65
 Using its own conception of the proper scope of the FTC's investigation, the district court limited the subpoena on a composite of relevance and collateral estoppel grounds. We have determined that these limitations, which effectively blocked legitimate avenues of the FTC's inquiry, cannot be reconciled with the narrow ambit as defined by the Supreme Court of a court asked to enforce an agency's investigative subpoena. We have also concluded that the district court erred in terms of other modifications founded on burdensomeness, and that certain confidentiality restrictions operated to usurp the agency's initial decision-making power. We therefore enforce the subpoenas as issued by the FTC, with the exception of the two modifications, in regard to raw field data and the suspected location of natural gas in currently unleased acreage, proposed by the FTC and accepted by the producers.[65] We also charge the FTC with implementation of the modifications to Specifications G through K offered by the Commission but rejected by the producers as unacceptable for settlement purposes.[66] Production is to be made within 90 days of the date of this opinion.[67]
 
 
 66
 So Ordered.
 
 APPENDIX A
 SUBPOENA DUCES TECUM
 
 67
 _______ DU
 
 
 68
 UNITED STATES OF AMERICA FEDERAL TRADE COMMISSION
 
 
 69
 To Mr. A. C. Long, Chairman Executive Committee & Chief Executive Officer,
 
 
 70
 Texaco, Inc., 135 East 42nd Street, New York, New York. 10017
 
 
 71
 You are hereby required to appear before Donald K. Tenney, an Attorney and Examiner of the Federal Trade Commission, at Room 368, Federal Trade Commission Building, 6th and Pennsylvania Avenue, N.W., in the City of Washington, D.C. 20580 on the 5th day of January, 1972, at 10:00 a. m., to testify in connection with the Commission's investigation of various corporations and persons, File No. 711 0042, pursuant to Commission Resolution dated June 3, 1971, a copy of which is attached and made a part hereof, for the purposes stated therein.
 
 
 72
 And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents: See attached "Definitions" and "Specifications."
 
 
 73
 Fail not at your perilIn testimony whereof, the undersigned, an authorized official of the Federal Trade Commission, has hereunto set his hand and caused the seal of said Federal Trade Commission to be affixed at Washington, D.C., this 24th day of November, 1971.
 
 
 74
 (SEAL)
 
 
 75
 /s/ ___
 
 
 76
 Assistant Director, Bureau of Competition.
 
 DEFINITIONS
 
 77
 As used herein, the term "documents" means all writings of every kind including books, records, folios, minutes, reports, memoranda, correspondence, agreements, discounted cash flow studies, cover sheets, calculation sheets, print outs, telegrams, diary entries, pamphlets, notes, charts, and tabulations in the possession, custody or control of the Company. The term "documents" also includes voice recordings and reproductions or film impressions of any of the aforementioned writings as well as copies of documents which are not identical duplicates of the originals and copies of documents of which the originals are not in the possession, custody or control of the Company. The term "documents" further includes all punch cards or other cards, tapes or recordings used in data processing, together with the programming instructions and other written material necessary to understand or use such punch cards, tapes or other recordings.
 
 
 78
 In response to specifications in which the term "documents" is followed by an asterisk (*), a verified written statement by an officer of the company containing the requested information may be submitted in lieu of the documents called for provided that the underlying documents or source materials are listed or otherwise specifically identified in, or as part of, such verified statement.
 
 
 79
 Each document submitted must be identified as to the specification or specifications to which it is responsive.
 
 
 80
 The term "the Company" means the corporation upon which this Subpoena was served as well as its directors, officers, employees, and agents; its subsidiaries and affiliates; and the directors, officers, employees and agents of its subsidiaries and affiliates. The term "the corporation" means the corporation upon which this Subpoena was served.
 
 
 81
 Unless otherwise stated, the following definitions apply to the specifications that ensue:
 
 
 82
 1. South Louisiana. That geographical area delineated by Map III, page 84, of the May, 1971 edition of Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity as of December 31, 1970 including the offshore area. The term "Offshore South Louisiana" is defined as that geographic area which lies seaward from the Louisiana coastline. The South Louisiana Offshore Area is sometimes referred to as Federal Areas 1 through 4 and includes the West Cameron Area, East Cameron Area, Vermilion Area, South Marsh Island Area, Eugene Island Area, Shoal Area, South Pelto Area, Bay Marchand Area, South Timbalier Area, Grand Isle Area, West Delta Area, South Pass Area, Main Pass Area, Breton Sound Area, Chandeleur Area and Chandeleur Sound Area and any additions thereto, as indicated on the United States Geographical Survey "Oil and Gas Development Map of the Gulf Coast State of Louisiana Outer Continental Shelf", as revised on January 5, 1971.
 
 
 83
 2. Net Production. The definition appearing in Technical Report No. 1, Standard Definitions for Petroleum Statistics (First Edition, July 1, 1969), at page 11, is adopted.
 
 
 84
 3. Natural Gas Present or Recoverable or Ultimately Recoverable.
 
 
 85
 a. Present. Natural gas in place, i. e., existing either in the gaseous phase or in solution with crude oil in a natural underground reservoir or reservoirs.
 
 
 86
 b. Recoverable. Natural gas in place that is producible.c. Ultimately recoverable. Natural gas in place that is producible, together with its cumulative production.
 
 
 87
 4. Field. A field is an area consisting of a single reservoir or multiple reservoirs all grouped on, or related to, the same individual geological features and/or stratigraphical condition. A reservoir is a porous and permeable underground formation containing an individual and separate natural accumulation of hydrocarbons (oil and/or gas) which is confined by impermeable rock or water barriers and is characterized by a single natural pressure system.
 
 
 88
 5. Completion Date. The first date on which any permanent equipment for the production of oil or gas is installed in a well. Completion reports may relate to the abandonment of a well or to the installation of permanent productive equipment.
 
 
 89
 6 & 7. Associated Gas; Dissolved Gas. The definitions of these two terms that appear in Technical Report No. 1, Standard Definitions for Petroleum Statistics (First Edition, July 1, 1969), page 6, are adopted.
 
 
 90
 8. Nonassociated Gas. Natural gas which is in a reservoir or reservoirs not containing significant quantities of crude oil.
 
 
 91
 9-13. Proved Reserves; Revisions; Extensions; New Field Discoveries; and New Reservoir Discoveries in Old Fields. The definitions of these five terms that appear in Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity as of December 31, 1970 at pages 102-104, are adopted.
 
 
 92
 14. Dedicated Reserves. The volume of natural gas committed to a pipeline company and for which both the seller and the pipeline company have received certificate authorization from the Federal Power Commission.
 
 SPECIFICATIONS
 
 93
 A. Documents * which will indicate the correct legal name and business address of the corporation, its date and state of incorporation, and the name, position and home address of each officer and director of said corporation.
 
 
 94
 B. Documents * which will indicate the correct legal name and business address of the parent of the corporation, the date and state of incorporation of the parent and the percentage ownership the parent has in the corporation, and the name, position and home address of each officer and director of the parent.
 
 
 95
 C. The corporation's Annual Reports for each of the years 1966, 1967, 1968, 1969 and 1970.
 
 
 96
 D. Documents * which will indicate the name and address of each subsidiary, affiliate, and division of the corporation and of the divisions of each such subsidiary and affiliate engaged in the exploration, development, production, or distribution of natural gas; the function(s) as heretofore set forth of each; and the dates and states of incorporation and the names, positions, and addresses of officers, directors, managers of each subsidiary, affiliate, and division.
 
 
 97
 E. Documents * which will indicate (1) each type of customer purchasing natural gas, produced in South Louisiana, from the corporation, its subsidiaries and affiliates and (2) the manner and methods of distribution of such natural gas to each type of customer.
 
 
 98
 F. Documents * which will indicate the following for each of the years 1966 through 1970:
 
 
 99
 1. Total net production of natural gas, in units, in (a) the United States and (b) South Louisiana, by the corporation, its subsidiaries and affiliates.
 
 
 100
 2. Total unit and dollar volume of sales of the total net production of natural gas produced in (a) the United States and (b) South Louisiana, by the corporation, its subsidiaries and affiliates.
 
 
 101
 3. Total dollar volume of sales of the total net production of natural gas produced in South Louisiana by the corporation, its subsidiaries and affiliates to each type of customer identified in Specification E(1) for 1969 and 1970 only.
 
 
 102
 G. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time between January 1, 1962 to December 31, 1970, which contain estimates or evaluations of the volume of natural gas present or recoverable or ultimately recoverable (1) throughout all of South Louisiana (2) throughout all of Offshore South Louisiana and/or (3) in specific fields, portions of fields, leaseholds and/or portions of leaseholds located in Offshore South Louisiana.
 
 
 103
 Excluded from this specification are any documents previously made available to the Commission by the American Gas Association and presently in the custody of Price, Waterhouse & Company, 1801 K Street, Washington, D.C. Included in this specification by way of illustration but not limitation are documents containing estimates or evaluations including re-estimates or reevaluations made in connection with or in preparation for or as the result of the following: (1) bidding on or nominating leases (2) deciding whether to erect permanent platforms (3) compiling or inventorying total company reserves or supply (4) negotiating or contracting for the sale of natural gas, or for the joint or common exploration, development, production, purchase or sale of acreage, or for obtaining bank loans (5) filing depreciation expense schedules with Internal Revenue Service or (6) submitting field-by-field estimates to subcommittees or committees of the American Gas Association or the American Petroleum Institute.
 
 
 104
 H. Documents * indicating any or all of the following with regard to each field and leasehold in Offshore South Louisiana for which estimates or evaluations of the volume of natural gas, pertaining to the whole or a portion thereof, are produced pursuant to Specification G:
 
 
 105
 1. For each such field and portion thereof, its name and the number(s) of each block number comprising said field or portion thereof if the field or field portion is situated at least in part in a portion of a block, the portion of the block as well, e. g., "NW 1/4";
 
 
 106
 2. For each such leasehold and portion thereof, the OSC number and name(s) and location(s) of the field(s) and portion(s) thereof comprising such leasehold or portion thereof;
 
 
 107
 3. The pipeline company(ies) serving each such field, leasehold, or portion thereof;
 
 
 108
 4. The producer(s) and the operator(s) of each such field, leasehold, or portion thereof, indicating the precise interest each such producer and operator has in the acreage;
 
 
 109
 5. For each such field, leasehold and portion thereof, the location (on the map) and designation of each well drilled including (for each such well):
 
 
 110
 a. The current status as classified by the Company, e. g., "dry and abandoned", "temporarily abandoned", "suspended", "shut-in", "service", "producer", etc.;
 
 
 111
 b. Whether classified by the Company as an oil or gas well at the time of (1) application for drilling (2) the filing of each completion report (3) currently;
 
 
 112
 c. The number of reservoirs containing natural gas that have been penetrated by the well;
 
 
 113
 d. The date drilling commenced; the date total depth was reached; first date of testing; first date of testing officially reported; completion date; date commenced producing.
 
 
 114
 I. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time subsequent to January 1, 1962, which refer, analyze, compare, comment on, set forth, and/or relate to any or all of the following:
 
 
 115
 1. Any natural gas estimates or evaluations called for by Specification G; the preparation or completion of such estimates or evaluations; the procedures, criteria or interpretations used in such preparation or completion; the identity of organizational units and personnel of the Company involved in such preparation or completion;
 
 
 116
 2. Any natural gas estimates or evaluations made available to the Commission by the American Gas Association and presently at Price, Waterhouse & Co., or appearing in any American Gas Association Report on Natural Reserves, published subsequent to January 1, 1967, including the constituent categories of these estimates such as "proved reserves", "revisions", "extensions", "new field discoveries", "new reservoir discoveries in old fields"; the preparation or completion of such estimates or evaluations; the procedures, criteria or interpretations used in such preparation or completion; the organizational units and personnel of the Company involved in such preparation or completion;
 
 
 117
 3. Any lease nominations and bids, any agreements for joint or common leasing, exploration, development, production, purchase or sale, or any cash flow or economic feasibility studies preparatory to leasing, exploring, developing, purchasing or selling, which involve Offshore South Louisiana acreage;
 
 
 118
 4. Any compilation, report or study of "dedicated reserves";
 
 
 119
 5. Whether any well designated in response to Specification H 5 contains natural gas in sufficient quantities as to be capable of producing in paying quantities.
 
 
 120
 J. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time subsequent to January 1, 1966, which refer, analyze, compare, comment on, set forth, and/or relate to any or all of the following:
 
 
 121
 1. Any failures or delays, for whatever reason, in reporting proved reserves of natural gas to the American Gas Association, including any failures or delays by personnel of the Association to identify to subcommittee members all fields containing proved reserves;
 
 
 122
 2. The classification or exclusion or inclusion of volumes of natural gas as proved reserves;
 
 
 123
 3. The relationship between increases or decreases of crude oil proved reserves with increases or decreases of associated, dissolved or associated-dissolved natural gas proved reserves;
 
 
 124
 4. Negative revisions to American Gas Association proved reserve estimates because of clerical or mathematical error.
 
 
 125
 K. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time subsequent to January 1, 1962, which refer, analyze, compare, comment on, set forth, and/or relate to any or all of the following:
 
 
 126
 1. The relation between the amount of "proved reserves" and the rate allowed, to be allowed, or that may be allowed for natural gas by the Federal Power Commission;
 
 
 127
 2. The reporting of lower "proved reserve" figures.
 
 
 128
 L. Documents * naming all employees of the corporation, its subsidiaries and affiliates who have, any time since January 1, 1966 with regard to Offshore South Louisiana, estimated, evaluated or enumerated natural gas proved reserves, dissolved gas proved reserves, potential gas supply or well drilling activity either for the American Gas Association, American Petroleum Institute, Potential Gas Committee, American Association of Petroleum Geologists or the International Oil Scouts, including local scout checks, indicating for each person named (1) the association for which he estimated or enumerated (2) whether a member of the association (3) what was estimated or enumerated and (4) the dates for which he estimated or enumerated for the particular association.
 
 APPENDIX B
 
 129
 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
 
 
 130
 _______ NIT
 
 Civil Action No. 1089-73
 FEDERAL TRADE COMMISSION
 
 131
 v.
 
 
 132
 TEXACO, INC.
 
 
 133
 _______ INCCivil Action No. 1090-73
 
 FEDERAL TRADE COMMISSION
 
 134
 v.
 
 STANDARD OIL CO. (INDIANA)
 
 135
 _______ OI
 
 Civil Action No. 1092-73
 FEDERAL TRADE COMMISSION
 
 136
 v.
 
 EXXON CORPORATION
 
 137
 _______ RPO
 
 Civil Action No. 1093-73
 FEDERAL TRADE COMMISSION
 
 138
 v.
 
 SHELL OIL COMPANY
 
 139
 _______ L C
 
 Civil Action No. 1095-73
 FEDERAL TRADE COMMISSION
 
 140
 v.
 
 STANDARD OIL COMPANY OF CALIFORNIA
 
 141
 _______ OI
 
 Civil Action No. 1096-73
 FEDERAL TRADE COMMISSION
 
 142
 v.
 
 MOBIL OIL CORPORATION
 
 143
 _______ L C
 
 ORDER
 
 144
 The Federal Trade Commission ("Trade Commission") having petitioned on June 13, 1973, for enforcement of subpoenas duces tecum issued by an Assistant Director of the Trade Commission's Bureau of Competition to each of the above captioned respondents on November 24, 1971, in the course of a Trade Commission investigation into natural gas reserve reporting procedures (FTC Investigation File No. 7110042); and the respondents having opposed enforcement of said subpoenas, contending that the principles of primary jurisdiction and collateral estoppel preclude the Trade Commission from seeking the demanded documents or data for purposes of determining the validity or accuracy of natural gas reserve estimates, and contending further, inter alia, that certain demands of the subpoenas are irrelevant to any proper subject or area of investigation and are unduly broad and burdensome; and the parties having fully briefed and presented oral argument on the issues; and the Court upon consideration of all the premises, being of the opinion that the Trade Commission is authorized to pursue the investigation to determine whether there exists any evidence of conspiracy in the reporting of proved natural gas reserve estimates to the American Gas Association by respondents, but that the subpoenas duces tecum are improper insofar as they seek data for the purposes of enabling the Trade Commission to attempt to determine natural gas reserves or the validity or accuracy of natural gas reserve estimates, matters already considered and ruled upon by the Federal Power Commission, and the Court being of the further opinion that the subpoenas are improper in other respects as well and should not be enforced as issued:
 
 It is now therefore ordered:
 
 145
 1. Enforcement of specifications A, B, C, D, E, and F of the subpoenas duces tecum is hereby granted. Enforcement of specifications G, H, I, J, K, and L is hereby denied except as provided below.
 
 
 146
 2. Respondents shall produce documents as called for by specifications G, H, and I of the subpoenas duces tecum for the years 1969, 1970 and 1971, subject to the following modifications and limitations:
 
 
 147
 (a) Production shall be limited to documents containing or underlying proved natural gas reserve estimates. Raw filed data, bid calculation data, and bid calculation files are not required to be produced. As regards underlying back-up data for each estimate called for by specification G, only the immediate data used to make the estimate need be submitted. For estimates arrived at volumetrically, specification I(1) will be satisfied by supplying all the underlying numbers which were used in the formula including the recovery factor and the size of the reservoir(s). As for the estimates arrived at by pressure decline curves, specification I(1) will be satisfied by submitting the curve used.
 
 
 148
 (b) Production of documents shall be made with respect only to a random sample of 100 of those offshore Southern Louisiana fields which were included in reports for 1971 by the Southern Louisiana Subcommittee of the American Gas Association Committee of Natural Gas Reserves. This random sample shall be selected by a procedure agreed upon between Trade Commission and respondents.
 
 
 149
 (c) Each respondent shall make production with respect to the fields, selected in the manner described in paragraph 2(b), in which it had an ownership interest as of the date reports were submitted by the Southern Louisiana Subcommittee of the American Gas Association Committee of Natural Gas Reserves.
 
 
 150
 (d) All production ordered pursuant to this paragraph 2 shall be made for the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates, and not for the purpose of permitting the Trade Commission to investigate or determine the amount of proved natural gas reserves.
 
 
 151
 3. Respondents shall produce documents as called for by specifications J and K of the subpoenas duces tecum, subject to the following modifications and limitations:
 
 
 152
 (a) Production shall be limited to documents relating to proved natural gas reserve estimates in those offshore Southern Louisiana fields which were included in reports for 1971 by the Southern Louisiana Subcommittee of the American Gas Association Committee of Natural Gas Reserves.
 
 
 153
 (b) Production shall be limited to documents prepared or dated during the years 1966 through 1971, inclusive, which were exchanged between or among, or constitute, contain or refer to any agreement, arrangement or communication between or among, respondent or others, including the American Gas Association.
 
 
 154
 4. Respondents shall produce documents as called for by specification L, except production shall be limited to the employees who have acted with respect to proved natural gas reserve estimates for offshore Southern Louisiana during the year 1966 through 1971, inclusive.
 
 
 155
 5. In complying with this Order, the definition of terms contained in the original subpoenas duces tecum shall apply.
 
 
 156
 6. Respondents shall comply with this Order within 180 days after the date upon which they are advised of the sample fields selected in accordance with paragraph 2(b) hereof.
 
 
 157
 7. Each respondent shall have the option of producing documents called for by this Order at the corporate office or field location where the responsive documents are normally maintained or at the Federal Trade Commission's offices in Washington, D.C. With respect to documents as to which any respondent elects to make production at a corporate office or field location, the Trade Commission shall inspect and reproduce any of said documents at such office or field location at, such other location as agreed upon by the respective parties, and shall bear any costs of reproduction or copying which the Trade Commission may require or desire.
 
 
 158
 8. Any document produced under this Order which contains confidential information may be designated as being confidential by the respective respondents, in which event all documents so designated shall be subject to the following protective treatment:
 
 
 159
 (a) Documents designated as confidential by a respondent shall be deposited with and be maintained by a custodian who shall be the Secretary of the Commission. Unless and until otherwise ordered by the Court upon due notice to all affected parties documents so designated may be inspected only at the depository location and only by employees of the Trade Commission officially assigned to the Trade Commission's investigation entitled "File No. 711 0042." Said documents shall be used only in connection with said investigation, and said employees shall not suffer or permit disclosure or copying of any such document, or any portion thereof, or any information contained therein to any other person.
 
 
 160
 (b) Unless and until otherwise ordered by the Court upon due notice to all affected parties, documents designated confidential under this Order shall remain in custody of the Custodian and neither the documents nor any copies thereof shall be removed from such custody.
 
 
 161
 (c) At the conclusion of the Trade Commission's investigation pursuant to which such confidential documents have been produced, all documents so designated as confidential, together with all copies thereof, shall be returned to the respective respondent unless the Trade Commission seeks and obtains an order of the Court providing otherwise.
 
 
 162
 (d) The protective provisions of this Order shall be deemed to apply to the Trade Commission, to the individual Commissioners of the Trade Commission and to all persons in the employ of the Trade Commission; sanctions for violation of any provision of this Order may be imposed on the Trade Commission, or any person who violates any provision of this Order.
 
 
 163
 9. The Court reserves its ruling as to any and all matters, contentions or issues not specifically disposed of by this Order. Jurisdiction over these proceedings is retained for the purposes of providing other and further relief as necessary.
 
 
 164
 So ordered this 22nd day of March, 1974.
 
 
 165
 /s/ George L. Hart Jr.
 
 
 166
 /s/ Chief Judge
 
 APPENDIX C
 
 167
 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
 
 Civil Action No. 1091-73
 FEDERAL TRADE COMMISSION
 
 168
 v.
 
 SUPERIOR OIL COMPANY
 ORDER
 
 169
 Upon consideration of the Federal Trade Commission's petition for enforcement of a subpoena duces tecum, the matter having been fully briefed and argued before the Court, and the Court being advised in the premises, it is this 22nd day of March, 1974,
 
 
 170
 ORDERED, That the respondent, The Superior Oil Co., Inc., shall comply, within 180 days from the date on which this Order becomes final, with Specifications A through F and K through L of the subpoena, provided that Specifications A, B. D. E and F may be complied with by submitting a verified written statement by an officer of the Company containing the requested information in lieu of the documents specified, and it is
 
 
 171
 FURTHER ORDERED, That as to the respondent, The Superior Oil Co., Inc., Specifications G through J of the subpoena be, and the same hereby are, denied enforcement and quashed; and it is
 
 
 172
 FURTHER ORDERED, That any document produced under this Order which contains confidential information may be designated as being confidential by the respondent, in which event all documents so designated shall be subject to the following protective treatment:
 
 
 173
 (a) Documents designated as confidential by a respondent shall be deposited with and be maintained by a custodian who shall be the Secretary to the Commission. Unless and until otherwise ordered by the Court upon due notice to all affected parties documents so designated may be inspected only at the depository location and only by employees of the Trade Commission officially assigned to the Trade Commission's investigation entitled "File No. 711 0042." Said documents shall be used only in connection with said investigation, and said employees shall not suffer or permit disclosure or copying of any such document, or any portion thereof, or any information contained therein to any other person.
 
 
 174
 (b) Unless and until otherwise ordered by the Court upon due notice to all affected parties, documents designated confidential under this Order shall remain in custody of the Custodian and neither the documents nor any copies thereof shall be removed from such custody.
 
 
 175
 (c) At the conclusion of the Trade Commission's investigation pursuant to which such confidential documents have been produced, all documents so designated as confidential, together with all copies thereof, shall be returned to the respondent unless the Trade Commission seeks and obtains an order of the Court providing otherwise.
 
 
 176
 (d) The protective provisions of this Order shall be deemed to apply to the Trade Commission, to the individual Commissioners of the Trade Commission and to all persons in the employ of the Trade Commission; sanctions for violation of any provision of this Order may be imposed on the Trade Commission, or any person who violates any provision of this Order.
 
 
 177
 The Court reserves its ruling as to any and all matters, contentions or issues not specifically disposed of by this Order. Jurisdiction over these proceedings is retained for the purposes of providing other and further relief as necessary.
 
 
 178
 SO ORDERED THIS 22 DAY OF MARCH, 1974.
 
 
 179
 GEORGE L. HART, JR.
 
 
 180
 George L. Hart, Jr.
 
 Chief Judge
 
 181
 _______ f J
 
 LEVENTHAL, Circuit Judge, concurring:
 
 182
 I concur fully in Chief Judge Bazelon's majority opinion. I write separately to record another strand of doctrine that supports the court's judgment. In substantial if elusive measure the District Court projected the defense contention that the FTC is collaterally estopped from investigating certain matters because of a prior determination by the FPC in the course of ratemaking. In my view the whole doctrine of preclusive effect, whether cast as collateral estoppel or res judicata, is inapplicable to the conclusion of an agency exercising such a legislative function as ratemaking, Arizona Grocery Co. v. Atchison, Top. and Santa Fe Ry. Co., 284 U.S. 370, 389, 52 S.Ct. 183, 76 L.Ed. 348 (1932); 2 K. Davis, Administrative Law Treatise, § 18.08 at 597 (1958). The doctrines of res judicata and collateral estoppel preclude litigation of an issue even though a "wrong" result was reached the first time. But the Federal Power Commission itself would not have been precluded from changing its mind concerning reserves if it had started a new ratemaking investigation, and would not be precluded from starting a new investigation to consider whether it should change its mind or method.
 
 
 183
 In recent years, I am aware, notions of res judicata and collateral estoppel have been extended as to administrative proceedings. See Cartier v. Secretary of State, 165 U.S.App.D.C. 130, 135 n. 3, 506 F.2d 191, 196 n. 3, cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1974). Authoritative doctrine, however, still retains the concept that such preclusive effect is to be accorded determinations "in a judicial capacity." United States v. Utah Construction Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). The need for finality with respect to appraisal of an event that has passed outweighs any desire the agency may have to change its policies for future rulings.
 
 
 184
 Different considerations emerge, and a different balance is struck, when an agency exercises an essentially legislative function like ratemaking, especially the kind of broad area ratemaking lately conducted by the Federal Power Commission. The agency must remain free "to adapt (its) rules and policies to the demands of changing circumstances." Permian Basin Area Rate Cases, 390 U.S. 747, 784, 88 S.Ct. 1344, 1369, 20 L.Ed.2d 312 (1968). Changes may occur not only in objective circumstances but in the way the agency perceives the critical facts, whether, say, service life of equipment, or calculations of gas reserves. With such legislative activity focused primarily prospectively, the need for flexibility outweighs any interest in repose. Thus, the Supreme Court has repeatedly held that an individualized ratemaking is not res judicata.[1] The pertinent considerations are multiplied when what is involved is the kind of broad ratemaking now conducted by the FPC, an approach approved in Permian Basin, and now used with rulemaking procedures.[2]
 
 
 185
 Of course, the Rule of Administrative Law restrains agencies from "arbitrarily" or "capriciously" reopening earlier determinations and reaching new results. An agency changing its course must be able to explain its departure from prior policy. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Some comparable doctrine may be fashioned to prevent arbitrariness even when a second agency is involved. Whether a determination has been arbitrary is an entirely different question, however, from whether inquiry has been precluded by a prior determination that is binding. The FTC, in the exercise of its functions and responsibilities, has only begun to seek out the relevant facts. One cannot possibly say that it is acting unreasonably in beginning its examination. The opinion of Chief Judge Bazelon effectively establishes that conclusion.
 
 
 186
 WILKEY, Circuit Judge, with whom joined MacKINNON, Circuit Judge, dissenting:
 
 
 187
 This litigation is an outgrowth of a Federal Trade Commission (FTC) investigation into the reporting of natural gas reserves by natural gas producers in Southern Louisiana:[1] The issues concern the District Court's action in modifying and enforcing the Trade Commission's subpoenas.
 
 
 188
 We see the issues in this case quite differently from the majority. Fundamentally, our colleagues state the issues and write as if the court were reviewing directly the action of the Trade Commission in issuing these subpoenas. We are not. We are reviewing the action of a District Court in modifying and enforcing those subpoenas. It is the validity and reasonableness of the District Court's action which we judge. What we review and the standards we employ are determined by that.
 
 
 189
 The District Court modified the subpoenas in two principal ways: (A) limiting the material to be produced to any and all material containing data on proved reserves and their reporting; and (B) limiting the use of the data to purposes other than establishing the accuracy of the proved reserve figures, such estimates having been established for the same time period by three separate investigations of the Federal Power Commission.
 
 
 190
 In so modifying and enforcing the subpoenas the District Court acted on three separate and independent grounds: (1) relevance of the data sought to the purpose of the Trade Commission investigation, the reporting of proved gas reserves (applicable to the content or production limitation); (2) burdensomeness of producing material already twice or thrice furnished before (applicable to both the content and use limitations); (3) administrative collateral estoppel as to one finding of fact, the accuracy of the proved reserve figures, already made by the agency primarily responsible, the Federal Power Commission (applicable to the use limitation).
 
 
 191
 The first two grounds are essentially factual, within the sound discretion of the District Court, and must be respected unless clearly erroneous. The third ground is a question of law, initially for determination by the District Court.
 
 I. THE FACTS, THE ISSUES, AND THE ARGUMENTS
 A.
 
 192
 The American Gas Association (AGA) is a trade association of producers, distributors, and marketers of natural gas. Through its Committee on Natural Gas Reserves, the AGA has since 1946 been providing the industry, the Government, and the general public with annual estimates of the proved natural gas and natural gas liquid reserves of the United States.[2]
 
 
 193
 In May 1969 when the AGA reported its 1968 figures, they indicated a decline in proved reserves nationally, the first such decline ever reported. Before the year 1969 was out, this and other information reaching the Federal Power Commission (FPC) prompted a reopening of its just-concluded Southern Louisiana Area Rate Proceeding.
 
 
 194
 In late 1970 the Federal Trade Commission began an investigation into the reporting of natural gas reserves in Southern Louisiana. On 3 June 1971 the investigation achieved more formal status when the Trade Commission issued a resolution authorizing the use of compulsory process in furtherance of a nonpublic investigation. From the beginning of the investigation the AGA cooperated with the Trade Commission on a voluntary basis. As a result the Commission was able to obtain the field-by-field estimates of proved reserves made by each Southern Louisiana subcommittee member for the years 1966 through 1970.[3] The Commission also obtained reserve information from Form 15 reports filed with the Federal Power Commission. These reports are filed by interstate natural gas pipelines and list recoverable saleable gas reserves committed to, collected by, or held by reporting pipelines.
 
 
 195
 Approximately one year after beginning its investigation, on 24 November 1971, the Commission staff issued identical administrative subpoenas duces tecum to eleven natural gas producers. All eleven producers moved to quash the subpoenas. Following the Commission's denial of the motions, the Trade Commission's staff, after negotiations with the gas producers, offered additional safeguards for confidentiality of the information to be supplied. As a result two producers agreed to comply fully with the subpoenas and one agreed to comply in part. Soon after petitions for enforcement were filed in the District Court, one more firm agreed to comply with the subpoena.
 
 
 196
 Petitions for enforcement of the remaining subpoenas were filed in the District Court on 4 June 1973. The two orders here under review were filed on 22 March 1974. One order covered the subpoenas issued to appellees Texaco, Inc., Standard Oil Co. (Indiana), Shell Oil Co., Exxon Corp., Standard Oil Co. of California, and Mobil Oil Corp. (hereinafter the "Six-Company Order") and enforced specifications A through F and K through L in full.
 
 
 197
 During the hearings held on 30 July and 13 December 1973, the District Court found the subpoenas to be overly broad and unduly burdensome because they sought to duplicate investigations of the Federal Power Commission which had already resulted in a finding that AGA proved reserve estimates were valid and accurate. As a result, specifications G through I were modified so that raw field data, bid calculation data, and bid calculation files need not be produced.[4] However, all documents, wherever located, containing or underlying proved reserve estimates in the Southern Louisiana area are to be produced under the District Court's order.
 
 
 198
 The court, in an attempt to make the subpoenas less burdensome, limited production of the documents called for by specifications G through I to a random sample of 100 out of the approximately 225 relevant fields and to the years 1969, 1970, and 1971. Specifications J, K, and L were also modified so that only documents relating to proved natural gas reserve estimates in the offshore Southern Louisiana area need be submitted. The court, however, enforced the subpoena as regards any documents prepared between 1966 and 1971, inclusive, "which were exchanged between or among, or constitute, contain or refer to any agreement, arrangement or communication between or among, respondents or others, including the American Gas Association." Finally, the subpoenas were modified so that additional protections were afforded to confidential information and the producers were accorded the option of producing records for inspection where they were stored.
 
 B.
 
 199
 Because the producers have not cross-appealed, the issues before us relate solely to those limiting modifications fashioned by the District Court which were not subsequently accepted by the Trade Commission and the producers in their field stipulations. Those issues, in the order we will deal with them, are as follows:
 
 
 200
 1. Did the District Court abuse its discretion under the relevance standard of United States v. Morton Salt Co.,[5] in refusing to order the production of documents which did not relate to estimates of proved reserves? In other words, was the District Court's finding that documents related to non proved reserve estimates (e. g., raw field data and bid files) were not "reasonably relevant" to the investigation described in the FTC's resolution of 3 June 1971 a clearly erroneous finding? (a relevance issue an essentially factual determination for the District Court)[6]
 
 
 201
 2. Considering the purpose of the Power Commission's investigation and the FPC's previous factual determination that AGA proved reserve data was reasonably reliable for ratemaking purposes,[7] would the effort and expense involved in producing documents so that the FTC could determine for itself the validity and accuracy of all natural gas reserve estimates (proved or unproved) have imposed an unfair and unreasonable burden on the producers? If so, did the District Court abuse its discretion in (1) limiting enforcement of the subpoenas to documents containing or underlying proved reserve estimates and (2) restricting use of the documents to an investigation of an alleged conspiracy in the reporting of natural gas proved reserve estimates? (a burdensomeness issue a determination within the sound discretion of the District Court)
 
 
 202
 3. Was the District Court in error in refusing to permit the Trade Commission to use the documents called for by specifications G through I "to investigate or determine the amount of proved natural gas reserves," i. e., in ordering this production "for the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates. . . ."[8] (the administrative collateral estoppel issue a question of law initially for the District Court)
 
 
 203
 4. Did the District Court abuse its discretion in:
 
 
 204
 a. limiting the production of documents called for under specifications G through I to a random sample of fields in which the producers "had an ownership interest as of the date reports were submitted by the Southern Louisiana Subcommittee of the (AGA)" for the years 1969, 1970, and 1971?[9]
 
 
 205
 b. limiting the production of documents called for under specifications J and K to ". . . documents relating to . . . estimates . . . which were included in reports for 1971 by the Southern Louisiana Subcommittee of the (AGA)" and ". . . prepared or dated during the years 1966 through 1971, inclusive, (and) which were exchanged between or among, or constitute, contain or refer to any agreement, arrangement or communication between or among, (the producers) or others, including the (AGA)"?[10]
 
 
 206
 c. permitting documents to be produced for inspection at their situs?[11]
 
 
 207
 d. attaching conditions to disclosure to insure confidentiality?[12]
 
 
 208
 e. allowing the producers ". . . 180 days after the date upon which they are advised of the sample fields selected . . ." in which to comply with the subpoenas?[13]
 
 
 209
 5. Was the District Court in error, under the relevance standard of United States v. Morton Salt Co.,[14] in affording Superior Oil Co. differing treatment?[15] (a relevance issue an essentially factual determination for the District Court).
 
 C.
 
 210
 Before embarking on our analysis of these issues we will briefly summarize the arguments of the parties. The producers have never quarreled with the power or the right of the Federal Trade Commission to investigate the natural gas industry to uncover violations of the antitrust laws or unfair trade practices. However, they do argue that there can be no possible reason for wanting documents that do not relate to proved reserve estimates simply because it is only proved reserve estimates that are taken into account by the Federal Power Commission in setting area rate ceilings and it is only proved reserve estimates that are reported to the AGA and then, through the AGA, to the public. Alternatively, the producers argue that the Federal Power Commission, the only agency possessing the requisite expertise, has determined that AGA proved reserve data are accurate. Therefore, the FTC is collaterally estopped from relitigating this one issue of fact.
 
 
 211
 The Trade Commission, on the other hand, points out that there is no provision in the Federal Trade Commission Act (FTCA) excepting gas producers from the coverage of the Act, as there is for banks and certain common carriers, and that therefore jurisdiction to investigate exists. They argue that such jurisdiction is broad, "reaching not only existing violations of . . . (the Sherman and Clayton Acts), but trade practices which conflict with their basic policies."[16] The Trade Commission goes on to argue that, as a factual matter, its investigation does not duplicate studies made by the Federal Power Commission and that, even if it did, collateral estoppel would be inapplicable because its purpose in determining the accuracy of reserve data is different from the Power Commission's purpose in determining accuracy.
 
 
 212
 Although the producers are correct in arguing that data relating to any reserves other than proved reserves would not be "reasonably relevant"[17] to the investigation defined by the Trade Commission's resolution of 3 June 1971 (and that this part of the District Court's order could properly be supported on relevance grounds alone), it is not clear from the transcript of the 13 December 1973 hearing whether the District Court reached the issue of relevance in regard to all documents subpoenaed. Since the Trade Commission had subpoenaed all reserve records so that it could determine independently the total gas reserves of the area, and since the Power Commission had already determined that the AGA figures were accurate, the court apparently was of the view that the Trade Commission was collaterally estopped from forcing the producers to relitigate this matter, and that therefore it was unnecessary to reach the issue of relevance for all documents. In any event, it seems clear that the District Court also felt that it would be unduly burdensome to permit yet another plenary investigation (for the third time in two years) of natural gas reserves.[18]
 
 
 213
 Thus, there are three independent grounds for affirming the District Court's most important limiting modifications:[19] relevance (issue 1 supra ), burdensomeness (issue 2 supra ), and administrative collateral estoppel (issue 3 supra ). For the sake of clear analysis, we will attempt to keep these three grounds separate as we now proceed to a discussion of the issues.[20]
 
 
 214
 II. THE FEDERAL POWER COMMISSION INVESTIGATIONS
 
 
 215
 First, we turn to the District Court's determination that, for the years covered by the Trade Commission's subpoena, the Federal Power Commission had already (1) considered and ruled upon the validity and accuracy of natural gas reserve data, and (2) determined natural gas reserves.[21] The majority opinion implicitly agrees with this District Court finding, but some development of this point is necessary, as it forms the background of the whole case.
 
 
 216
 Although the Power Commission began area rate proceedings in 1961 for the Southern Louisiana area, it was not until 1968 that the Commission rendered a final decision, which in turn was modified in early 1969. Even before oral argument could be heard before the Fifth Circuit on petitions for review sought by producers, pipeline companies, and consumers, the FPC had instituted new proceedings (So La II ) "to reconsider all major actions it had taken" in the prior proceedings.[22] As the FPC stated in its order instituting So La II, Phase I of its new proceeding solicited ". . . evidence with respect to the adequacy of gas supply and adequacy of service to consumers, the demand for gas, the gas shortage, if any, the effect of price on gas supply and demand, and other relevant economic evidence. . . ."[23]
 
 
 217
 The FPC was concerned in So La II with complaints that adequate supplies of natural gas were not being produced and would not be produced under the recently ordered area rate ceilings. More important for present purposes, the FPC during So La II was presented with the argument by Municipal Distributors Group (MDG), an intervenor which represented the interests of municipal and other publicly owned gas distribution systems, that the supply shortage was more apparent than real. It was argued that "the sharp decline in the supply picture in 1968-69 is revealed by the above record evidence to be caused . . . largely by revisions in the estimates" of proved reserves reported by the AGA.[24] Such a contention went to the heart of the Power Commission investigation. If it were true that the decline in reserves was a matter of definition and not of economics, the concern of the FPC that new area rates might be required to encourage production would be obviated.
 
 
 218
 In its final opinion in So La II the FPC discussed testimony which was used by MDG to impeach AGA data. The testimony outlined several methods by which producers could withhold reserves from the AGA. Discussed also were MDG's arguments relating to discrepancies between figures gathered by the FPC and those submitted by the AGA. Additionally, the FPC referred in some detail to the testimony and exhibits supporting the reliability of AGA data.[25] As a result, it reached the following conclusions:
 
 
 219
 AGA and Form 15 data show similar trends of reserves and reserve-to-production (R/P) ratios. AGA data indicates a steady decline in the national R/P ratio from 19 in 1963 to 13 in 1969. Form 15 data indicates a similar decline in the national R/P ratio from 20 in 1963 to 14 in 1969. The American Gas Association reserve data is not impeached, in our opinion, in this discrepancy.[26]
 
 
 220
 For the reasons stated herein, we find the AGA reserve data is reasonably reliable for the purposes used herein. Accordingly, and because petitioner has not raised any new evidence, we deny the petition to reopen.[27]
 
 
 221
 In other words, while in 1963 AGA data started with nineteen years of reserves and the Form 15 data started with twenty years of reserves, by 1969 each calculation had dropped 6 years of reserves off its proved reserve figure, so the two calculations were comparable. Other substantial corroborating evidence, including the fact and extent of pipeline curtailments of gas service, was received and considered by the FPC during So La II.[28] Thus, AGA data was shown to be reliable.
 
 
 222
 The underreporting issue was again raised on review before the Fifth Circuit and received the following extensive rebuttal in a footnote:
 
 
 223
 . . . Standing virtually alone against the National (and record) judgment of a near energy calamity, the American Public Gas Association (APGA) contends that the current critical shortage of natural gas is but a pretextual "cry of wolf" calculated to mislead FPC into establishing artificially high rates in the producers' behalf. APGA would have us believe that the energy crisis is a mirage indeed, a hoax! APGA claims that "there appear to be adequate supplies of gas in the domestic United States to satisfy the projected demands of U.S. consumers well into the 21st Century." APGA Supp. Brf. at 5 n. 9. But to talk of "Supplies" of gas is a misleading oversimplification. Obviously, the gas is not presently available. At most, if there is appropriate exploration, the demonstrable reserves may be exploited to meet the needs. Given a system which depends on private stewardship and marshalling of natural resources, there is a supply shortage if the producers do not produce. FPC has the statutory duty, not only to guard the consumers against super-profits reaped from artificially inflated rates, but also to protect consumer interests by making sure that the rate schedule is high enough to elicit an adequate supply. It is a delicate balancing test. FPC must fix its course to attain the utopian "optimum" rate schedule. Given the current shortage of available supply FPC must swing the pendulum towards the incentive, supply-eliciting side of rates. And so it has done.[29]
 
 
 224
 In addition to the examination undertaken in relation to the So La II proceedings, the Power Commission undertook in early 1971, at the direction of Congress, a National Gas Survey, a portion of which was the National Gas Reserves Study (NGRS). The NGRS was a completely independent survey of reserves and did not rely on AGA figures at any point. However, in the final staff report of the NGRS (issued May 1973) a comparison was made with AGA figures:
 
 
 225
 The NGRS estimate is lower than the estimate by A.G.A.; however, the difference is less than 10 percent. The difference of 23.5 Tcf between the estimate of the non-associated and associated gas reserves for the 6,358 entries in the reported fields category (a) is the primary difference between the total estimates. The gas reserves in the "A.G.A. omitted fields" are a relatively insignificant part in the total NGRS estimate, and it seems evident that the 62 entries in the "omitted" category (b) are small fields. The two dissolved gas estimates differ by 1.7 Tcf or by about 5 percent.[30]
 
 
 226
 Thus, this independent study concluded that, if anything, AGA proved reserve estimates overstated the true picture.
 
 
 227
 In these Power Commission investigations the FPC necessarily analyzed and checked the AGA reserve data in So La I and So La II, the FPC considered the data offered by the Municipal Distributors Group to impeach the AGA data and found that this data (derived from the regular Form 15 reports) confirmed rather than contradicted the AGA data, all of which was reviewed by the Fifth Circuit and the Supreme Court. Then separately and in addition to the above, the Power Commission made, in 1971-73 at the request of Congress, a completely independent analysis, not relying on AGA data in any way, called the National Gas Reserves Study, which concluded that proved gas reserves were actually somewhat less than calculations based on the AGA figures showed.
 
 
 228
 While the analyses of the FPC in the So La I and So La II proceedings were made for ratemaking purposes, the National Gas Reserves Study was not. And in both instances the Power Commission made findings of fact on the precise issue (accuracy of reported reserves) which the Trade Commission now seeks to relitigate. Hence the District Court made the factual determination that the Power Commission had already (1) considered and ruled upon the validity and accuracy of natural gas reserve estimates and (2) determined natural gas reserves. The District Court's finding of fact should not be confused with the question of law which necessarily followed, whether it was appropriate to give this finding of fact collateral estoppel effect, which we explore in section VI, infra.III. COURT ENFORCEMENT OF ADMINISTRATIVE SUBPOENAS
 
 
 229
 A. Court Enforcement of Administrative Subpoenas
 
 
 230
 The Trade Commission and a majority of this court apparently would have us proceed as if there were on appeal here an order of the Trade Commission, entitled to deference as an exercise of that agency's expertise.
 
 
 231
 To the contrary, this is an appeal from orders of the District Court enforcing the Commission's subpoena with some limiting modifications. Accordingly, it is not the views of the Commission staff which must be accorded deference, but the determinations of the District Court which must be upheld unless clearly erroneous or an abuse of discretion.
 
 
 232
 There are limits to the subpoena power of an administrative agency, and the duty and authority to enforce those limits rests in our federal district courts. As the Ninth Circuit has stated,
 
 
 233
 There is no rule requiring a court to act against conscience. The proceeding (judicial enforcement of administrative subpoenas) is equitable in character. Equitable considerations should prevail. There is no power to compel a court to rubberstamp action of an administrative agency simply because the latter demands such action.[31]
 
 
 234
 By arguing as if it had been denied the ability to proceed with its investigation, and by arguing that its subpoena must be enforced unless "the evidence sought is plainly irrelevant to any purpose within (its) statutory authority . . .,"[32] the Trade Commission demonstrates that its real purpose is to strip the federal judiciary of any discretion in subpoena enforcement proceedings. Ironically, the District Court's order here enforces the FTC's subpoena as to the great preponderance of the documents sought, and even specifically preserves the FTC's ability to obtain further documents and information.[33] Consequently, the majority's failure to sustain the District Court in its reasonable limitations of the FTC's subpoena may have exactly the precedential effect desired by the Trade Commission. By stripping the District Court, which has reviewed countless submissions and has held two full days of hearings, of any discretion in enforcing this FTC subpoena, our colleagues have totally undermined the concept of judicial enforcement of administrative subpoenas.
 
 
 235
 The Supreme Court has announced repeatedly the principles which should guide a district court in deciding the lawfulness of investigative subpoenas issued by administrative agencies:
 
 
 236
 The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable. . . .
 
 
 237
 (T)he requirement of reasonableness . . . comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, . . . this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes, and scope of the inquiry.[34]
 
 
 238
 It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.[35]
 
 
 239
 More specifically, in United States v. Morton Salt Co., in the context of a Trade Commission investigatory proceeding, the Supreme Court wrote,
 
 
 240
 Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. . . . But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.[36]
 
 
 241
 In addition, the Court has made clear that these "issues of . . . relevancy of the materials sought, and breadth of the demand are neither minor nor ministerial matters."[37] They are, instead, matters which require the exercise of sound discretion on the part of a district court and matters which raise questions essentially factual in nature. Accordingly, we, at the appellate level, must defer to the determinations of the District Court unless we find those determinations clearly erroneous or an abuse of discretion.[38]
 
 
 242
 In a recent opinion affirming the order of a district court enforcing another Trade Commission subpoena, this court correctly stated the standard of appellate review applicable to a district court's determinations of relevance:
 
 
 243
 A finding by the district court that documents are relevant and necessary to an inquiry by the FTC is essentially factual in nature and cannot be overturned unless the district court's finding is clearly erroneous.[39]
 
 
 244
 We point out in Part IV.A., infra, how the majority has ignored and evaded this established standard and any other appellate standard of judicial review. Similarly, in NLRB v. Northern Trust Co., the Seventh Circuit has written,
 
 
 245
 We agree that the courts are not mere rubber stamps and that subpoenas are in the District Court's discretion, but we fail to see how that helps appellants. It seems to us to have the opposite effect, for here the court after a very thorough and careful inquiry granted the Board's request for enforcement. Thus appellants are in the unenviable position of sustaining the great burden of showing an abuse of discretion. They have failed to do so. The facts of the case insofar as the Board knew them at the time of the application and the materiality of the evidence sought were brought out before the trial judge, who concluded that the documents which the Board wanted to be produced were relevant. We are not willing to disturb his holding, because we do not think any abuse of discretion was involved.[40]
 
 
 246
 Thus, we are left to decide in the instant case whether the District Court abused its discretion, under the reasonably relevant standard of United States v. Morton Salt Co., by refusing to enforce those portions of the subpoenas that called for documents which did not relate to estimates of proved reserves. In other words, was the District Court's finding that only documents related to proved reserves were "reasonably relevant" to the FTC's investigation a clearly erroneous finding? We conclude that it was not and that the District Court acted well within the bounds of its discretion.
 
 IV. RELEVANCE
 
 247
 A. Purpose of Inquiry, Test of Relevancy, and Standard of Judicial Review
 
 
 248
 The requirement that documents sought by an agency must be "reasonably relevant" to a lawful investigative purpose constitutes the fundamental limitation on administrative subpoena power. The most astonishing point about the majority opinion's discussion of "relevance" is that nowhere therein does it define the FTC's "purpose" in the investigation, nor does it purport to employ a standard of appellate review which is legally definable.
 
 
 249
 "Relevance" simply cannot be determined in the absence of defined "purpose," whether that purpose be as sharply defined as in a criminal trial, less precisely delineated as in a civil proceeding, or more generally defined as in a grand jury inquiry or in an administrative agency investigation as here.[41] In all situations, purpose in some degree must be defined in order that notice be given and relevance thereafter may be assessed.
 
 
 250
 This is the reason for the Administrative Procedure Act requirement[42] that an agency state the purpose of its proposed investigation at the very outset, to give notice to objects of the investigation and all other interested parties, and to set a standard by which the relevance of the agency's demands for tangible evidence and testimony, as well as other actions, may be judged. Without such a requirement for a defined and announced purpose the Federal Trade Commission or any other of our regulatory agencies would speedily metamorphosize into the "Roving Commission." In seeking to ascertain the actual purpose of the FTC's investigation, the District Court here understandably looked beyond the FTC's authorizing resolution, for, as written, this broad resolution could have authorized a subpoena covering virtually any information relating to appellees' oil and gas business. And the majority here never came any closer to defining the purpose and scope of the FTC inquiry than this.
 
 
 251
 Where the agency's statement of purpose is not sufficient to permit a relevance determination, the courts may refuse enforcement.[43] Or, even if the statement is somewhat obscure, the court may seek to clarify and determine for itself the agency's actual purpose, as the District Court did here.[44] As written, the resolution certainly furnished no meaningful criteria for measuring the relevance of the data sought.[45] Forced to seek clarification from other sources the District Court asked Trade Commission counsel to define the purpose of the Agency's investigation. He responded as follows:
 
 
 252
 (FTC COUNSEL): . . . (W)hat we are investigating is possible collusive conduct by the natural gas producers in the reporting of these reserves.
 
 
 253
 . . . .NSE
 
 
 254
 (FTC COUNSEL): . . . What we want to find out is whether or not in reporting natural gas reserves there has been collusive conduct in the way these estimates are prepared.
 
 
 255
 THE COURT: Reporting them to whom.
 
 
 256
 (FTC COUNSEL): All right. Reporting them to the American Gas Association, because the American Gas Association data is the only available published data on these reserves.[46]
 
 
 257
 In addition, the FTC previously had made the following significant representation to Congress:
 
 
 258
 The subpoena (issued on 24 November 1973) focused on Offshore South Louisiana and revolved around one central premise which is that natural gas producers, for a variety of reasons, make estimates of proven gas reserves. . . .
 
 
 259
 The theory of the investigation is to compare the reserve estimates used by the companies in their internal purposes with the estimates submitted to the American Gas Association that were relied on by the Federal Power Commission. In other words the investigation was not attempting to make new estimates of the proved reserves in South Louisiana but was instead attempting to get at reserve estimates already prepared.[47]
 
 
 260
 It seems clear from these sources that the central purpose of the FTC investigation was to compare proved reserve estimates kept by the companies with the proved reserve estimates reported to the AGA. Moreover, since only proved reserves are reported to the AGA and since AGA data is the only published reserve data available, it followed that speculative estimates of possible, potential, or other unproved reserves (e. g., the reserve estimates typically found in raw field data or bid files) could have no relevance to the FTC's investigation into whether in the reporting of natural gas reserves there had been collusive conduct in the way these proved reserve figures were prepared.
 
 
 261
 The District Court was clearly of this opinion, and because this factual determination was well-founded in both logic and evidence, we do not understand how a majority of this court could find it to be clearly erroneous. Likewise, we do not understand how the District Court could have abused its discretion in limiting enforcement of the subpoenas to documents containing or underlying proved reserve estimates. By the Trade Commission's own admissions, before the District Court, in briefs to the court,[48] and in representations to Congress, these were the only documents relevant to the Trade Commission's investigation.[49]
 
 
 262
 Of course, the majority does not determine the District Court's finding to be "clearly erroneous," nor did it find an "abuse of discretion." By these accepted tests the trial court action could not possibly be upset. What the majority does do is to brush aside the accepted legal standards of appellate review. In so doing it wriggles and twists to avoid applying the proper standard of judicial review by claiming "(h)ere, however, the district court's relevance determinations rested upon and, indeed, were inseparable from its view of the applicable law with respect to the proper scope of the FTC's investigation."[50] After the factual inquiry made by the District Court of FTC counsel, after the FTC's representations to Congress, it is clear that the trial court's determination of the purpose of the FTC investigation was made as a factual matter, not a legal determination. ("Tell me what you are trying to do. I don't understand the resolution.")[51] The FTC resolution, the FTC counsel's answers to questions, the FTC statements to Congress (notes 47 and 49, supra ), all are evidentiary facts as to the Commission's stated purpose of its inquiry.
 
 
 263
 A most basic flaw in the majority's analysis concerns their characterization of this inquiry by the trial court into the purpose of the FTC's investigation. A close examination of this characterization is in order, since the majority relies on the characterization as the foundation for its belief that it should completely substitute its judgment for that of the District Court in this case. The majority states that the District Court's "relevance determinations rested upon and, indeed, were inseparable from its view of the applicable law with respect to the proper scope of the FTC's investigation."[52] At another point the majority emphasizes that the trial court used "its own conception of the proper scope of the FTC's investigation"[53] in making its decisions as to relevance. In other words, the majority believes that the District Court imposed on the parties its own view of the proper scope of the investigation and, in effect, decided that the FTCA allowed the FTC to investigate only proved reserves of natural gas.
 
 
 264
 The majority is clearly wrong in its artificial attempt to cast the actions of the trial court as a determination of law. Rather, the trial judge conducted a factual inquiry in order to determine what, in actuality, the FTC was attempting to do in this case. Indeed, at the hearing on 13 December 1973, the District Court, in making its relevance determination as to the bid files, stated that the files were not relevant "to the investigation or inquiry that you tell me you are making. . . ."[54] The trial court recognized that the breadth of the investigation was primarily for the investigators (the FTC) to determine; in this case, the court was merely trying to develop the necessary factual foundation to make a ruling on relevance. The District Court was clearly not trying to mold the scope of the investigation, but rather to define it; this was not an imposition of the court's view but an inquiry made of those conducting the investigation. In making its relevance determinations the trial court proceeded on the basis of the FTC counsel's representations to the court and not on its own view of the FTC's statutory authority in this area.
 
 
 265
 Not only does the majority repeatedly offer an inaccurate characterization of the trial court's factual inquiry into the FTC's purpose, but they further confuse the issue by failing to be consistent even in their own misconceptions. The majority at one point assert that the trial court's erroneous definition of purpose resulted from its acceptance of the gas producer's concept of purpose in this case.[55] The majority thus switches its position, at various points asserting that the District Court highhandedly shaped the investigation according to its own view of the law, and at another stating that the court totally accepted the view of the private parties in this case. Which is it? Imposition or total acceptance? The truth is that neither characterization is accurate; rather, the trial court conducted a factual inquiry directed to the FTC in order to lay the analytical foundation for the relevance determinations. There is such a basic difference between shaping an inquiry and defining it; the sequence of events as revealed in the record in this case simply does not lend itself to inclusion in the former category.
 
 
 266
 Nor is there any place in the record where the District Judge "speculate(d) about the possible charges that might be included in a future complaint, and then . . . determine(d) the relevance of the subpoena requests by reference to those hypothetical charges."[56] Quite to the contrary, the District Judge acted on the basis that "(t)he relevance of the material sought by the FTC must be measured against the scope and purpose of the FTC's investigation, as set forth in the Commission's resolution"[57] the standard as defined by the majority, supplemented by factual inquiries of FTC counsel and FTC statements to Congress.
 
 
 267
 The majority's mistaken speculation that the District Court equated its definition of purpose with "a particular theory of violation"[58] is grossly deficient in several respects. First, there is no evidence that the trial court required a "narrowly focused theory of a possible future case"[59] as the only acceptable definition of purpose. Indeed, the District Court did not require it; we in the dissent do not suggest it; the precedents do not mention it; and logic, reason, and clear thinking do not dictate such a narrow focus. What the District Court, we in the dissent, the precedents, and logic do suggest is that some refinement of the FTC's extraordinarily broad investigatory resolution is in order. What the majority has done in suggesting that "a particular theory of violation" is the only acceptable refinement of purpose is to set up a straw man against which to argue its case for complete substitution of judgment on factual matters. Straw men are easy to knock down; it is far more difficult to provide a response to the eminently sensible proposition that some refinement of purpose is needed if the court is to have any role in considering the rights of all the parties who stand before it in a subpoena enforcement proceeding.
 
 
 268
 Returning to the question of the proper standard of review of the trial court's relevance determination, after the majority rejected the "clearly erroneous" and "abuse of discretion" standards, what standard did the majority set for itself? The standard is substitution of judgment about that there is no doubt or disagreement. The truly novel element of this substitution standard is the justification put forth by the majority for its use in this case. The majority states that it has substituted its judgment here because "the (relevance) determinations of the trial court were dependent on, and integrally related to, a legal premise."[60] The majority does not venture beyond this conclusory statement in defense or explanation of its standard of review. In what way are the determinations as to purpose related to the legal premise so as to justify this standard of review? Are all fact determinations made in pursuit of a relevance determination (the "legal premise") subject to being disregarded under the substitution standard? What is the relationship between law and fact in this case which calls for the appellate court to substitute its view for that of a United States district judge? These are but a few of the vital questions left unanswered by the majority in this case.
 
 
 269
 The majority concedes that "(w)hen relevance determinations are, in essence, factual judgments, they are normally entitled to special deference from appellate courts . . . ."[61] As noted previously, the majority has attempted to cast the actions of the trial judge as determinations of law by inaccurately characterizing the events in the District Court. Once this false characterization is stripped away, we are left with a factual determination of purpose made by the District Court. How was this factual determination "clearly erroneous"? The majority dare not make this claim, for it was the FTC which provided the facts for the trial court's finding related to purpose. And if it is not clearly erroneous, we must accept it; if we must accept it, the modifications fashioned by the District Court in the name of relevance must be seen as sensible. And, further, when the majority's straw man who advocates "a particular theory of violation"[62] as the only acceptable statement of purpose is removed from the scene (and this straw man is the only advocate of such a narrow focus), the scope of the District Court's refinement of the FTC's purpose emerges as a moderate and sound method to accommodate the rights of all the parties to this case.
 
 
 270
 We are well aware that the distinction between questions of law and questions of fact is often an elusive one. We have, however, shown that the District Court's inquiry into the purpose of the FTC's investigation was essentially of a factual nature to elicit from the FTC information (facts) relating to the purpose for investigating the gas industry at this time. The majority believes it is sufficient to say that the relevance determinations involved a "legal premise" and thus are subject to a substitution of judgment. But they have not told us why this is a question of law; instead, the label "legal premise" is supposed to be taken as a sufficient basis for the appellate court's usurpation of the trial court's fact-finding role. The failure to explain the circumstances under which the mere existence of a "legal premise" can trigger de novo review in the appellate court is most disturbing. By failing so to explain, the majority has established a standard which can be employed by the simple unexplained step of denominating a trial court's decision as resting on a "legal premise." All litigation is premised on the law; until we have further clarification and analysis of this point from the majority, this standardless form of review can be imposed whenever more than half of the judges sitting on a case decide that they want to substitute their own preferences for the careful hearings of the trial judge.
 
 
 271
 The majority have correctly observed that there is a "limited role assigned to the federal courts in (subpoena) enforcement proceedings."[63] We fail to see how this observation can be reconciled with the complete substitution of judgment which the majority undertakes in this case. The directionless, standardless review employed by the majority in order somehow to vindicate a "legal premise" does no credit to an appellate tribunal.
 
 
 272
 B. Raw Field Data, Bid Calculation Data, and Bid Calculation Files
 
 
 273
 We now narrow our focus to two particular categories of documents which the District Court held need not be produced: (1) "(r)aw field data" and (2) "bid calculation data and bid calculation files."[64] We shall first try to clarify what remains in dispute after the stipulations and then analyze the principal controversy remaining.
 
 
 274
 As to the first category of documents there appears to be no further controversy between the parties all parties having agreed that "(t)he Order may be affirmed insofar as it excludes raw field data, subject to the FTC's right to seek access to or production of such data pursuant to paragraph 9 of said Order. . . . "[65] The FTC and producers other than Superior also agreed that "(t)he Order may be modified to expressly exclude maps or other documents relating to the suspected location of natural gas in currently unleased acreage."[66] This second stipulation agreeing to exclude such documents pertaining to "currently unleased acreage" seems to eliminate any controversy between the parties over "bid calculation data" or "bid calculation files" (hereinafter referred to collectively as "bid files")[67] relating to acreage not currently leased by one of the appellees.
 
 
 275
 Unfortunately, as to bid files relating to acreage that is currently leased or owned by one of the appellees, and to the extent that these files contain information other than "raw field data," a controversy still exists perhaps the major controversy in this case. These bid files, which would be liable to disclosure under specifications G, H, and I of the FTC's subpoena (as modified by the "raw field data" and "treasure map" stipulations supra ), include information which producers assemble in advance of a lease bid. The information is based upon limited geophysical information and almost never upon actual exploration. The producers consider the models they have developed for making lease bids the most valuable trade secrets they own, because of the large outlays which have gone into their development and the ease with which any producer could be outbid on leases if its competitors had access to the model.[68] Understandably, the producers argue strongly against disclosure of their bid files, since, according to them, the data contained therein would give a competitor easy access to their bid model.
 
 
 276
 Most important to the legal issues herein, they also assert that bid files are not relevant to any calculation of proved reserves, because these files only contain speculative estimates of producing capacity based on limited information. Once a producer obtains a lease and thus is able to drill exploratory wells, these bid estimates are no longer used by any company (except presumably to improve its bidding model or to analyze the bidding behavior of opponents). As a result, the producers contend that bid files could not be relevant to an investigation of conspiratorial and other practices aimed at underreporting proved reserves.
 
 
 277
 Bid files rarely, if ever, contain proved reserve estimates.[69] However, if they do, all appellees except Superior have agreed to produce any proved reserve data contained in their bid files.[70]
 
 
 278
 The Trade Commission, on the other hand, argues that "(t)he 'bid files' contain estimates of reserves, no matter how speculative or untested, and, as such, are plainly relevant to the analysis of gas reserve reporting which is part of the Commission's investigation."[71] How unproved reserve estimates, which are never reported, can be ". . . plainly relevant to the (FTC's) analysis of gas reserve reporting . . . ," (emphasis added) we leave to our colleagues to explain.
 
 
 279
 Our reading of the transcript of 13 December 1973 indicates that the District Court denied production of appellees' bid files on the theory that they were irrelevant to any type of investigation of reserve reporting. After probing FTC counsel to ascertain whether the FTC had any theories of possible relevance, the court stated,
 
 
 280
 . . . I hold that the bid files, the estimated unproved and unverified estimates, represented by the bid files are in no way relevant to the investigation or inquiry that you tell me you are making, with one exception.
 
 
 281
 If you can later come back to me with a situation where a company has been awarded a bid on a property and has delayed an unreasonable time in drilling on it so they could come up with a proper estimate, then you may apply and I will consider giving you the bid file on that particular one.[72]
 
 
 282
 Since issuance of the District Court's orders, the Trade Commission has implicitly conceded the irrelevance of producers' bid files on at least two occasions. First, in FTC v. Continental Oil Co.,[73] one of the cases originally consolidated herewith, the FTC initially appealed, but subsequently moved for dismissal, explaining that FTC representatives had held further discussions and negotiations with Continental, that Continental had agreed to submit "further testimony relating to their production in compliance with the FTC's subpoena, as needed," and that the case was therefore moot.[74] According to appellees, Continental did not, however, agree to produce its bid files.[75] Second, as previously mentioned, the FTC has now offered, as a basis of settling its dispute with Superior, to modify specification G ". . . to require Superior to produce only documents containing proved natural gas reserve estimates."[76] By agreeing that production of all subpoenaed documents other than bid files was satisfactory compliance for Continental and by offering to settle for production by Superior of only those documents containing proved reserved estimates, the FTC necessarily recognized the correctness of the District Court's determination that bid files are irrelevant.
 
 
 283
 In its supplemental brief on rehearing en banc, the FTC argues that resolution of the bid file relevance issue somehow hinges upon resolution of the collateral estoppel issue.[77] This both distorts the holding of the District Court and misstates appellees' position. This court's determination of the bid file issue (as well as its determination of all other relevance issues raised herein) should be entirely independent of its resolution of the collateral estoppel issue. Relevance and collateral estoppel are two of three wholly independent legal grounds for affirming the District Court's major limiting modifications. (As mentioned earlier, the third ground is burdensomeness.)
 
 
 284
 The affidavit of H. R. Hirsch, appended to Brief for Appellee, Mobil Oil Corp. (filed 8 Nov. 1974), lucidly explains why data included in the producers' bid files has no logical or scientific relevance to any investigation of reports made after the drilling and development of a lease has commenced. In response to this affidavit by a qualified expert with twenty years experience in the oil and gas industry, the FTC offers only the argumentative affidavit of an FTC attorney who states that he has seen some proved reserve data in bid files which he has inspected.[78] The FTC's failure to offer rebuttal testimony by another qualified expert leads us to believe that it has been unable to find an expert willing to endorse its unsound, unscientific, and illogical speculations about the possible relevance of bid file data.
 
 
 285
 The simple fact is that estimates based on drilling on actual physical penetration of geological structures are so superior to speculative bid file estimates based on various geophysical tests that they immediately and completely supersede the earlier estimates. Even if the FTC is completely free of collateral estoppel limitations (as a majority of this court holds) and is allowed to pursue the broadest investigatory purpose it or this court can now envision, only reserve estimates and reports based on drilling (where hydrocarbon-bearing structures have been penetrated) will be of any relevance. After drilling, all prior estimates (there are no prior reports since only proved reserve estimates are reported) become nothing but irrelevant, superseded, and misleading.
 
 
 286
 Of course, if after making a successful bid on a piece of property a producer does not drill promptly, or if after drilling and discovering proved reserves the producer does not promptly report its discovery, then there might be some cause to look into the company's bid files.[79] These possible delays in drilling and reporting, although not supported by any evidence before the District Court,[80] were exactly what the court had in mind when it made the following provision in both orders here under review:
 
 
 287
 The Court reserves its ruling as to any and all matters, contentions or issues not specifically disposed of by this Order. Jurisdiction over these proceedings is retained for the purposes of providing other and further relief as necessary.[81]
 
 
 288
 Additionally, at the 13 December 1973 hearing, Judge Hart expressly notified the FTC that he would be receptive to a motion for the production of any bid file where the Commission could show him that ". . . a company ha(d) been awarded a bid on a property and delayed an unreasonable time in drilling. . . . "[82] Since through its subpoena, as enforced and modified by the District Court's Six-Company Order, the FTC would have at its disposal all the information necessary to make a showing of delayed drilling or delayed reporting[83] (if either such practice exists), the District Court's approach seems perfectly sound especially in light of the highly confidential nature of these files.
 
 
 289
 With regard to bid files, the FTC advances, in its supplemental brief on rehearing en banc, the following three theories of relevance:
 
 
 290
 (1) The bid files may be relevant to the calculation of proved reserves because they may contain reserve figures for adjacent tracts.[84]
 
 
 291
 (2) The bid files may be relevant in establishing a lease history which, by permitting comparison of proved reserve figures for a tract with initial speculative estimates contained in bid files, might indicate that the proved reserve figures were in error or misstated if they were markedly lower.[85]
 
 
 292
 (3) Bid files may be relevant to determine whether appellees have a practice of deferring drilling in certain circumstances to minimize the extent of proved reserves even though they regard their untested estimates to be of comparable degree of certainty.[86]
 
 
 293
 In building up the informational foundation necessary to understand the FTC's bid file theories, we have necessarily touched upon these three theories to some degree. Now, without being unnecessarily repetitive, we will briefly examine and show the error of each theory.
 
 
 294
 1. Possible Existence of a Limited Number of Proved Reserve Estimates in a Few Bid Files
 
 
 295
 It is highly unlikely that a producer's bid files would ever include proved reserve estimates. In only one situation is this even hypothetically possible. If a company leased a tract adjacent to an open, unleased tract, and commenced drilling on its tract, perhaps that company could develop sufficient data to make proved reserve estimates for some portion of the adjacent open tract. If the company bid successfully on the open tract and obtained it, then these proved reserve estimates for the adjacent tract would be called for under the subpoena, as enforced by the District Court. If, however, the company did not bid successfully on the open tract, then it could conceivably have in its bid files proved reserve estimates for a tract which was still open or leased by another company.[87]
 
 
 296
 In any event, the FTC's adjacent tract argument does not support its demand for appellees' bid files in toto particularly the highly confidential and sensitive documents reflecting bid methodology (i. e., appellees' bid models). At most, the FTC's argument would support an order directing them to extract and produce all proved reserve data (if any) found in their bid files. But at this point even this order would be a meaningless gesture, since all parties (except Superior) have agreed in their stipulations that the District Court's Six-Company Order may be modified by adding the following proviso :
 
 
 297
 Provided that, to the extent otherwise called for, any and all proved reserve data contained in bid calculation files and relating to tracts covered by (this subpoena) shall be produced.[88]
 
 
 298
 2. Evaluating the Accuracy of Proved Reserve Estimates by Comparing Them to Earlier, Superseded, Speculative Estimates in Bid Files
 
 
 299
 We agree with appellees: "The FTC's argument that comparing proved reserve estimates on a tract with earlier, superseded speculative reserve estimates may reveal something about the accuracy of the proved reserved estimates illustrates dramatically the danger of relying solely on legal imagination (as a majority of this court does) in a highly technical area such as gas reservoir engineering."[89] As the only qualified expert whose testimony was before the District Court explained,
 
 
 300
 (T)he speculative reserve estimates which are based purely on raw geological and geophysical data are often grossly inaccurate. Thus to suggest that they should be compared to proved estimates to see if there has been under-reporting is absurd.[90]
 
 
 301
 The evidence and argument presented to the District Court permitted it to make the factual determination that the producers' bid files contained highly speculative estimates, which would be rapidly superseded by much sounder estimates, once the winning bidder could begin drilling. After the first well is drilled on a lease, no company relies on bid file data, nor is such data ever reported to the AGA. Only data relating to proved reserves is reported, and the essential ingredient in the definition of "proved reserves" is that the data is obtained by drilling, by penetration of the formation.[91]
 
 
 302
 The "proved reserves" definition is accepted by the industry, the Power Commission, and the Trade Commission here.[92] Thus, even if the bid file data showed a gross disparity compared to the data on proved reserves submitted to the AGA, this would demonstrate nothing except that the company's original bid estimates were sadly in error, for by definition the proved reserve data must be based on geological information obtained by drilling at a later time than when the bid file data is assembled.[93] The preliminary and superseded data in the bid files has no relevance whatsoever in determining whether preliminary bid file estimates will later be moved into the more strictly defined category of "proved reserves".[94] In the absence of any such correlation, the FTC's hypothesis that compilation of a "lease history" dating back to the initial speculative estimates might be relevant in ascertaining possible violations of Section 5 is plainly unsound.[95]3. Delays in Drilling or Reporting
 
 
 303
 The Trade Commission makes one final argument: that companies sometimes delay drilling in order not to acquire any proved reserve data which would supersede the speculative estimates in the bid files and which they would be obligated to report to the AGA. Even though the likelihood of such behavior (i. e., of a company paying millions of dollars for a lease and then permitting that lease to go undrilled) seems quite remote,[96] the District Court, as we have mentioned before, expressly provided for just such a circumstance.[97] Considering the highly sensitive and confidential nature of appellees' bid files, the District Court's approach seems particularly sound. Indeed, in the case of Continental Oil Co., even the FTC accepted this approach as satisfactory.[98]
 
 
 304
 If a few instances of deferred drilling or reporting do actually exist, the FTC would be able to detect such behavior with the information called for by the subpoenas, as enforced by the District Court's order.[99] By no means, however, would a few such instances justify the blanket subpoena of all bid files (or even the subpoena of the contents of one entire bid file) by the FTC. We would affirm the District Court's ruling, since it amply preserves the FTC's interest in having access to those speculative reserve estimates in bid files involved in any case of delayed drilling or reporting, while at the same time it affords appellees protection against the forced disclosure of sensitive data where such information is irrelevant to any alleged delay in drilling or reporting.
 
 C. Summary on the Relevance Issue
 
 305
 How wide of the mark is the Trade Commission's understanding of the differing roles of different type reserve data a misunderstanding which unfortunately has infected the majority opinion is capsuled by this statement: "But any estimate of reserves however defined on which a company relies in the course of its business is relevant to the company's practices in estimating and reporting reserves."[100]
 
 
 306
 Of course a company relies on each of the estimates of reserves it makes, but at different stages of the natural gas business, and with different degrees of confidence and far different purposes. The most preliminary and superficial of exploratory techniques may yield some clues as to natural gas presence or absence. Reliance at this stage is expressed simply as a decision to spend more money on additional exploration. At a later stage, with data assembled from much more sophisticated techniques but short of drilling or penetration of the geologic formation, the company may rely on the preliminary data to the extent of bidding for a lease.
 
 
 307
 In bidding for a lease the company obviously has some preliminary reserve estimate on which it relies, for the purpose of bidding; otherwise, it would never bid or would make a total gamble. Not only is this reserve estimate never reported, not only is it never revealed to a competitor, but even within company walls it is a closely guarded secret. This preliminary reserve estimate is a product of the "bid model" of the company and the scientific data amassed on that individual tract, and constitutes the heart of the "bid file."
 
 
 308
 At this point we note that the Trade Commission has never stated, or even hinted, that it suspects and is inquiring into collusive bidding by the gas producers. Nothing in the record suggests that. If that were an object of inquiry, the contents of the bid files obviously could be relevant, e. g., to show that from differing scientific calculations there strangely emerged similar bids, or that based on similar scientific data the companies bid and failed to bid.
 
 
 309
 But the inquiry of the FTC is into the reporting of proved reserves and at the bidding stage of developing a gas deposit there is no such thing as a PROVED reserve, and there is no reporting (or revealing) of such reserve estimates as the companies do have. Then when proved reserve data is obtained by penetration of the formation only all the preliminary reserve data is literally junked, it is relied upon no more by the companies, reliance is placed entirely upon the proved reserve data, which is reported to the AGA, and which is to be produced totally by the subpoenas as modified by the District Court. Anything else the FTC seeks in the way of reserve estimates is completely immaterial to the FTC's purpose of investigating the collusive or false reporting of proved reserves.
 
 
 310
 One other statement from the majority opinion will serve to illustrate why, in reading the briefs and hearing oral arguments, we have received the impression that the great problem in this case has been and still is the curtain of ignorance between the Trade Commission staff and counsel and the gas producers, sheer ignorance on the part of the investigators as to the science and economics of the natural gas industry which leaves them without any rational concept of relevance or direction to their inquiry. As the majority says (approvingly, we fear):
 
 
 311
 "The Commission also suggests that bid files could be used to establish lease histories . . . . (I)f (the) 'speculative' estimates were consistently higher than the reported 'proved' estimates, and by a roughly equivalent amount this might well be indicative of anticompetitive practices."[101]
 
 
 312
 In this statement the Trade Commission exhibits a basic misconception concerning the significance of any disparities between the estimates of preliminary and proved reserves. Repeated disparities of this variety are significant indeed, they are precisely the type of error which would cost a company millions of dollars and get a group of geologists fired and which have absolutely nothing to do with the kind of inquiry the Trade Commission is making here. If the preliminary or "speculative" estimates turn out in repeated instances to be widely different from later proved reserve estimates, there will be considerable soul-searching on the part of the company geologists and higher officials. If time after time the proved reserves delineated by drilling are different from the gas reserve estimates based on preliminary scientific data, what was wrong with the preliminary estimates? What was wrong with the bid model? The company will seek to find out, to correct its bidding on the next available leases, whether the error was in bidding too much or in bidding too little and seeing a profitable tract go to a competitor. But in doing so, we may be sure that the company will not breathe a word of it to a competitor or to the AGA.
 
 
 313
 This is a matter of accuracy of bidding calculations, it has nothing to with the accuracy of proved reserves, but it is the guts of competition in the gas industry. If bid files, bid models, bid calculation techniques are brought out into the public domain[102] by enforcement of the FTC's unmodified blunderbuss subpoena, then effective competition in both exploration and bidding will be discouraged. We had always assumed that the principal duty of the Trade Commission was to preserve effective competition; it appears in this case not to know the effect of what it is doing.
 
 
 314
 The most frightening aspect of this revealed lack of comprehension by the Trade Commission is to contemplate what the FTC will do with the bid file data, if the subpoenas are allowed to stand unmodified. Obviously, from the instances publicly known and cited to us by appellees herein, the FTC will discover in the files of every company many horrible examples of the grossest errors in preliminary calculation of reserves as compared to the proved reserve data later developed by drilling. Given the FTC's concept of relevancy as argued herein, what conclusions will the FTC draw? If a company originally estimated a hundred million cubic feet of recoverable gas, and made an appropriate bid thereon, and now reports only ten million cubic feet in proved reserves, will the FTC trumpet that the company is falsely underreporting proved reserves, because the original estimate was so different? If a company estimated and bid the same amount, drilled twenty dry holes, and abandoned the lease with proved reserves of zero the same logic would hold, although we would expect the FTC to have enough good sense not to claim on these facts that the company was deliberately underreporting proved reserves. If Company A estimates a hundred million cubic feet of recoverable gas on a tract, but decides not to bid on it because of a preference for other tracts in the same auction, and Company B is the successful bidder but later reports only ten million cubic feet of proved reserves, will the FTC accuse Company B of false underreporting of proved reserves?
 
 
 315
 The examples could be multiplied endlessly, with but only one question to be put to the FTC: Can the FTC draw a conclusion of false or collusive reporting from discrepancies between the proved reserve data and the preliminary reserve estimates? If the FTC thinks it can, then it is in the process of perpetrating a terrible hoax on the American people. If the FTC admits it cannot, then it concedes the irrelevancy of the preliminary reserve estimates for the purpose of its investigation.
 
 
 316
 The conclusion is inescapable: the preliminary estimates of reserves before drilling on which bids are made have no earthly relevance to proved reserve calculations based solely on drilling into the geological formation. Actual production from drilling is the proof, hence the term "proved reserves"; every estimate, no matter how much scientific thought has gone into it, made before is nothing but an educated guess it is not proof, and it has no bearing on the accuracy of the proved reserve figures, which alone are reported.
 
 
 317
 In sum, none of the theories of bid file relevance advanced by the FTC withstands analysis. The leading Supreme Court case on FTC investigations, United States v. Morton Salt Co.,[103] makes clear that the burden is upon the FTC to prove that the bid files (and all other documents not related to proved reserves)[104] are "reasonably relevant" to its investigation,[105] This the FTC has not done, either here or in the District Court. The finding on relevance by the District Court is "essentially factual in nature" and cannot be overturned unless it was "clearly erroneous" or "an abuse of discretion."[106]
 
 V. BURDENSOMENESS
 
 318
 We turn now to the second independent ground supporting the District Court's order burdensomeness. In formulating its order enforcing the FTC's subpoena, the District Court had to consider the reasonableness of the burden of compliance placed upon the respondents.[107] And where, as here, this consideration leads to a finding that the subpoena is unduly burdensome, the District Court may act to alleviate this burden by modifying or partially enforcing the subpoena.[108] Such modification or partial enforcement is an exercise of the District Court's sound discretion and may be overturned on appeal only for an abuse of discretion.[109]
 
 
 319
 In FTC v. Lonning this court recognized the appropriateness of an abuse of discretion standard when it recently had to evaluate the burden placed on a cereal manufacturer by a district court's order enforcing another FTC subpoena. The cereal manufacturer took the position that certain data called for under the subpoena ". . . should be disclosed only to counsel of record who are 'outside' counsel and should not be revealed to any counsel of record who is inside or house counsel for a respondent."[110] This court disagreed and sustained the District Court which had adopted the protective order issued by the administrative law judge permitting disclosure to all counsel of record. The court concluded,
 
 
 320
 We see no abuse of discretion in limiting the disclosure of the individual brand cost data to counsel of record. Although this Court has previously commented that there may be some distinction between disclosure of trade secrets to house counsel, and outside counsel, we find no abuse of discretion in refusing to limit such disclosure in this case. . . . The decision as to the type and scope of any protective order rests within the sound discretion of the trial judge and must be determined on a case by case basis. There is nothing in this record which would support a determination that the district court abused its discretion by its adoption of the protective order issued by the Administrative Law Judge.[111]
 
 
 321
 Thus, like appellants in NLRB v. Northern Trust Co., our colleagues and the FTC ". . . are in the unenviable position of sustaining the great burden of showing an abuse of discretion."[112] We conclude that they, too, have failed to do so.
 
 
 322
 In determining the reasonableness of the burden of compliance cast upon appellees, the District Court was, of course, free to consider all pertinent facts and circumstances. The repetitive and cumulative nature of the Trade Commission's subpoena (in view of the Power Commission's previous factual determination that AGA proved reserve data was reasonably reliable for ratemaking purposes)[113] was, and should have been, an important factor in the District Court's assessment of burden.[114] The repetitiveness of an agency's demands cannot be ignored or excused merely because the repetition and cumulativeness are the result of similar demands made by other agencies of the same federal government.[115]
 
 
 323
 The majority's position in this regard appears to be that repetition and cumulativeness must be excused where agency jurisdictions overlap or where, as has become increasingly common, different agencies or officers of the federal government assume an adversarial or competing posture toward one another. We strongly reject this position, a position which will leave district courts even in the most extreme cases powerless to ameliorate the effects of repetitive agency demands. In the words of one of the appellees, "Such a result would create bureaucratic competition having the characteristics of a Kafka nightmare in which no response to an agency is ever sufficient because of the needs of a competing agency to show the insufficiency of a prior response to the former agency."[116] In such cases of competing agencies or overlapping jurisdiction, we would leave it to the sound discretion of the district courts to determine whether the effort and expense involved in responding to repetitive agency demands imposes an unfair and unreasonable burden on the responding parties. Being another essentially factual determination, this has always been, and should remain, the province of the district courts.
 
 
 324
 Here there was a full showing of the immense burden which even partial compliance with the FTC's subpoena would impose on appellees. For example, Standard Oil Co. of California filed in the District Court an affidavit of one of its vice-presidents setting forth a preliminary estimate of the time and cost of compliance, as he understood the subpoena's specifications. He stated that in order to locate the responsive documents, more than four million documents would have to be reviewed requiring approximately sixty-two man-years. The total cost of searching, reviewing, reproducing, and refiling was estimated at approximately four million dollars.[117]
 
 
 325
 Considering the purpose of the Trade Commission's investigation[118] and the factual determination of the prior Power Commission investigation into reserve reporting,[119] the District Court was eminently fair and reasonable (1) in limiting the disclosures required under the FTC's subpoena to those documents relating to the reporting of proved reserves and (2) in not permitting the use of any such documents to reinvestigate or redetermine the amount of proved gas reserves in Southern Louisiana. By no stretch of the imagination can either of these limitations be characterized as an abuse of discretion.
 
 
 326
 On burdensomeness issues, the majority opinion recognizes the "abuse of discretion" standard (there's too much binding authority on this point), but attempts to escape from the teeth of the abuse of discretion standard by arguing that the District Court's determinations of burden were intimately tied to and colored by improper applications of collateral estoppel and relevance. Therefore, says the majority, we shall review these modifications for "mere error."[120] The majority cannot escape their obligatory standard so easily. In trying to do so, they have confused the overlap of some facts basic to more than one legal theory with an overlap of the legal theories themselves.
 
 
 327
 Of course there is some overlap in the factual foundations underlying burdensomeness and collateral estoppel; to some extent both grounds rely upon the finding of fact discussed in Section II supra. (However, the third ground affirmance relevance is entirely independent of collateral estoppel and burden, both in terms of legal theory and underlying factual foundation.) Notwithstanding the overlap between FACTUAL foundations, burdensomeness and collateral estoppel are independent LEGAL grounds for affirming the District Court's "use" restriction. Similarly, burdensomeness and relevance are independent legal grounds for affirming the District Court's PROVED reserve limitation. Each of these grounds would be sufficient without the others. Accordingly, there is no way, as the majority opinion puts it, that the District Court's views on collateral estoppel and relevance could have somehow "infected" its determinations based on burden. Even if the legal theories of collateral estoppel and relevance had never been raised by appellee's counsel or ever thought of by the District Court, the major modifications of the court's order would be fully sustainable on burdensomeness grounds alone.
 
 
 328
 There can be no question that the Trade Commission has jurisdiction to determine whether the antitrust laws or the FTCA has been violated. However, the District Court was entitled to conclude on the present record (1) that the Trade Commission desired all reserve data in the possession of appellees in order to recompute independently Southern Louisiana reserves, and (2) that the Power Commission, on the basis of a contested evidentiary hearing, had found that the industry's figures for Southern Louisiana reserves for the relevant years were accurate. Based on these findings, the District Court could reasonably have concluded that it would be unjust, unreasonable, and unduly burdensome to require the production of every scrap of data which related to reserves of any kind. By limiting production to "documents containing or underlying proved natural gas reserve estimates" and by restricting the use of these documents to "the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates," the court drew a reasonable balance between the investigatory needs of the Trade Commission and the producers' burdensomeness claims. Similarly, through its "use" restriction the court struck an equally reasonable balance between the investigatory needs of the FTC and the producers' collateral estoppel claims.
 
 
 329
 The majority opinion has not only managed to confuse overlapping facts with overlapping law, in their effort to escape applying the abuse of discretion standard, but the opinion manages to confuse in which forum a burden of proof concept is applicable. The majority claims that "(t)he burden of showing that the request is unreasonable is on the subpoenaed party."[121] Of course it is but in the District Court! On appeal we as an appellate court review the issue of burdensomeness with an abuse of discretion standard.
 
 
 330
 Why the majority falls into this error is obvious. From the start, and continuing throughout, the majority opinion proceeds as if this court were reviewing directly an administrative agency decision.[122] The majority ignores the intervening action of the District Court in modifying and enforcing the administrative subpoenas, which under the law requires us to review the action of the District Court not the FTC under certain well defined standards. Having ignored the District Court and cast themselves in that role, the majority unwittingly adopt a standard fitting for and applied by the District Court. A very revealing error. An error which goes a long way to support the Trade Commission's effort to eliminate effective judicial review of administrative subpoenas.[123]
 
 
 331
 Having stated, from the standpoint of burdensomeness, our position on the District Court's two most important modifications, approving the court's other minor modifications becomes almost an a fortiori exercise. Consequently, we will forego any detailed analysis of these modifications, and comment on them only very briefly in section VII, infra.
 
 VI. COLLATERAL ESTOPPEL
 
 332
 We turn now to an analysis of the third independent ground supporting the District Court's order collateral estoppel. Initially, it is important to understand that appellees have never sought, and the District Court did not issue, an order halting the FTC's inquiry in this proceeding. As stated in their initial brief to this court, "Respondents do not contend that the FTC has no authority to investigate the allegation of collusive reporting or fabrication of reserve estimates."[124] Appellees do contend that under the principles of collateral estoppel, and alternatively, in order to prevent the imposition of an unfair burden of compliance, the FTC should not be permitted to redo for a third time what has already been done by another equally competent agency of the federal government.[125]
 
 
 333
 Having already concluded in Section II supra that the District Court's factual determination that the FPC had already (1) determined natural gas reserves and (2) considered and ruled upon the validity and accuracy of such reserves was correct (indeed, implicitly assumed by the majority opinion), we focus now on the question of law confronting the District Court after it made this important finding of fact: Under the circumstances of this case, is it appropriate to give this finding of fact collateral estoppel effect?
 
 
 334
 The Supreme Court and this court have clearly stated that an agency or a private party can be collaterally estopped in a later court proceeding if a relevant factual issue has already been resolved in a contested hearing before the agency.[126] The Supreme Court recently affirmed this principle in United States v. Utah Construction Co.:
 
 
 335
 Occasionally courts have used language to the effect that res judicata principles do not apply to administrative proceedings, but such language is certainly too broad. When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. Sunshine Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 263; Hanover Bank v. United States, 285 F.2d 455, 152 Ct.Cl. 391; Fairmont Aluminum Co. v. Commissioner, 4 Cir., 222 F.2d 622; Seatrain Lines, Inc. v. Pennsylvania R. Co., 207 F.2d 255. See also Goldstein v. Doft, D.C.N.Y., 236 F.Supp. 730, aff'd, 2 Cir., 353 F.2d 484, cert. denied, 383 U.S. 960, 86 S.Ct. 1226, 16 L.Ed.2d 302 where collateral estoppel was applied to prevent relitigation of factual disputes resolved by an arbitrator.[127]
 
 
 336
 The Supreme Court has also held that collateral estoppel can be applied when the prior proceeding involved a different government agency because, for collateral estoppel purposes, agencies of the same government are in privity with one another:
 
 
 337
 Where the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal. As stated in Chicago, R. I. & P. Ry. Co. v. Schendel, 270 U.S. 611, 620, 46 S.Ct. 420, 423, 424, 70 L.Ed. 757 "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different, . . . and parties nominally different may be, in legal effect, the same." A judgment is res judicata in a second action upon the same claim between the same parties or those in privity with them. Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 681. There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.[128]
 
 
 338
 Other Circuits have applied both these principles in appropriate cases. The Eighth Circuit in George H. Lee, Co. v. FTC[129] has held that the FTC was collaterally estopped from claiming use of unfair methods of competition where the claim was based on factual issues resolved favorably for defendants in a prior proceeding instituted under the Food and Drug Act. Reciprocally, the Seventh Circuit in United States v. Willard Tablet Co.[130] upheld the defense of collateral estoppel in a proceeding under the Food and Drug Act where a prior proceeding before the FTC held that defendant's labeling claims were not deceptive. More recently, in Safir v. Gibson[131] the Second Circuit held that the Maritime Administration, an agency within the Department of Commerce, was estopped from re-investigating and redetermining an issue previously decided by the Federal Maritime Administration.
 
 
 339
 In Safir the Second Circuit gave collateral estoppel effect to the FMC's prior determination that the rates of a conference of water common carriers were unjustly discriminatory and unfair to plaintiff Safir's company. Writing for the court, Judge Friendly explained,
 
 
 340
 . . . While the issues here may not have been purely factual, they were fully litigated before the agency designated to determine them. . . . The Restatement of Judgments, § 70, says that even determinations of questions of law are conclusive between the parties on a different cause of action unless injustice would result. . . .
 
 
 341
 It is the FMC, not the Maritime Administration, that has the expertise to pass on whether rates are unfair or unduly discriminatory, . . . and it would be quite unseemly for the Maritime Administration to conclude that its sister agency had been wrong on a fully litigated issue the decision of which Congress had confided to it. . . .
 
 
 342
 We recognize there is a general rule against judicial interference with administrative proceedings prior to the issuance of a final order . . .. Nevertheless we believe . . . it appropriate for us to direct conformity with our views on the preclusive effect of the FMC decision here and now. . . . (T)he reason for applying res judicata to administrative agencies is not only to "enforce repose" but also to protect a successful party from being vexed with needlessly duplicitous proceedings. . . . If the latter interest is not protected at the outset of the second proceeding, it will be lost irreparably. . . .[132]
 
 
 343
 We conclude that the Trade Commission is now in the same position as the Maritime Administration was in Safir, as the United States was in Willard Tablet, and as the FTC itself was in George H. Lee.
 
 
 344
 Regardless of the general applicability of res judicata and collateral estoppel principles between administrative adjudications involving different agencies, on the facts of this case application of the doctrine of collateral estoppel is particularly warranted. The Power Commission is the federal agency with special technical and scientific expertise on factual issues involving the oil and gas industry (e. g., the accuracy of AGA proved reserve estimates), and as such its findings of fact on oil and gas matters are entitled to the respect of other government agencies. The Trade Commission knew of the Power Commission's adjudicatory proceeding in So La II when it initiated its own investigation into gas reserve reporting and could have intervened in the Power Commission's ongoing investigation. This way, perhaps the Trade Commission could have avoided the charge leveled so persuasively by the producers in the District Court that some of the documents called for under the Trade Commission's subpoena were sought for the sole purpose of collaterally attacking a Power Commission finding of fact on an oil and gas matter.
 
 
 345
 The District Court, although it found the producers' charge to be perfectly valid, decided not to restrict production to only those documents which could never be used to attack collaterally the FPC's prior finding. Instead, the court took the less restrictive approach of placing the following "use" restriction on all data produced pursuant to specifications G, H, and I:
 
 
 346
 All production . . . shall be made for the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates, and not for the purpose of permitting the Trade Commission to investigate or determine the amount of proved natural gas reserves.[133]
 
 
 347
 Thus, even though some data containing or underlying proved reserves, and ordered to be produced by the court, could conceivably be used by the Trade Commission in a collateral attack on the Power Commission's reserve estimates finding, this "use" was strictly proscribed by the court's order. It is this "use" restriction, soundly based on either collateral estoppel or burdensomeness grounds, which the Trade Commission attacks so vigorously in this appeal.
 
 
 348
 Having briefly explained why it is appropriate to give the Power Commission's reserve estimates finding collateral estoppel effect, we now direct our attention to the reasons which the FTC and a majority of this court give for reaching an opposite result. Generally, they conclude that the doctrine of collateral estoppel has no applicability here because (1) it is inappropriate to consider the issue of collateral estoppel at the subpoena enforcement stage of an investigatory proceeding, (2) the Power Commission's reserve estimates finding was made in the context of a quasi-judicial ratemaking proceeding, and (3) the Power Commission found the AGA reserve figures "reasonably reliable" for ratemaking purposes only. To our mind, none of these reasons are valid or should preclude application of administrative collateral estoppel.
 
 
 349
 A. The Appropriateness of Considering the Issue of Collateral Estoppel in this Subpoena Enforcement Proceeding
 
 
 350
 The issue of collateral estoppel is not an issue on the merits that must be deferred until an administrative complaint has issued; far from it, deferring consideration does violence to the sound policy justifications underlying the doctrine. Thus collateral estoppel is appropriately at issue in this enforcement proceeding. As the Trade Commission itself recognizes, "Collateral estoppel is now seen as an immensely practical doctrine, rooted in considerations of fairness and the public policy favoring finality in litigation."[134] These fairness and public policy considerations, including ". . . finality to litigation, prevention of needless litigation, (and) avoidance of unnecessary burdens of time and expense(,) are as relevant to the administrative process as to the judicial."[135]
 
 
 351
 One important consideration which argues for applying collateral estoppel at this stage of the instant proceeding is the need for a consistent and final determination of a technical oil and gas issue by the expert agency in the oil and gas field. Early consideration of the issue ensures that judicial and administrative resources, as well as the resources of the litigants, will not be wasted needlessly. In addition, the Trade Commission's inquiry into alleged underreporting of reserves is neither stymied nor prohibited by the District Court's "use" restriction. The only restriction is that the Trade Commission must accept the Power Commission's factual finding with respect to the reliability and accuracy of AGA proved reserved estimates. No administrative agency, including the Trade Commission, has carte blanche authority to reinvestigate and relitigate a factual issue simply because it disagrees with another agency's finding. The collateral estoppel doctrine serves the essential purpose of protecting the agencies, the courts, and the parties from such unnecessary and wasteful expenditures of time and money.
 
 
 352
 Endicott Johnson Corp. v. Perkins,[136] Oklahoma Press Publishing Co. v. Walling,[137] and other cases refusing to consider at the investigative stage certain defenses which should be raised on the merits against a formal complaint, illustrate the generally-accepted principle that courts should not interrupt the administrative process except under exceptional and narrowly-defined circumstances.
 
 
 353
 Collateral estoppel, as applied by the District Court, is easily distinguishable from the jurisdiction and statutory coverage questions dealt with in Endicott Johnson, Oklahoma Press and their progeny.[138]
 
 
 354
 First, in this case the main policy goal behind nonintervention has been fulfilled; the expert agency in the oil and gas field (the Power Commission) was allowed initially to apply its expertise and make the factual determination on which ultimate decisions will later be based. Second, in contrast to the Endicott Johnson line of cases, here the District Court's limited application of collateral estoppel would not preclude the Trade Commission from exercising its full statutory and jurisdictional authority in pursuing its investigation of possible Section 5 violations. The District Court here did not intrude on the jurisdiction of the Trade Commission or decide a jurisdictional question of statutory coverage.[139]
 
 
 355
 This simply is not an ENDICOTT JOHNSON-type case. Endicott itself dealt not with the issue of collateral estoppel, but with the question of whether the Secretary of Labor could subpoena data for the purpose of determining if a company's activities were covered by (i. e., within the jurisdiction of) the Walsh-Healy Act. Denying enforcement of the Secretary's subpoena would have had the effect of preventing a determination of the coverage issued by the very person (the Secretary) authorized by the statute to make that determination. Specifically, the Walsh-Healy Act directed the Secretary to make
 
 
 356
 . . . findings of fact after notice and hearing, which findings shall be conclusive upon all agencies of the United States, and if supported by the preponderance of the evidence, shall be conclusive in any court of the United States; and the Secretary of Labor . . . shall have the power, and is hereby authorized, to make such decisions, based upon findings of fact, as are deemed to be necessary to enforce the provisions of this Act.[140]
 
 
 357
 With this language in mind, the Supreme Court found that ". . . under the statute determination of (the coverage) issue was primarily the duty of the Secretary . . ."[141] and not the district court.[142]
 
 
 358
 Here we have no such statutory authorization; the Federal Trade Commission Act clearly does not make the estimation of natural gas reserves primarily the duty of the Trade Commission and cut out the Power Commission; nor does it make the Trade Commission's findings of fact on oil and gas matters "conclusive upon all agencies of the United States" (i. e., upon the Power Commission). Quite to the contrary, the conceded expert on all technical aspects of the oil and gas industry is the Power Commission, not the Trade Commission.[143] In So La II the information necessary to reach a determination on the gas supply question was placed before the Power Commission, the agency most qualified to make such a determination, and that agency made specific findings of fact based on a lengthy (over 30,000 pages) and comprehensive record. Those findings are now fully available to the Trade Commission and are entitled to its respect as a matter of law and logic.
 
 
 359
 The Second Circuit's opinion in Safir strongly supports our position. There, in concluding that collateral estoppel was applicable to an administrative proceeding at the investigative stage, Judge Friendly pointed out that the concepts of collateral estoppel and res judicata differ from defenses raised in cases like Endicott Johnson and Oklahoma Press, where the respondents contended that the agencies lacked jurisdiction:
 
 
 360
 (T)he reason for applying res judicata to administrative agencies is not only to "enforce repose" but also to protect a successful party from being vexed with needlessly duplicitous proceedings. . . . If the latter interest is not protected at the outset of the second proceeding, it will be lost irreparably. . . . In this respect, a claim of res judicata differs from a claim that an administrative agency has no jurisdiction over the subject matter of the investigation . . . an issue which Congress meant to be decided in the first instance by the agency itself.[144]
 
 
 361
 In accusing the writers of this dissent and the District Court of (1) attempting to discern the shape of the merits, (2) trying to divine all possible issues that could arise in the course of an FTC investigation, (3) attempting to forecast the ultimate conclusion of the FTC's proposed investigation, and (4) generally putting our cart before our horse, the Trade Commission and our colleagues repeatedly overlook the difference between res judicata and collateral estoppel, i. e., the difference between claim preclusion and issue preclusion. When this difference is understood it becomes apparent how both we and the District Court are able to apply the doctrine of collateral estoppel to the facts of this case without so much as a passing glance into our crystal ball.
 
 
 362
 The FTC is fully aware of the difference between issue and claim preclusion, and it has even had occasion to admonish parties appearing before it that collateral estoppel precludes the redetermination of factual issues while res judicata forecloses entire claims or ultimate issues:
 
 
 363
 . . . Strictly speaking the doctrine of res judicata refers to the merger or bar of a subsequent action based on the same cause of action as opposed to the doctrine of collateral estoppel under which the determination of a question of fact essential to a judgment is conclusive between the parties (and their privies) in a subsequent action on a different cause of action.[145]
 
 
 364
 Thus, to apply the doctrine of collateral estoppel (not the doctrine of res judicata) to the facts of this case, we need not attempt to forecast the ultimate conclusion, or even the ultimate issue of the FTC's proposed investigation; we need only define ONE FACTUAL ISSUE (the accuracy of AGA proved reserve estimates) which has already been determined by the Power Commission. The Trade Commission has a free investigative rein on ALL ULTIMATE issues (e. g., have appellees committed or conspired to commit an unfair trade practice; have appellees engaged or conspired to engage in a price-fixing scheme; are appellees guilty of an attempt to monopolize) and on all relevant factual issues except the accuracy of AGA proved reserve estimates.
 
 
 365
 Thus two recent decisions of the Sixth and Seventh Circuits, relied on by the Trade Commission, in no way conflict with our position here, nor with the decisions in Safir and others which we believe govern this case. In FTC v. Feldman[146] and FTC v. Markin[147] two taxicab companies argued that a 1947 holding that they had not been engaged in interstate commerce barred the FTC from now investigating the industry. First, it is obvious that changed facts and changed law might justify an investigation after 29 years. In our case the Trade Commission proposes to examine the reporting of proved reserves in the same time frame as the Power Commission did. It was on precisely this point that the Seventh Circuit distinguished Feldman from the panel opinion in our case, with which this dissent agrees. Second, in both Feldman and Markin the private litigants sought to stop the whole investigation, i. e., claim preclusion. Here the appellee producers have never sought to bar the Trade Commission investigation, they have never asserted that the Power Commission's inquiries immunized them against further investigation; they have only asserted that the Power Commission's determination of one factual issue, the accuracy of the proved reserve reporting during the same time span, must be taken as established under the doctrine of collateral estoppel, i. e., issue preclusion.
 
 
 366
 Unlike the situation in Endicott Johnson and similar cases, the District Court here was not making a jurisdictional determination[148] or arrogating to itself a factual determination that was primarily the duty of the Trade Commission. In accordance with well-established principles of collateral estoppel, the District Court simply applied an already-found fact to the proceedings before it. The court did not try the issue of underreporting itself; nor did it delve into the same conflicting materials that the Power Commission had previously considered in So La II. The Trade Commission was foreclosed on collateral estoppel grounds from reinvestigating and redetermining this one question of fact, not by the District Court, but by the Power Commission, a sister agency of at least equal competence on oil and gas matters.[149]
 
 
 367
 Likewise, the Power Commission was not arrogating to itself a factual determination that was primarily the duty of the Trade Commission. On this one question of fact, the Trade Commission simply began its investigation too late. On 24 November 1971, when these subpoenas issued, the FTC was estopped from collaterally attacking any finding of fact essential to the FPC's ratemaking determinations in So La II (issued on 16 July 1971). Having to accept this one finding of fact can have the effect of conferring antitrust and Section 5 immunity on appellees only insofar as the FTC's antitrust theories necessarily require an opposite finding. If it turns out that all of the FTC's antitrust and Section 5 theories do require a finding that AGA proved reserve estimates for the years 1962-1970 were in accurate, then the problem here is not an overly restrictive enforcement order, but a poorly aimed investigation.[150]
 
 
 368
 B. Giving Collateral Estoppel Effect to a Finding of Fact Made in the Context of a FPC Ratemaking Proceeding
 
 
 369
 As the Supreme Court made clear in United States v. Utah Construction & Mining Co.,
 
 
 370
 When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.[151]
 
 
 371
 By its use of the words, "(w)hen . . . acting in a judicial capacity," we do not believe the Court intended to engraft on the doctrine of administrative collateral estoppel the drastic restrictions advocated by the Trade Commission. The fact that the Power Commission's ratemaking proceeding in So La II was "quasi-judicial" in nature, rather than purely "judicial", does not mean that the facts found therein are not entitled to collateral estoppel effect.
 
 
 372
 The crucial, threshold requirement for any application of collateral estoppel is a truly adversary proceeding, i. e., a proceeding sufficiently adverse to guarantee that opposing interests are adequately represented and that the facts established can withstand the test of opposition. When facts are established as a result of the adversary process (i. e., when they have been challenged and controverted by opposing interests), they acquire an added dimension of respectability and are therefore accorded a binding effect on parties (and their privies) in subsequent proceedings. If there is no adversariness in a proceeding, then there is no assurance that the facts have been truly established; the facts found may well be inaccurate since they have not been tested by an opposing interest. We submit that so long as there is sufficient adversariness in a quasi-judicial, ratemaking proceeding, the necessary guarantee of trustworthiness is present. Accordingly, the facts found therein should be given collateral estoppel effect.
 
 
 373
 There is little room to quarrel over the adversariness of the Power Commission's proceedings in So La II. All evidence was developed in an adversarial environment with public and private parties representing sharply opposing interests participating at all stages.[152] Witnesses were subjected to rigorous cross-examination, and an opportunity for rebuttal testimony or rebuttal evidence was provided.[153] Based on this record, the Power Commission's staff concluded in its initial brief in So La II that ". . . the validity and reliability of the reported AGA reserves data (was established) beyond any reasonable doubt."[154] In So La II itself the Power Commission specifically found that the AGA reserve estimates had not been "impeached or substantially contradicted"[155] and that they were "reasonably reliable" for ratemaking purposes.[156] This area rate proceeding, bringing together as it did sharply divergent economic interests in the same arena to do battle, provided an excellent context in which to determine finally the accuracy of AGA proved reserve estimates.
 
 
 374
 Discussing the problem of how and where to draw the line between "judicial" and "nonjudicial" action for purposes of collateral estoppel and res judicata, Professor Davis in his Administrative Law Treatise suggests,
 
 
 375
 The best approach is to avoid the labels that have been attached to various functions for other purposes and to determine what is judicial or nonjudicial for purposes of res judicata by emphasizing factors which relate to res judicata. For instance, the Supreme Court has held that because the granting of broadcasting licenses is nonjudicial, that function cannot be vested in the Supreme Court. But a function may be nonjudicial for one purpose and judicial for another purpose. The Supreme Court's holding that a court ought not to grant and deny licenses may be entirely sound, for practical reasons relating to qualifications, and it is natural for the court to say in such a context that the function is nonjudicial. But if an agency having the licensing power conducts a full hearing and adjudicates a controversy about past facts concerning the applicant, the determination should ordinarily be res judicata ; for want of a better set of terms, the conclusion may even be announced that the action is deemed judicial. The question is not what is judicial in the abstract or for some other purpose. The question is whether considerations relating to res judicata require that the particular action be regarded as judicial or nonjudicial.[157]
 
 
 376
 Like the FCC in Professor Davis' example, the Power Commission in So La II conducted a full hearing and adjudicated a controversy about past facts concerning appellees. Hence, the Power Commission's findings of fact with respect to that controversy are entitled to collateral estoppel effect. For purposes of administrative collateral estoppel, the only litmus test is adversariness (i. e., a FULL hearing adjudicating a CONTROVERSY about past facts), not whether the administrative proceeding is labeled "licensing" or "ratemaking".
 
 
 377
 As this court has recognized on prior occasions, there is no clear, bright line between adjudicative (judicial) proceedings and rulemaking (legislative or nonjudicial) proceedings. On one side of this coin is our decision in Mobil Oil v. FPC ;[158] on the other side our decision today. In Mobil Oil we recognized that even in a legislative rulemaking proceeding under APA § 553, the circumstances of the case might call for "some kind of hearing."[159] Today, however, the majority refuses to recognize that where there is sufficient adversariness in a quasi-judicial, ratemaking proceeding, the principles of collateral estoppel should apply in the same way they do in pure judicial proceedings. In Mobil Oil the requirement of "some kind of hearing" derived from the circumstances of the case; here the application of collateral estoppel should derive from the circumstances of this case the adversariness of the hearings in So La II.
 
 
 378
 In a suit for refund of income taxes paid upon a deficiency assessment the Fifth Circuit has given collateral estoppel effect to a prior Internal Revenue Service determination letter revoking a taxpayer's tax-exempt status.[160] Despite the fact that an IRS determination letter bears little resemblance to a "judicial" proceeding, the court held that ". . . the revocation of appellee's exemption must be considered a judicial act for the purpose of res judicata."[161] Factors influencing the Fifth Circuit's decision included, inter alia, finality to litigation, prevention of needless litigation, and avoidance of unnecessary burdens of time and expense; that the agency's action was directed specifically at the taxpayer and was not a general rule applicable to all organizations of a given class, that the agency's action had an immediate effect upon the status of the taxpayer; and that the taxpayer was well-informed of the progress of the agency's proceedings.[162]
 
 
 379
 These same factors militate in favor of giving the findings of fact in So La II collateral estoppel effect. There, in a proceeding bearing all the hallmarks of the adversary system, the issue of the accuracy of the AGA proved reserve estimates was fully considered and finally determined.
 
 
 380
 C. Giving Collateral Estoppel Effect to a Finding of Fact Made for Ratemaking Purposes
 
 
 381
 In So La II the Power Commission specifically found that ". . . the AGA reserve data is reasonably reliable for the purposes used herein."[163] The Trade Commission interprets this to be a statement intended to limit and qualify the Power Commission's acceptance of the AGA data. Taken as a whole, the record in So La II clearly does not support this inference. In fact, in its initial brief in So La II the FPC staff concluded that ". . . the record establishe(d) the validity and reliability of the reported AGA reserves data beyond any reasonable doubt."[164] Furthermore, the statement "for the purposes used herein" can just as easily be taken on the positive side to mean that these figures are good enough even for the FPC's use in calculating just and reasonable rates, or it can be taken as a relatively meaningless and gratuitous expression intended to have no substantive effect whatsoever. Whatever its meaning, we doubt seriously that the Power Commission intended it to limit the subsequent collateral estoppel effect of the finding it precedes.
 
 
 382
 Arguing along this same line, the Trade Commission makes much of the fact that the ultimate purpose of its investigation (determining if there has been a violation of Section 5 of the FTCA) differs from the ultimate purpose of So La II (determining the just and reasonable area rate for the Southern Louisiana area). However, since the FTC now seeks to determine whether the producers are underreporting reserves and are thereby violating the FTCA,[165] we must agree with appellees that any distinction based on different ultimate purposes is purely illusory. No matter how ingenious or how farfetched it is, any antitrust or unfair trade practice theory must have at its core an illegal activity having some effect (or at least some intended effect) on area rates.[166] Hence, the Power Commission's finding of reliability, even if for ratemaking purposes only, cannot be nonchalantly brushed aside as a limited and irrelevant factual determination. While this was indeed a finding of fact made for ratemaking purposes, it was nevertheless a determination that the only estimates (i. e., AGA proved reserve data) which could possibly affect rates were reliable and accurate. (We repeat: since the only supply estimates relied upon by the Power Commission are AGA proved reserve estimates, only these data can ever affect the rates set by the Commission.)
 
 
 383
 For basically the same reasons, the majority's reliance on United States v. RCA[167] is misplaced. In RCA the broadcasting company argued that the Federal Communications Commission's prior approval of its agreement to exchange a television station in Cleveland for one in Philadelphia immunized that agreement from a future antitrust attack by the Justice Department. In other words, the broadcasting company urged the court to give res judicata or collateral estoppel effect to the FCC's determination that this agreement was "in the public interest" (the ultimate issue before the FCC). Here, appellees are not asking this court to give res judicata or collateral estoppel effect to the FPC's ratemaking determination (the ultimate issue in So La II ); nor do they claim any immunity from the antitrust laws or the FTCA. The accuracy of AGA proved reserve data was a factual issue in controversy in So La II, and it is only this one factual issue, not appellees' antitrust or Section 5 liability, which the FTC is estopped from re-investigating and redetermining. In RCA there was no finding of fact by the FCC on the antitrust question which concerned the Justice Department; nor could there have been since the FCC was not authorized to decide antitrust issues as such.[168] Here, in comparison, there was a finding by the FPC on a factual issue concerning the FTC. Additionally, there can be no contention here that the FPC, the expert agency on oil and gas matters, was not empowered to determine the accuracy of the AGA proved reserve estimates.
 
 
 384
 In its supplemental reply brief on rehearing en banc, the FTC takes one final desperate stab at a "ratemaking purposes" argument, asserting that "factual determinations in ratemaking proceedings are not 'final' even among the parties, and hence are not entitled to be the basis for applying collateral estoppel in other contexts."[169] Unfortunately, the FTC overstates its case. As the Trade Commission itself recognizes in the sentence that immediately precedes this statement, the only case in point[170] indicates that ". . . an agency is ordinarily free . . . to reconsider factual determinations in the light of new evidence. . . ."[171] Thus, on factual issues (e. g., the accuracy of AGA proved reserve data) the FPC can change its mind if new evidence or changed circumstances arise.[172] But this observation applies with equal force to the factual determinations of a judicial proceeding. Accordingly, it does not preclude application of collateral estoppel in either context. If it did, no factual determination, be it administrative or judicial, could ever be given collateral estoppel effect.
 
 VII. CONFIDENTIALITY AND PRODUCTION AT SITUS
 
 385
 The District Court attached the following conditions to the disclosure of documents designated as confidential:
 
 
 386
 (1) The Secretary of the Federal Trade Commission is designated the custodian of the documents;
 
 
 387
 (2) The documents (and presumably any documents or memoranda derived therefrom) must be kept in a depository with access restricted to the FTC employees assigned to the investigation;
 
 
 388
 (3) Documents can only be removed from the depository or used for other purposes with the court's permission; and
 
 
 389
 (4) Upon the termination of the investigation, the documents (and presumably all copies of documents) must be returned to their owner.[173]
 
 
 390
 The Trade Commission does not question the confidential nature of the documents it seeks disclosed. Rather, its position is that the FTCA and the Commission's Rules of Practice provide appellees with adequate protection. Quite to the contrary, the FTCA and the Rules of Practice merely state that the public disclosure of geophysical data or information and trade secrets is within the discretion of the Commission. The FTC's rules governing in camera orders, the release of confidential information, and requests for disclosure of records clearly indicate that the Trade Commission will decide ultimately whether records exempt from disclosure under the Freedom of Information Act (as most of these records probably would be) will be disclosed.[174]
 
 
 391
 The District Court was not required to rely on the unbounded discretion of the Trade Commission to keep the producers' estimates confidential.[175] In addition, we fail to see how the minor protective procedures fashioned by the court will impose any substantial burden on the FTC's investigation[176] especially since the parties have agreed that this portion of the court's order may be modified by the addition of the following provisos:
 
 
 392
 Provided that, nothing in this order shall prohibit disclosure of materials produced by respondents to commissioners of the FTC in connection with the performance of said commissioners' official functions; nothing in this order shall prohibit employees of the Trade Commission from referring to or relying on any of the materials produced by respondents in connection with the presenting of any recommendation to the Trade Commission for or against issuance of a complaint; and nothing in this order shall prohibit the Trade Commission from referring to or relying on any of the materials produced by respondents in connection with any determination for or against issuance of any complaint based on such materials. (P 8(a))
 
 
 393
 In the event the Trade Commission desires to release any confidential material, it shall so notify the Court and each affected respondent, specifying the material it desires to release, and each such respondent may, within ten days of receipt of such notice, file with the Court opposition to such release. The respondents shall bear the burden of proving the material is entitled to confidential treatment upon notice that the Trade Commission intends to release any such material. No such data may, however, be released until this Court shall enter its order permitting such release. (P 8(b))
 
 
 394
 Provided that, in the event the Trade Commission issues a formal complaint, at the conclusion of the investigation, the confidential material produced by respondents may be offered and received in evidence in the complaint proceeding, provided that each affected respondent shall be given opportunity to request appropriate confidential treatment of such material. (P 8(c))[177]
 
 
 395
 We would adopt these modifications (as the majority opinion does to some extent, e. g., the ten day notice requirement) and hold that the District Court did not abuse its discretion when it attached the conditions listed above to the disclosure of information by all seven appellees.
 
 
 396
 The Trade Commission also complains about the option permitting the production of documents for inspection where they are stored. The Supreme Court in CAB v. Hermann upheld the enforcement of a subpoena "with appropriate provisions for assuring the minimum interference with the conduct of the business of respondents.[178] The Second Circuit has also upheld a similar provision. It noted that "(r)equiring records to be produced away from the place where they are ordinarily kept may impose an unreasonable and unnecessary hardship which in itself would make the issuance of the subpoena, otherwise proper, arbitrary and capricious."[179] Since the number of documents to be produced will be quite large, it is not inappropriate to relieve appellees of some of the expense and burden entailed by permitting them the option of producing documents where they were stored[180] and requiring the Trade Commission to copy and transport to Washington any documents they consider useful. Adding the one agreed-upon modification, we would affirm the District Court's in situs restriction.
 
 VIII. THE SUPERIOR ORDER
 
 397
 The Commission concedes that Superior does not report reserve estimates to, or participate in, the work of the AGA. Since the FTC issued identical subpoenas to all producers, it was obvious to the District Court that several specifications, those relating to reporting and participating in the AGA, were not relevant to Superior. As a result, the District Court simply refused to enforce specifications G through J. In all other respects, the court required Superior to provide the Commission with the same documents and information that were being required of the other six producers, and subject to the same confidentiality protections previously discussed. We do not understand, and the majority opinion does not bother to explain, how this logical factual determination can be viewed as clearly erroneous.
 
 IX. CONCLUSION
 
 398
 The preceding pages set forth in detail our differences with the majority opinion. In our view, the majority is not only wrong in its evaluation of the details of this case and in its misconception of the economic facts of life in the gas industry, but, more importantly, the majority has abandoned any standard of appellate review of the factual determinations of a trial court in proceedings to enforce an administrative subpoena.
 
 
 399
 It cannot be denied that questions of relevance and burdensomeness are peculiarly within the ken of the trial court, and the recognized standard is that the district court's findings are to be upset only if they represent clear error or an abuse of discretion. The majority apparently feels this standard would be too restrictive of what it is resolved to do. So, instead, it cavalierly labels the trial court's findings of fact as questions of law and proceeds to substitute its judgment for that of the trial court.
 
 
 400
 Our concern over the majority's approach thus derives, not from a disagreement over the application of the accepted standard of appellate review to the particular factual setting in this case, but rather from a more basic apprehension over the consequences of the undefined standard of review which was employed.
 
 
 401
 The majority has engaged in a standardless, directionless review in this case, and no euphemism can disguise this embarrassing fact. The majority opinion demonstrates this assertion by failing to even define the purpose of the FTC investigation which is being subjected to de novo review, although the trial court had elucidated this quite well from FTC counsel, taking the original "We're Going to Investigate the Gas Industry" resolution of the FTC as a beginning. The precedents clearly establish this definition of purpose as the starting point for analysis; if the majority chooses to disregard these precedents, the dictates of logic should serve as an adequate substitute. The failure to focus on the FTC's purpose in turn causes the majority to roam into those areas committed by precedent to, and more appropriate for, the district court. A particularly striking example of this is to be found in the majority's decision to ignore the scientific and economic realities of the gas industry which the District Court correctly took into account.
 
 
 402
 The enlarged role which the majority has assigned to this court in this case distorts the proper relationship between the federal agencies, the federal trial courts, and the federal appellate courts. In so doing, the majority sets a pernicious precedent for future trials de novo which would leave the Court of Appeals as the primary determinant of factual matters more properly suited for the District Court.
 
 
 403
 The strength of this sloppy precedent is, of course, weakened by the composition of the en banc court in this case; here the majority consists of only four of our colleagues. It is our hope that the approach adopted by this diminished majority of the court will not be carried over into future cases. If it is attempted to be so applied in the future, it will be a divergence from accepted practice of such magnitude that a close examination by our full court will be warranted, if the errors of our four colleagues have not already received their just reward from an even higher authority.
 
 
 
 [1]
 The FTC subpoena and the district court orders are reproduced in the appendix to this opinion
 
 
 [2]
 The term "proved reserves" is central to the discussion herein. The following definition has been adopted by the AGA:
 Proved Reserves are the estimated quantity of natural gas which analysis of geologic and engineering data demonstrate with reasonable certainty to be recoverable in the future from known oil and gas reservoirs under existing economic and operating conditions. Reservoirs are considered proved that have demonstrated the ability to produce by either actual production or conclusive formation test.
 The area of a reservoir considered proved is that portion delineated by drilling and defined by gas-oil, gas-water contacts or limited by the structural deformation or lenticularity of the reservoir. In the absence of fluid contacts, the lowest known structural occurrency of hydrocarbons controls the proved limits of the reservoir. The proved area of a reservoir may also include the adjoining portions not delineated by drilling but which can be evaluated as economically productive on the basis of geological and engineering data available at the time the estimate is made. Therefore, the reserves reported should include total proved reserves which may be in either the drilled or the undrilled portions of the field or reservoir.
 Natural gas reserves take into account the shrinkage of the reservoir gas volume resulting from the removal of the liquefiable portions of the hydrocarbon gases and the reduction of volume due to the exclusion of non-hydrocarbon gases where they occur in sufficient quantity to render the gas unmarketable.
 The proved reserves estimated are to include all gas reserves regardless of size, availability of market, ultimate disposition or use.
 See "Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity," Volume 28, June 1974. The first two paragraphs of this definition appear on page 103 of this publication, the third paragraph is derived from page 99, and the last paragraph is derived from pages 96 and 97.
 Essentially the concept of proved reserves is bottomed on the presence of enough technical data to ensure reasonably accurate measurement of a known reservoir. Even proved reserves are only estimates, however, and competent evaluators may produce slightly different figures based on different analyses of the geological data. See, e. g., Federal Power Commission Staff Report on the Updated 31 Lease Investigation, June 1976, at 16; Federal Power Commission Analysis of "Gas Reserve Estimation of Offshore Producible Shut-in Leases in the Gulf of Mexico," May 1976, at 1-3. Gas producers may also denominate reserves as "speculative," "possible," "probable," "recoverable," or "ultimately recoverable" indicating the progression of knowledge as a field is developed but there is no accepted use or definition of these terms by the industry. Only proved reserves are consistently defined, and only proved reserves are reported by the AGA.
 
 
 [3]
 App. III 537a-543a, 556a-558a
 
 
 [4]
 41 F.P.C. 378 (Mar. 20, 1969). The FPC order mandated an investigation of "offshore gas supply and costs associated therewith." Id. at 379; see further discussion infra at ---- of 180 U.S.App.D.C., at 869-870 of 555 F.2d. In May of 1968 the Supreme Court had approved the FPC's functional use of price "as a tool to encourage the production of appropriate supplies of natural gas." Permian Basin Area Rate Cases, 390 U.S. 747, 796-98, 88 S.Ct. 1344, 1375, 20 L.Ed.2d 312
 
 
 [5]
 Mobil Oil Corp. v. FPC, 417 U.S. 283, 292-93, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), citing Southern Louisiana Rate Cases, 428 F.2d 407, 418 (5th Cir. 1970). The area is defined by the FPC to include all parts of the state south of the thirty-first parallel, together with the offshore territory in the federal domain that would be bounded by Louisiana borders if extended into the Gulf of Mexico. Id
 
 
 [6]
 Section 5(a)(1) of the FTC Act, as amended, provides that "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. § 45(a) (1)
 
 
 [7]
 App. IX 1686a. Section 6(a) of the FTC Act, as amended, empowers the Commission
 To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations. 15 U.S.C. § 46(a).
 
 
 [8]
 App. III 497a
 
 
 [9]
 Section 9 of the FTC Act, as amended, provides in pertinent part:
 For the purposes of (the FTC Act) the Commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any person, partnership, or corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. Any member of the Commission may sign subpoenas, and members and examiners of the Commission may administer oaths and affirmations, examine witnesses, and receive evidence.
 Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. 15 U.S.C. § 49.
 
 
 [10]
 App. IV 625a, 643a
 
 
 [11]
 Section 9 of the FTC Act, as amended, provides in relevant part that
 . . . in case of disobedience to a subpoena the Commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.
 Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any person, partnership, or corporation issue an order requiring such person, partnership, or corporation to appear before the Commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. 15 U.S.C. § 49.
 
 
 [12]
 Area Rate Proceeding (Southern Louisiana), 40 F.P.C. 530 (Sept. 25, 1968), modified on rehearing, 41 F.P.C. 301 (Mar. 20, 1969), aff'd, Southern Louisiana Area Rate Cases, 428 F.2d 407 (5th Cir.), cert. denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970)
 
 
 [13]
 41 F.P.C. 378 (Mar. 20, 1969)
 
 
 [14]
 42 F.P.C. 1110 (Dec. 15, 1969)
 
 
 [15]
 The FPC stated that evidence should be taken "with respect to the adequacy of gas supply and adequacy of service to consumers, the demand for gas, the cause of a gas shortage, if any, the effect of price on gas supply and demand, and other relevant economic evidence. . . ." 42 F.P.C. 1110, 1112 (Dec. 15, 1969)
 
 
 [16]
 43 F.P.C. 444, 445 (Mar. 17, 1970). The FPC already had data pertaining to gas reserves from Form 15 reports filed by pipelines. Form 15 applies only to reserves "committed" or "dedicated" to interstate sale; thus, "uncommitted" reserves are unreported. The uncommitted reserves study was intended to supplement existing data in an effort to determine if the trends reflected in Form 15 reports were an accurate cross-check of AGA reported reserves. See 46 F.P.C. 86, 113-114 (July 16, 1976)
 
 
 [17]
 Order and Opinion Determining Just and Reasonable Rates for Natural Gas Produced in the Southern Louisiana Area, 46 F.P.C. 86, 110-116 (July 16, 1971)
 
 
 [18]
 Id. at 116. The Commission's order was affirmed by the Fifth Circuit, Placid Oil v. FPC, 483 F.2d 880 (5th Cir. 1973), and the court of appeals subsequently was affirmed by the Supreme Court, Mobil Oil v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974)
 At the direction of Congress, the FPC began in 1971 a National Gas Reserves Study. The independent survey was conducted on a random sampling basis and produced estimates of gas reserves as of December 31, 1970. A staff report, published in May 1973, noted that the AGA total estimate was slightly higher than the NGRS total estimate. App. VI 1048a.
 
 
 [19]
 Notably, the Fair Labor Standards Act incorporated sections 9 and 10 of the Federal Trade Commission Act for the purpose of any hearing or investigation. See 327 U.S. at 200, n. 24, 66 S.Ct. 494
 
 
 [20]
 The principles set down by the Supreme Court have been uniformly followed by the circuit courts of appeals. See, e. g., United States v. Litton Industries, 462 F.2d 14, 16 (9th Cir. 1972); Genuine Parts v. FTC, 445 F.2d 1382, 1391 (5th Cir. 1971); FTC v. Browning, 140 U.S.App.D.C. 292, 298, 435 F.2d 96, 102 (1970); SEC v. Wall Street Transcript Co., 422 F.2d 1371, 1375 (2d Cir.); cert. denied, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970); Adams v. FTC, 296 F.2d 861, 866 (8th Cir. 1961), cert. denied, 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83 (1962)
 
 
 [21]
 On the initial appeal to this court, Standard Oil of California maintained that the district court's first order is not a final decision under 28 U.S.C. § 1291 and therefore is not appealable. This argument was rejected in the panel decision, and Standard Oil has not pressed it on rehearing en banc. We nonetheless note that it is settled that an order of a district court granting or denying an agency's petition for enforcement of a subpoena is final and appealable. Ellis v. ICC, 237 U.S. 434, 442, 35 S.Ct. 645, 59 L.Ed. 1036 (1915); Int'l Brotherhood of Electrical Workers v. EEOC, 398 F.2d 248, 251 (3d Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed.2d 565 (1969). The district court's retention of jurisdiction for possible further relief after the documents were produced does not defeat finality. See FTC v. Feldman, 532 F.2d 1092, 1098 (7th Cir. 1976)
 
 
 [22]
 As previously discussed, the district judge did not concretely state the reasons for the limitation to proved reserves in his order. During the hearings, however, the district judge appeared to accept the producers' arguments that only proved reserves are relevant. App. II 398a-402a, 431a, 439a-443a. The limitation to proved reserves was also premised in part on an application of collateral estoppel. See discussion infra at ---- of 180 U.S.App.D.C., at 881 of 555 F.2d
 
 
 [23]
 This standard was urged by the FTC in its first brief on appeal. FTC's Brief at 16. In its supplementary brief the FTC argues that the pertinent inquiry is whether the requested material is "plainly irrelevant" to the investigation. Supp. Brief at 5, 31
 The "plainly irrelevant" language is derived, of course, from the Supreme Court's statement in Endicott Johnson that the evidence sought by the subpoena was not "plainly incompetent or irrelevant" to any lawful purpose of the Secretary. 317 U.S. at 509, 63 S.Ct. 339. The issue before the Endicott Court was the authority of the district court to decide the question of statutory coverage; the appropriate standard of relevance was not directly addressed. In Oklahoma Press and Morton Salt, decided after Endicott, the Court spoke of information "relevant" and "reasonably relevant," respectively, to the inquiry. 327 U.S. at 209, 66 S.Ct. 494; 338 U.S. at 652, 70 S.Ct. 357. More recently, the Court has stated that, for enforcement of an Internal Revenue Service summons for records, the Commissioner must demonstrate, inter alia, that the inquiry "may be relevant" to a legitimate purpose. United States v. Powell, 379 U.S. 48, 57, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). And in See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the Court noted, citing Morton Salt and Oklahoma Press, that when an administrative agency subpoenas corporate books or records, the subpoena must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." Id. at 544, 87 S.Ct. at 1740.
 While some courts of appeal have employed a "clearly" irrelevant standard in enforcement proceedings, see, e. g., FTC v. Feldman, 532 F.2d 1092, 1098 (7th Cir. 1976); FTC v. Standard American, Inc., 306 F.2d 231, 235 (3d Cir. 1962), most have utilized the "reasonably relevant" language of Morton Salt. See cases cited at ---- of 180 U.S.App.D.C., n. 20, at 873 of 555 F.2d, n. 20. In Moore Business Forms v. FTC, 113 U.S.App.D.C. 231, 307 F.2d 188 (1962), a panel of this court stated it could not say that the subpoenaed information was "plainly irrelevant" to the charges in the complaint. Id. at 232, 307 F.2d at 189. Another panel of this court, however, has recited the "reasonably relevant" language. FTC v. Browning, supra n. 20, 140 U.S.App.D.C. at 298, 435 F.2d at 102.
 Without deciding whether a "plainly irrelevant" standard actually is indicative of a more limited power of review, it suffices to dispose of this case that the material sought by the FTC is "reasonably relevant" to a permissible FTC purpose.
 
 
 [24]
 See, e. g., Westside Ford v. United States, 206 F.2d 627, 632 (9th Cir. 1953); FTC v. Green, 252 F.Supp. 153, 156 (S.D.N.Y.1966)
 
 
 [25]
 In Oklahoma Press, the Court emphasized that the purpose of the subpoena was "to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so." 327 U.S. at 201, 66 S.Ct. at 501. And in Morton Salt the Court stated that "(e)ven if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." 338 U.S. at 652, 70 S.Ct. at 369
 
 
 [26]
 Supra, p. ---- of 180 U.S.App.D.C., at 868 of 555 F.2d. While the language of the resolution is broad, resolutions of this sort are not uncommon in the investigative process, and the agency was not required to articulate its purpose with greater specificity. See, e. g., FTC v. Feldman, supra n. 23, 532 F.2d at 1093; FTC v. Standard American, Inc., supra n. 23, 306 F.2d at 233-34; Westside Ford v. United States, supra n. 24, 206 F.2d at 630-31; FTC v. Green, supra n. 24, 252 F.Supp. at 154-56
 
 
 [27]
 FTC Reply Brief at 304; FTC Supp. Brief at 32-34, TR. at 5-7
 
 
 [28]
 Another entirely legitimate result may ensue from an investigation of questionable conduct, even if the agency should conclude that the conduct does not violate existing law the investigation may reveal the need for changes in the law. The underlying act gives the FTC the authority to conduct investigations for the purpose of making recommendations to Congress. 15 U.S.C. § 49. See generally Davis, Administrative Law Treatise §§ 3.02-.03
 
 
 [29]
 The dissent argues that the evaluation of the relevance of particular documents is "essentially factual in nature," and that the district court's conclusion on this point can therefore be reviewed only for "clear error" or "abuse of discretion." Dissenting op. at ---- , ----, ---- of 180 U.S.App.D.C., at 897, 904, 907 of 555 F.2d. Here, however, the district court's relevance determinations rested upon and, indeed, were inseparable from its view of the applicable law with respect to the proper scope of the FTC's investigation
 When relevance determinations are, in essence, factual judgments, they are normally entitled to special deference from appellate courts, at least where there are issues of credibility of witnesses. We need not pause to consider to what extent the appellate court has greater latitude on review where, as here, the evidence was documentary, and raised no issues of credibility. Here the determinations of the trial court were dependent on, and integrally related to, a legal premise. In such a case, the appellate court has the authority and the duty to determine the proper legal premise and to correct the legal error of the trial judge, without limitation by the doctrines of "clearly erroneous" and "abuse of discretion" that are applicable to review of factual determinations. See Del. & Hudson Ry. Co. v. United Trans. Union, 146 U.S.App.D.C. 142, 159-160, 450 F.2d 603, 620-1, cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971):
 If the appellate court has a view as to the applicable legal principle that is different from that premised by the trial judge, it has a duty to apply the principle which it believes proper and sound. The reversal of the trial judge in no way reflects a determination that he was unreasonable or arbitrary, or chargeable with an abuse of discretion, but only and simply that his premise as to the applicable rule of law is deemed erroneous by the appellate court.
 Id. See also Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 10, 458 F.2d 827, 832 (1972); Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601 (1951); Societe Comptoir de L'Industrie v. Alexander's Dept. Stores, 299 F.2d 33, 35-6 (2d Cir. 1962); Milsen Co. v. Southland Corp., 454 F.2d 363, 369 (7th Cir. 1971).
 
 
 [30]
 The district judge ruled from the bench that bid files are irrelevant to the FTC's investigation. App. II 431a
 
 
 [31]
 Mobile Brief at 6. Bid files are considered highly confidential by the producers; a competitor who had access to the bidding model developed at high cost by another producer could easily outbid his opponent
 
 
 [32]
 The FTC suggests, for example, that bid files may contain proved reserve figures for adjacent tracts. These proved reserve figures could be compared with other proved reserve figures for the same tract maintained by the company. While Mobil asserts that none of its bid files contain such proved reserve figures, Mobil Brief at 17-18, the affidavit of a Commission attorney who has examined bid files of producers who complied with the subpoenas states that such files have been found to contain proved reserve estimates, App. IV 633a. On this record we cannot conclude that the Commission's supposition is obviously wrong
 Moreover, the Commission suggests that bid files might be relevant in analyzing whether companies have deferred drilling in some circumstances in order to minimize the extent of proved reserves which would have to be reported. The district judge provided that if the FTC found a "situation where a company has been awarded a bid on a property and has delayed an unreasonable time in drilling on it so they could come up with a proper estimate, then you may apply and I will consider giving you the bid file on that particular one." App. II 431a. Without the bid files, however, it may be difficult, if not impossible, for the FTC to identify such instances.
 The Commission also suggests that bid files could be used to establish lease histories; such histories would enable the Commission to examine the relationship, if any between "speculative" and "proved" estimates. If the Commission were to find a reasonably stable relationship between these different estimates if, for example, "speculative" estimates were consistently higher than the reported "proved" estimates, and by a roughly equivalent amount this might well be indicative of anticompetitive practices.
 
 
 [33]
 In Moore Business Forms v. FTC, supra, n. 23, the company argued against enforcement on the ground that the documents sought were not relevant indeed, were "meaningless" to the precise theory the Government would have to use to demonstrate a trade violation. 113 U.S.App.D.C. at 232, 307 F.2d at 189. A panel of this court enforced the subpoenas per curiam, noting that the Commission had not yet ruled on the inherent factual question and that the court should not "anticipate" the Commission's determination by passing on that question. Id
 
 
 [34]
 In addition, the producers argued that the doctrine of "primary jurisdiction" forecloses this issue to the FTC, since regulatory and fact-finding expertise concerning proved reserve estimates lies with the Power Commission. On appeal, and particularly on rehearing en banc, the producers have concentrated on collateral estoppel, rather than on a primary jurisdiction argument, presumably because the district court's order appears more likely to be premised on collateral estoppel
 
 
 [35]
 Texaco, et al. Supp. Brief at 2
 
 
 [36]
 Standard Oil (California) Supp. Brief at 2
 
 
 [37]
 Superior Supp. Brief at 2
 
 
 [38]
 While the defenses urged were briefly summarized by the Court in a footnote, see 317 U.S. at 509 n. 11, 63 S.Ct. at 343 n. 11, they were explained in greater (and here quite pertinent) detail in the Second Circuit's decision:
 Defendants also urge that application of the Walsh-Healy Act to their tanneries, etc., would be improper because of an alleged prior inconsistent "ruling" made, as to a different company, by the acting administrator, and because of certain conduct thought to "estop" the government. Consideration of these issues has no place in such a proceeding as this . . . . Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 224, aff'd, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424.
 
 
 [39]
 The instant case is an ample witness to the correctness of this rationale. Enforcement proceedings began in 1973
 
 
 [40]
 See also SEC v. Brigadoon Scotch Distributing Co., 480 F.2d 1047, 1052-53 (2d Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); FTC v. Gibson, 460 F.2d 605, 608 (5th Cir. 1972)
 
 
 [41]
 The producers specifically argued that the FTC had no "jurisdiction" to inquire into gas reserves, by virtue of both primary jurisdiction and collateral estoppel. App. II 218-220a, 226a. In the second hearing in the district court, the parties agreed to present their "jurisdictional" arguments first. Id. 331a-332a
 
 
 [42]
 We do not hold that collateral estoppel can never be raised in defense to an investigative subpoena. Instances of abuse of a court's process can be imagined, though they are unlikely. In the instant case, we can perceive no reason to deviate from the general principles discussed above. Moreover, because we conclude that the assertion of collateral estoppel in this enforcement proceeding is premature, we need not reach the issue, discussed in Judge Leventhal's concurring opinion, of whether a determination in an essentially legislative rate-making proceeding can ever be given preclusive effect
 
 
 [43]
 In this context we note that section 15(b) of the Federal Energy Administration Act of 1974, P.L. 93-275, 88 Stat. 96, 109 (May 7, 1974), provides:
 (b) Not later than one year after the effective date of this Act, the Administrator shall submit a report to the President and Congress which will provide a complete and independent analysis of actual oil and gas reserves and resources in the United States and its Outer Continental Shelf, as well as of the existing productive capacity and the extent to which such capacity could be increased for crude oil and each major petroleum product each year for the next ten years through full utilization of available technology and capacity. The report shall also contain the Administration's recommendations for improving the utilization and effectiveness of Federal energy data and its manner of collection. The data collection and analysis portion of this report shall be prepared by the Federal Trade Commission for the Administration. Unless specifically prohibited by law, all Federal agencies shall make available estimates, statistics, data and other information in their files which, in the judgment of the Commission or Administration, are necessary for the purposes of this subsection.
 Although this statute was enacted several years after the FTC commenced its investigation, it is at least indicative that Congress intends a major role for the FTC in the analysis of natural gas reserves.
 
 
 [44]
 Adams v. FTC, supra n. 20, 296 F.2d at 870 n. 7; see SEC v. Savage, 513 F.2d 188, 189 (7th Cir. 1975); SEC v. Brigadoon Scotch Distributing Co., supra n. 40, 480 F.2d at 1056; Genuine Parts Co. v. FTC, 313 F.Supp. 855, 857 (N.D.Ga.1970), aff'd, 445 F.2d 1382 (5th Cir. 1971)
 
 
 [45]
 See FTC v. Lonning, 176 U.S.App.D.C. 200, at 209, 539 F.2d 202, at 211, 1976; FCC v. Cohn, 154 F.Supp. 899, 912 (S.D.N.Y.1957); cf. NLRB v. Northern Trust Co., 148 F.2d 24, 29 (7th Cir.), cert. denied, 326 U.S. 731, 66 S.Ct. 38, 90 L.Ed. 435 (1945). Most courts have not enunciated the correct scope of review. In Adams v. FTC, supra n. 20, for example, a panel of the Eighth Circuit overturned several modifications made by the district court on grounds of burdensomeness without specifically stating the applicable standard. See 296 F.2d at 867-870
 
 
 [46]
 That many of the restrictions were premised on a limited view of the FTC's inquiry is evident from the district judge's remarks towards the close of the second hearing:
 Well, Gentlemen, I think this: it is within their province to determine whether there has been any violation of the matters that are entrusted to them. For that I don't think it is necessary or proper that they endeavor to obtain and to determine the entire gas reserves available to all these companies, but it may well be pertinent that they get certain information to determine whether or not there has been a conspiracy to get together and violate some law in connection with these returns.
 So I think the better way to handle it would be for the Court to limit their discovery in such a manner as to cover the purposes and not go to all out to have a further determination of what the national gas reserve is.
 Now, how do we approach that? Your present subpoenas are certainly, it seems to me, too broad . . . .
 App. II 397a.
 In formulating the random sample limitation, the court stated,
 Say 100 out of 220, would give them, it seems to me, ample opportunity to prove any conspiracy if there is one. At the same time, it wouldn't let them get into the business of estimating all the gas reserves in the country.
 App. II 438a.
 
 
 [47]
 Cf. Colonial Times v. Gasch, 166 U.S.App.D.C. 184, 189-191, 509 F.2d 517, 522-24 (1975); Societe Comptoir de L'Industrie Cotonniere Establissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 35-36 (2d Cir. 1962); Ring v. Spina, 148 F.2d 647, 650 (2d Cir. 1945)
 
 
 [48]
 Arguably, these questions could be remanded to the district court for a reassessment, free from the errors made in the areas of collateral estoppel and relevance. This litigation already has been inordinately delayed, however; a proceeding usually summary in nature has stretched into years. In a protracted litigation of this sort, we need not return an issue "for another round of proceedings in the trial or appellate courts" even if that issue is one which normally depends on trial court discretion "if we can fairly dispose of it at this juncture." Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 340-41, 91 S.Ct. 795, 807, 28 L.Ed.2d 77 (1971)
 
 
 [49]
 See United States v. Powell, 379 U.S. 48, 58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); FTC v. Standard American, Inc., supra n. 23, 306 F.2d at 235
 
 
 [50]
 See 379 U.S. at 58, 985 S.Ct. 248; SEC v. Brigadoon Scotch Distributing Co., supra n. 40, 480 F.2d at 1056; Genuine Parts Co. v. FTC, supra n. 44, 445 F.2d at 1391; Adams v. FTC, supra n. 20, 296 F.2d at 867; FCC v. Cohn, supra n. 45, 154 F.Supp. at 912
 
 
 [51]
 Adams v. FTC, supra n. 20, 296 F.2d at 867. The Fifth Circuit has stated that the Commission must be accorded "extreme breadth" in conducting its investigations. Genuine Parts Co. v. FTC, supra n. 44, 445 F.2d at 1382, citing United States v. Morton Salt, 338 U.S. at 652, 70 S.Ct. 357
 
 
 [52]
 See, e. g., SEC v. Savage, supra n. 44, 513 F.2d at 189; SEC v. Wall Street Transcript Corp., supra n. 20, 422 F.2d at 1381; FTC v. Standard American, Inc., supra n. 23, 306 F.2d at 235
 
 
 [53]
 See, e. g., App. IX 1759a-1762a
 
 
 [54]
 Mobil Brief at 5; see App. XI 2014a-2031a
 
 
 [55]
 See FTC Brief at 52-53; App. IV 628a. Gulf Oil, a company with extensive natural gas operations, informed the Commission that 2028 man-hours were spent gathering the documents. Two other companies compiled, reproduced, and forwarded the data to the FTC within three months. Id
 
 
 [56]
 See note 46 supra
 
 
 [57]
 The district court also changed the beginning date in Specification K from 1962 to 1966. This modification must fall for the same reason
 
 
 [58]
 15 U.S.C. § 49; see n. 9 supra. While this statute grants the FTC the power of "access" and the "right to copy" any documentary evidence of an entity under investigation, it also enables the FTC to require such evidence via a subpoena duces tecum. See id. Here the FTC chose to act pursuant to its subpoena power, not its access power
 
 
 [59]
 This is not a case in which the subpoena is directed to a third party not under investigation. See FTC v. Bowman, 149 F.Supp. 624, 630 (N.D.Ill.), aff'd, 248 F.2d 456 (7th Cir. 1957). Cf. United States v. Friedman, 3rd Cir., 532 F.2d 928 (1976); United States v. Davey, 426 F.2d 842 (2d Cir. 1970); United States v. Dauphin Deposit Trust Co., 385 F.2d 129 (3d Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968)
 
 
 [60]
 There is no indication that the bulk of these documents are in current business use; in fact, since the investigation is focused on the period 1962-1971, the situation appears to the contrary. See, e. g., App. IX 1762a. See also FTC v. Standard American, Inc., supra n. 23, 306 F.2d at 235
 
 
 [61]
 See 15 U.S.C. § 46(f); 16 C.F.R. §§ 3.45, 4.10, 4.11
 
 
 [62]
 In the past, some courts have conditioned enforcement of an agency subpoena upon a protective order. See, e. g., FTC v. Menzies, 145 F.Supp. 164 (D.Md.1956), aff'd, 242 F.2d 81 (4th Cir.), cert. denied, 353 U.S. 957, 77 S.Ct. 863, 1 L.Ed.2d 908 (1957); FCC v. Cohn, supra n. 45, 154 F.Supp. at 912-913. The Schreiber decision makes clear, however, that it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality. See 381 U.S. 295-6, 85 S.Ct. 1459. See also FTC v. United States Pipe and Foundry Co., 304 F.Supp. 1254, 1260 (D.D.C.1969), FTC v. Green, supra n. 24, 252 F.Supp. at 157; Gellhorn, "The Treatment of Confidential Information by the Federal Trade Commission: Pretrial Practices," 36 U.Chi.L.Rev. 113, 126 (1968)
 
 
 [63]
 We think it not unreasonable to require notice to the producers even in the event of a proposed release to Congress, since the circumstances surrounding such a disclosure cannot presently be ascertained. See Ashland Oil v. FTC, 179 U.S.App.D.C. 22, 548 F.2d 977 (1976)
 
 
 [64]
 The Court is not herein adopting a rule of general applicability for a 10-day notice provision. It is rather adopting for purposes of this case a proposal for confidentiality advanced by FTC, even though this was put as a basis for settlement and no settlement was reached
 It should be noted that the settlement conference was initiated by this Court. Pursuant to an order of this Court dated April 21, 1976, counsel for the FTC and the appellees conferred for the purpose of seeking agreement as to the issues which still divided them on this appeal. On May 19, 1976, the FTC and Superior filed a Stipulation with the Court, indicating that they were "unable to agree on any modifications of the district court's order of March 22, 1974, concerning Superior which would eliminate or narrow the issues remaining for decision by this Court." On the same date, the FTC and the other six appellees who are parties in this matter filed a "Stipulation re Issues on which Parties have Agreed and Issues which Remain to be Resolved by the Court," in which they set forth certain issues upon which they had reached agreement. Attached to the stipulations was a document entitled "FTC's Statement of Issues and Proposed Modifications," which included certain "modifications the FTC is willing to accept but which the Companies have not agreed to." Paragraph 18 of this latter document (Paragraph 9 of the Attachment to the "Stipulation" filed with Superior), which sets forth the modifications of the district court's confidentiality protection that the FTC was "willing to accept," reads as follows:
 Subject to the exceptions set forth below, the FTC will not disclose any of the documents produced which a company designates confidential to any person outside the employ of the FTC (other than an outside consultant retained by the FTC who has agreed not to disclose the documents) without first giving the company ten days' notice of its intention to do so.
 (a) With respect to an official request for such documents from a committee or subcommittee of Congress or a court (by compulsory process), the FTC will advise the Congressional committee or subcommittee or the court that the company considers the material to be confidential, and will give the company ten days' prior notice where possible, and in any event, as much advance notice as can reasonably be given, before releasing or granting access to the documents. (footnote omitted)
 (b) The above notice provisions shall not apply to any information which (1) is now in the public domain; (2) enters the public domain from a source other than the FTC or its employees; (3) was in the FTC's possession prior to disclosure to the FTC by Superior; or (4) is supplied to the FTC or its employees by a third party lawfully in possession thereof.
 (c) In the event that the investigation with respect to which the subpoena issued results in issuance of an adjudicative complaint, the confidential status of the documents and the limitations on their disclosure shall be governed solely by the applicable provisions of the FTC's Rules of Practice, Part 3 Rules of Practice for Adjudicative Proceedings.
 
 
 [65]
 Stipulation re Issues on Which Parties Have Agreed and Issues Which Remain to Be Resolved by the Court, May 19, 1976, at 5
 
 
 [66]
 Id. at 7-9, P 15-17; FTC's Statement of Issues and Proposed Modifications (re Superior Oil), May 19, 1976, at 3-5, P 5-8
 
 
 [67]
 The district court ordered that the documents be produced within 180 days. However, the experience of those companies that have already complied with the subpoenas evidence which was, of course, not available to the district court indicates that 90 days should suffice. See notes 54 and 55 supra and accompanying text. To remand this issue to the district court for re-evaluation in light of this new evidence would only prolong this already protracted litigation unnecessarily. See note 48 supra
 
 
 [1]
 Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908); Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 445, 50 S.Ct. 220, 74 L.Ed. 524 (1930); State Corporation Commission v. Wichita Gas Co., 290 U.S. 561, 569, 54 S.Ct. 321, 78 L.Ed. 500 (1934); St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 64, 56 S.Ct. 720, 80 L.Ed. 1033 (1936)
 
 
 [2]
 See Shell Oil Company v. FPC, 520 F.2d 1061 (5th Cir. 1975)
 
 
 [1]
 Outline of this opinion:
 OUTLINE
 Page
 I. THE FACTS, THE ISSUES, AND THE ARGUMENTS ............ 3
 II. THE FEDERAL POWER COMMISSION
 INVESTIGATIONS ..................................... 13
 III. COURT ENFORCEMENT OF ADMINISTRATIVE
 SUBPOENAS .......................................... 20
 IV. RELEVANCE .......................................... 25
 A. Purpose of Inquiry, Test of Relevancy, and
 Standard of Judicial Review ..................... 25
 B. Raw Field Data, Bid Calculation Data, and
 Bid Calculation Files .......................... 37
 C. Summary on the Relevance Issue .................. 53
 V. BURDENSOMENESS ..................................... 58
 VI. COLLATERAL ESTOPPEL ................................ 66
 A. The Appropriateness of Considering the Issue
 of Collateral Estoppel in this Subpoena
 Enforcement Proceeding .......................... 72
 B. Giving Collateral Estoppel Effect to a
 Finding of Fact Made in the Context of a FPC
 Ratemaking Proceeding ........................... 81
 C. Giving Collateral Estoppel Effect to a
 Finding of Fact made for Ratemaking Purposes .... 85
 VII. CONFIDENTIALITY AND PRODUCTION AT
 SITUS .............................................. 90
VIII. THE SUPERIOR ORDER ................................. 94
 IX. CONCLUSION ......................................... 95
 
 
 [2]
 Throughout this opinion we will use the term "proved reserves." The following is the definition of proved reserves adopted by the AGA in its annual publication, "Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity," Volume 28, June 1974. The first two paragraphs of the following definition appear on page 103 of this publication, the third paragraph is derived from page 99 and the last paragraph is derived from pages 96 and 97 (emphasis added):
 Proved Reserves are the estimated quantity of natural gas which analysis of geologic and engineering data demonstrate with reasonable certainty to be recoverable in the future from known oil and gas reservoirs under existing economic and operating conditions. Reservoirs are considered proved that have demonstrated the ability to produce by either actual production or conclusive formation test.
 The area of a reservoir considered proved is that portion delineated by drilling and defined by gas-oil, gas-water contacts or limited by the structural deformation or lenticularity of the reservoir. In the absence of fluid contacts, the lowest known structural occurrency of hydrocarbons controls the proved limits of the reservoir. The proved area of a reservoir may also include the adjoining portions not delineated by drilling but which can be evaluated as economically productive on the basis of geological and engineering data available at the time the estimate is made. Therefore, the reserves reported should include total proved reserves which may be in either the drilled or undrilled portions of the field or reservoir.
 Natural gas reserves take into account the shrinkage of the reservoir gas volume resulting from the removal of the liquefiable portions of the hydrocarbon gases and the reduction of volume due to the exclusion of non-hydrocarbon gases where they occur in sufficient quantity to render the gas unmarketable.
 The proved reserves estimated are to include all gas reserves regardless of size, availability of market, ultimate disposition or use.
 See also note 91 infra.
 
 
 [3]
 These statistics were made available to the FTC subject to an agreement restricting access to and disclosure of the data. The agreement provided, inter alia, that:
 (2) Representatives of your Bureau (i. e., the Commission's Bureau of Competition) will make use of such reports only in connection with its current investigation into the reporting of natural gas reserves by the American Gas Association, and for the purpose of verification of natural gas reserves estimates reported by the A.G.A. Committee on Natural Gas Reserves; and shall not release, disclose, disseminate or publicize in any manner, to any person, any statistic or data contained in such reports, unless otherwise available in published records or documents, without twenty days prior notice, and opportunity to seek appropriate legal protection or relief, to A.G.A. and to each member of the South Louisiana Subcommittee whose statistics are to be disclosed by the Commission.
 Supplemental Brief for Appellee Mobil Oil Corp. (filed 4 April 1975), Exhibit A at 2. (Emphasis supplied). The agreement also provided that custody of the documents be maintained by a neutral third party, Price, Waterhouse & Co.
 The producers have alleged in supplemental filings before this court that the FTC breached this agreement by releasing to a Congressman certain staff and working papers containing excerpts from the AGA reserve statistics after less than 72 hours' notice. In a reply the Commission conceded that it had released the information to the Congressman, who by a phone call "required that the documents be immediately released" to him. The Commission argues, however, that the above paragraph was intended to prohibit disclosure of the data to the public or to competitors, and was not meant to cover the case where a member of Congress or congressional committee might immediately require use of the data. In addition, the Trade Commission argues that it lacks the statutory power to keep this data confidential when a Member of Congress demands disclosure.
 
 
 [4]
 Preliminarily, it is necessary to recognize the central importance of specification G of the FTC's subpoena. This specification, if left unmodified by the District Court's order of any of the subsequently agreed upon stipulations, calls for the production of
 Documents either received (from whatever source) or written by the Company, in whole or in part, at any time between January 1, 1962 to December 31, 1970, which contain estimates or evaluations of the volume of natural gas present or recoverable or ultimately recoverable (1) throughout all of South Louisiana (2) throughout all of Offshore South Louisiana and/or (3) in specific fields, portions of fields, leaseholds and/or portions of leaseholds located in Offshore South Louisiana.
 Excluded from this specification are any documents previously made available to the Commission by the American Gas Association and presently in the custody of Price, Waterhouse & Company, 1801 K Street, Washington, D. C. Included in this specification by way of illustration but not limitation are documents containing estimates or evaluations including re-estimates or reevaluations made in connection with or in preparation for or as the result of the following: (1) bidding on or nominating leases (2) deciding whether to erect permanent platforms (3) compiling or inventorying total company reserves or supply (4) negotiating or contracting for the sale of natural gas, or for the joint or common exploration, development, production, purchase or sale of acreage, or for obtaining bank loans (5) filing depreciation expense schedules with Internal Revenue Service or (6) submitting field-by-field estimates to subcommittees or committees of the American Gas Association or the American Petroleum Institute.
 FTC Subpoena, App. I at 54a. This is the most significant specification of the subpoena not only because of the enormous breadth of its coverage but also because the next two specifications (H and I(1)) define their breadth by referring back to the documents produced pursuant to specification G. Id. at 55a-56a.
 
 
 [5]
 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950)
 
 
 [6]
 FTC v. Lonning, 176 U.S.App.D.C. 200, 208 n.14, 539 F.2d 202, 210 n.14 (1976). See text, infra, at note 39
 
 
 [7]
 Opinion and Order Determining Just and Reasonable Rates for Natural Gas Produced in the Southern Louisiana Area (So La II ), 46 F.P.C. 86, 115 (16 July 1971), aff'd sub nom., Placid Oil Co. v. FPC, 483 F.2d 880 (5th Cir. 1973), aff'd sub nom., Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974)
 
 
 [8]
 App. IV at 807a (P 2.d.)
 
 
 [9]
 Id. at 806a-07a (P 2.a.-c.) (emphasis added)
 
 
 [10]
 Id. at 807a-08a (P 3) (emphasis added)
 
 
 [11]
 Id. at 808a (P 7)
 
 
 [12]
 Id. at 809a-10a (P 8)
 
 
 [13]
 Id. at 808a (P 6)
 
 
 [14]
 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950)
 
 
 [15]
 App. III at 469a-71a
 
 
 [16]
 Brief for Appellant (filed 30 Aug. 1974) at 17-18
 
 
 [17]
 United States v. Morton Salt Co., 338 U.S. at 652, 70 S.Ct. 357
 
 
 [18]
 In addition to So La II, on 23 February 1971 the Power Commission commenced work on the National Gas Reserves Study (NGRS), a massive audit of all United States gas reserves. In its final report, issued May 1973, the Commission concluded that AGA proved reserve estimates slightly overstated total reserves. FPC STAFF REPORT ON NATIONAL GAS RESERVE STUDY (May 1973) at 3, App. VI at 1048a. See infra at p. ---- of 180 U.S.App.D.C., at p. 902 of 555 F.2d
 Counting NGRS and So La II, the investigation contemplated by the Trade Commission's subpoenas would have been the third plenary investigation into the same gas reserve data, i. e., proved reserve estimates in South Louisiana as of 31 December 1970. Since its NGRS report, the Power Commission has continued to monitor closely the accuracy of the AGA reports.
 
 
 [19]
 As we shall see, the two most important modifications made by the District Court (1) limiting the production of documents to those containing or underlying proved reserves and (2) restricting the use of this information to an investigation of an alleged conspiracy in the reporting of proved reserves can and should each be affirmed on two of these three grounds
 
 
 [20]
 Rule 81(a)(3), FED.R.CIV.P., provides that the Federal Rules of Civil Procedure ". . . apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States . . .." We are thus bound by Rule 52(a), FED.R.CIV.P., which states that "(f)indings of fact shall not be set aside unless clearly erroneous . . .."
 
 
 [21]
 App. IV at 805a
 
 
 [22]
 Southern Louisiana Area Rate Cases, 428 F.2d at 421
 This second proceeding was initially denominated the "Offshore Louisiana Area" proceeding to distinguish it from So La I (the "Louisiana Area" proceeding). The impetus for this proceeding was contained in the record of So La I where the FTC said:
 . . . the pleadings do lead us to the conclusion that the vital importance of future additional gas supply from the offshore areas in Southern Louisiana warrants the immediate commencement of the further proceeding we had contemplated in our original Opinion herein looking towards a possible revision of the area price ceilings for such gas.
 
 
 [41]
 F.P.C. at 307. The Court of Appeals for the Fifth Circuit expressly endorsed the FPC's new initiative commenting on "new evidence of a possible impending gas supply shortage" and leaving the proceeding open to explore this development. See In re Southern Louisiana Area Rate Cases, 444 F.2d 125, 126 (5th Cir. 1970). This new proceeding initially focused strictly on the offshore area, 41 F.P.C. at 307-08, but was later enlarged to include onshore Southern Louisiana, 42 F.P.C. 1110. The order officially beginning the record proceedings was entered on 20 March 1969. 41 F.P.C. 378. The FPC subsequently stayed the effectiveness of its So La I orders at the request of the Court of Appeals for the Fifth Circuit. 41 F.P.C. 675-76. This stay was continued on 15 December 1969. 42 F.P.C. 1110, 1111. When the Fifth Circuit issued its opinion in June 1970, it expressly left the So La I record open for "retrospective as well as prospective adjustments." 444 F.2d at 126-127. Since the FPC had never made its orders fully effective, it was legally and conceptually logical for it to consolidate So La I with the new proceeding, and it did so on 24 December 1970, 44 F.P.C. 1638, in order to assess supply factors which it had ignored in So La I
 
 
 [23]
 Order Enlarging Investigation and Proposed Rulemaking Area Rate Proceeding (Southern Louisiana Area), 42 F.P.C. 1110, 1112 (15 December 1969)
 
 
 [24]
 See MDG's Initial Brief in So La II at 15
 
 
 [25]
 As part of its examination of the false shortage allegations, the FPC had conducted a spot audit of natural gas reserves requiring producers to report uncommitted reserves in the Southern Louisiana area. A composite of this data was admitted into evidence in So La II after the FPC had closely audited both the composite and the underlying individual responses of the producers. The data underlying the producers' uncommitted reserve estimates, (e. g., electric and other technical logs, core analyses, formation tests, shut-in and flowing pressure tests, structure maps, isopachus maps, directional surveys, daily drilling records, etc.) was also thoroughly scrutinized by the FPC auditing team. See 43 F.P.C. 444-48 (1970). According to appellees, "In most of the analyses, the audit team derived independent factors for estimating reserve volumes and made its own reserve estimate based upon these independent factors." Supplemental Memorandum for Appellees Texaco Inc., Standard Oil Co. (Indiana), Shell Oil Co., Exxon Corp., and Mobil Oil Corp. (filed 13 April 1976) at 6. The FPC staff members in charge of the So La II audit concluded that APA reserve data was accurate and established ". . . beyond any doubt that . . . a serious gas supply shortage does in fact exist throughout the nation's gas supply areas, and in Southern Louisiana in particular." Hearings on Concentration by Competing Raw Fuel Industries in the Energy Market and its Impact on Small Business Before the Subcomm. on Special Small Business Problems of the House Select Comm. on Small Business (hereinafter 1971 House Concentration Hearings ), 92d Cong., 1st Sess. A43 (1971). Of the AGA data, the FPC staff also stated,
 Certain parties have questioned the reliability of the AGA data in these proceedings . . .. However, the record establishes the validity and reliability of the reported AGA reserves data beyond any reasonable doubt.
 Id. at A56. See also id. at A72.
 
 
 [26]
 Opinion and Order Determining Just and Reasonable Rates for Natural Gas Produced in the Southern Louisiana Area, 46 F.P.C. 86, 113 (16 July 1971), aff'd sub nom., Placid Oil Co. v. FPC, 483 F.2d 880 (5th Cir. 1973), aff'd sub nom., Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). In affirming, the Supreme Court expressly approved the FPC's reliance on the non-cost factor of supply and noted that both the Commission and the Fifth Circuit were working ". . . against the background of a serious and growing domestic gas shortage . . .." 417 U.S. at 320, 94 S.Ct. at 2352
 
 
 [27]
 Id. at 116
 
 
 [28]
 See 46 F.P.C. at 113
 
 
 [29]
 Placid Oil Co. v. FPC, 483 F.2d 880, 894 n. 13 (5th Cir. 1973), aff'd sub nom., Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974)
 
 
 [30]
 FPC STAFF REPORT ON NATIONAL GAS RESERVE STUDY (May 1973) at 3, App. VI at 1048a
 
 
 [31]
 Chapman v. Maren Elwood College, 225 F.2d 230, 234 (9th Cir. 1955); accord, NLRB v. Northern Trust Co., 148 F.2d 24, 29 (7th Cir. 1945)
 
 
 [32]
 Supplemental Brief for Appellant on Rehearing En Banc (filed 31 Mar. 1976) at 5 (emphasis added)
 
 
 [33]
 See the last paragraph of both District Court Orders, App. III at 471a & IV at 810a
 
 
 [34]
 Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208-09, 66 S.Ct. 494, 505-506, 90 L.Ed. 614 (1946)
 
 
 [35]
 See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967)
 
 
 [36]
 United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950) (emphasis added). The majority correctly decides that this is the applicable standard. Court's opinion note 23 & accompanying text. Previously, however, in its "II. Court Enforcement of Administrative Subpoenas The Applicable Legal Principles," the majority also relied upon Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), and Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). As we demonstrate in Part VI-A, infra, pp. ---- - ---- of 180 U.S.App.D.C., pp. 927-928 of 555 F.2d these two cases deal with the agency's jurisdiction under their basic statutes, on which judicial review may logically be postponed until the administrative proceeding is completed, while here we deal with issues of relevance, burdensomeness, and collateral estoppel, which if not decided at the outset may become, in effect, moot by the time the companies have gone to the time and expense of baring their confidential files. See Safir v. Gibson, note 131, infra
 
 
 [37]
 Oklahoma Press Publishing Co. v. Walling, 327 U.S. at 217 n. 57, 66 S.Ct. at 509 n. 57
 
 
 [38]
 See United States v. Nixon, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974):
 Enforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues.
 
 
 [39]
 FTC v. Lonning, 176 U.S.App.D.C. 200, 208 n. 14, 539 F.2d 202, 210 n. 14 (emphasis supplied)
 
 
 [40]
 148 F.2d 24, 29 (7th Cir.), cert. denied, 326 U.S. 731, 66 S.Ct. 38, 90 L.Ed. 435 (1945) (emphasis added); accord, Lynn v. Biderman, 536 F.2d 820, 824 & 826 (9th Cir. 1976)
 
 
 [41]
 The fact that a subpoena is issued in an investigative setting does not diminish this requirement; respondents to any administrative subpoena may object on grounds of relevance. See United States v. Associated Merchandising Corp., 261 F.Supp. 553, 560 (S.D.N.Y.1966) ("It is clear, even in the investigative cases, that respondents may object to the subpoena on the ground of relevance and upon the ground of oppressiveness, i. e., the undue burden of compliance.")
 
 
 [42]
 5 U.S.C. § 554(b) (1970)
 
 
 [43]
 Montship Lines, Ltd. v. Federal Maritime Bd., 111 U.S.App.D.C. 160, 167-168, 295 F.2d 147, 154-55 (1961); Hellenic Lines, Ltd. v. Federal Maritime Bd., 111 U.S.App.D.C. 151, 153, 295 F.2d 138, 140 (1961); FTC v. Green, 252 F.Supp. 153 (S.D.N.Y.1966)
 
 
 [44]
 During the hearing of 13 December 1973 the following exchange took place between Judge Hart and FTC counsel, Gerald Harwood:
 THE COURT: Wait a minute. You are trying to prove that they conspired together to make certain returns with regard to reserves that were incorrect, aren't you? Is that what you are trying to say?
 MR. HARWOOD: That was one of the subjects we are investigating, yes.
 THE COURT: What else are you investigating?
 MR. HARWOOD: Your Honor, the resolution states that we are engaged
 THE COURT: Don't tell me what the resolution says. Tell me what you are trying to do. I don't understand the resolution.
 App. II at 399a-400a.
 
 
 [45]
 When, as here, the District Court decides not to refuse enforcement because of an insufficient statement of purpose, the court must determine for itself the agency's actual purpose. In making this essentially factual determination the District Court may look to the agency's statement of purpose (here the FTC's authorizing resolution quoted in majority opinion at p. ---- of 180 U.S.App.D.C., at p. 868 of 555 F.2d) and any other relevant evidence, but neither the District Court nor this court may rely on its own or counsel's post hoc rationalizations. As the Supreme Court explained in Burlington Truck Lines, Inc. v. United States,
 The courts may not accept appellate counsel's post hoc rationalizations for agency action; (SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)) requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself:
 "(A) simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action . . . ." Ibid.
 For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate (see Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 197, 61 S.Ct. 845, 853, 854, 85 L.Ed. 1271), the administrative process, for the purpose of the rule is to avoid "propel(ling) the court into the domain which Congress has set aside exclusively for the administrative agency." 332 U.S., at 196, 67 S.Ct. 1575.
 371 U.S. 156, 168-69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).
 
 
 [46]
 Transcript of the 13 Dec. 1973 Hearing, App. II at 352a & 360a
 
 
 [47]
 Response to Senator Hart FTC Investigation of Reporting of Natural Gas Reserves, June 1973, App. IX at 1690a-91a (emphasis added). See also Statement of James T. Helverson, Director, Bureau of Competition, FTC, Before the Subcomm. on Antitrust and Monopoly of the Senate Judiciary Comm., 27 June 1973, App. IX at 1738a-39a
 
 
 [48]
 See note 171 infra
 
 
 [49]
 As recently as 28 July 1975, in a letter to Senator Hart from then-Chairman Engman, the FTC has reconfirmed that the purpose of its investigation is "to determine whether proved gas reserves have been underreported, either by collusion or by individual action." Memorandum in Support of Supplemental Opposition by Appellant, FTC, to Motion by Appellee, Superior Oil Co., for Permission to File Supplemental Memorandum (filed 1 Aug. 1975) (Attachment)
 One regrettable obfuscation of what the FTC is seeking and what is relevant to the investigation's purpose is repeated in the majority opinion. It refers to "all reserve estimates made by the producers, both for various internal business purposes and for reports to the AGA." Maj.Op. at ---- of 180 U.S.App.D.C., at 873 of 555 F.2d. The same false distinction is made at p. ----, at p. 868 of 555 F.2d, ". . . comparison of the various estimates used by producers in their internal procedures and business operations with those reported as proved estimates to the AGA"; and again at p. ----, at p. 875 of 555 F.2d, ". . . to compare estimates prepared for various business purposes with those reported to the AGA." The implication appears that the producers keep two sets of books, for their own use and for reporting to AGA. The proved reserve figures are prepared for "internal business purposes" just as much as any other calculations; more so, in fact, for without them no gas company could accurately manage its business, and proved reserve calculations were made long before AGA existed. These proved reserve figures are now reported to AGA, and they are the only figures ever so reported. The other calculations are various preliminary estimated reserves, derived in different companies from different assemblages of scientific data, and not commonly defined. These, too, are prepared for "internal business purposes," just as are proved reserve calculations, but at a much earlier stage in the gas exploration or prospecting process. These are never reported to AGA, because they are abandoned for internal business purposes as soon as "proved reserve" figures become available for each individual tract.
 The lack of understanding of the FTC as to the total non relationship of these preliminary estimates to proved reserves, which alone are reported, and the resulting total ir relevancy of these preliminary estimates to any purpose of the FTC in investigating false or collusive reporting, are discussed in Part B. infra. The immediate point here is to make clear that all producer reserve data is prepared for internal business purposes, though only proved reserve data is reported to AGA.
 The subpoenas, as modified by the District Court and the stipulations, cover every document which relates to proved reserve data. As is apparent from the purpose of the FTC investigation, discussed above, the modified subpoenas will cause the production by the companies of every document, prepared for any purpose, relating to proved reserves. The subpoenas will not cause the production of documents concerning data unrelated to proved reserves and therefore never reported to the AGA, as such material is irrelevant to the FTC inquiry purpose.
 
 
 [50]
 Maj.Op. ----, n. 29, 876 of 555 F.2d, n. 29
 
 
 [51]
 Note 44, supra
 
 
 [52]
 Maj.Op. ----, n. 29, 876 of 555 F.2d, n. 29 (emphasis added)
 
 
 [53]
 Id. at ----, at 885 of 555 F.2d (emphasis added). See also id. at ----, at 878 of 555 F.2d
 
 
 [54]
 Transcript of 13 Dec. 1973 Hearing, App. II at 431a (emphasis added)
 
 
 [55]
 Maj.Op. ---- & ----, 874 & 878 of 555 F.2d
 
 
 [56]
 Maj.Op. ----, 874 of 555 F.2d
 
 
 [57]
 Id
 
 
 [58]
 Maj.Op. ----, 877 of 555 F.2d
 
 
 [59]
 Maj.Op. ----, 874 of 555 F.2d (emphasis in original)
 
 
 [60]
 Id. at ---- n. 29, at 876 of 555 n. 29 (emphasis in original)
 
 
 [61]
 Id
 
 
 [62]
 Id. at ----, 877 of 555 F.2d
 
 
 [63]
 Id. at ----, at 866 of 555 F.2d. See also id. at ----, at 871 of 551 F.2d
 
 
 [64]
 Six-Company Order, App. IV at 860(a) (P 2. (a))
 
 
 [65]
 Six-Company Stipulation at 5. Even though the FTC and Superior were "unable to agree on any modifications of the district court's order of March 22, 1974, concerning Superior which would eliminate or narrow the issues remaining for decision by this Court . . . " (Superior Stipulation at 1), the FTC did offer to Superior the following modification, among others, as a basis for settling their dispute: "Specification G may be modified to require Superior to produce only documents containing proved natural gas reserve estimates." FTC's Statement of Issues and Proposed Modifications re Superior (filed 19 May 1976) at 3 (emphasis added). In light of this offer (which is less demanding than the District Court's Six-Company Order in that it would not require Superior to produce data underlying its proved reserve estimates), it also seems quite safe to assume (as the majority apparently does) (see Court's opinion note 64 and accompanying text) that the Trade Commission is no longer interested in Superior's raw field data
 One of the most puzzling and totally unexplained aspects of this case is why the FTC would make this eminently sensible and logical modification offer to Superior, but not to the other six appellees. Perhaps it is because the FTC and the other producers agreed not only that the District Court's ". . . Order may be affirmed insofar as it excludes raw field data . . . ," but also because they agreed that "(t)he Order may be modified to expressly exclude maps or other documents relating to the suspected location of natural gas in currently unleased acreage." Depending on what is and what is not included under the term "raw field data," these two stipulations, when read together with the proviso agreed to by all the parties for paragraph 2. (a) of the Six-Company Order, could be interpreted to require appellees to produce only those documents containing proved natural gas reserve estimates, at least for "currently unleased acreage." This would at least partially explain why the FTC did not bother to make the same "proved reserve" modification offer to the other six appellees as it did to Superior.
 Under specification G the FTC seeks, inter alia,
 documents containing estimates or evaluations including re-estimates or reevaluations made in connection with or in preparation for or as the result of the following: (1) bidding on or nominating leases (2) deciding whether to erect permanent platforms (3) compiling or inventorying total company reserves or supply (4) negotiating or contracting for the sale of natural gas, or for the joint or common exploration, development, production, purchase or sale of acreage, or for obtaining bank loans (5) filing depreciation expense schedules with Internal Revenue Service or (6) submitting field-by-field estimates to subcommittees or committees of the American Gas Association or the American Petroleum Institute.
 FTC Subpoena, App. I at 54a. The stipulations filed by the parties do not indicate which or what portion of these categories of documents can be characterized as "raw field data." Paragraph 2. (a) of the Six-Company Order reads as follows:
 Provided that, to the extent otherwise called for, any and all proved reserve data contained in bid calculation files and relating to tracts covered by subparagraph 2(c) (i. e., fields in which the respondent had an ownership interest as of the date reports were submitted by the Southern Louisiana Subcommittee of the AGA Committee on Natural Gas Reserves (FTC Subpoena, P 2(c)) or fields in which an employee of such respondent had reporting responsibility to this Subcommittee (Six-Company Stipulation at 3)) shall be produced.
 Six-Company Stipulation at 2 (emphasis supplied).
 
 
 [66]
 Superior Stipulation at 1
 
 
 [67]
 Bid files are merely collections of documents developed for, and used in, nominating and bidding for the right to lease tracts for oil and gas exploration (here limited to Offshore Louisiana). They contain only data assembled prior to ownership of a tract. Such files consist of:
 (1) Speculative reserve estimates (based not on drilling, but on highly speculative tests such as measurement of deviations in the earth's magnetic and gravitational fields);
 (2) Backup data for such estimates, consisting of raw geological and geophysical data and interpretations thereof; and
 (3) Documents reflecting the methodology employed by Appellees in developing bids.
 Supplemental Memorandum for Appellees Texaco, Inc., Standard Oil Co. (Indiana), Shell Oil Co., Exxon Corp., and Mobil Oil Corp. (filed 13 April 1976) at 35. Accord, Affidavit of H. R. Hirsch at 4-7, appended to Brief of Appellee, Mobil Oil Corp. (filed 8 Nov. 1974).
 
 
 [68]
 Mobil Oil Co. refers in its brief to "the all too frequent cases in which such information has been stolen and sold for large sums of money. See, e. g., Tlapek v. Chevron Oil Co., 407 F.2d 1129 (8th Cir. 1969); Abbott v. United States, 239 F.2d 310 (5th Cir. 1956); Hunter v. Shell Oil Co., 198 F.2d 485 (5th Cir. 1952); Ohio Oil Co. v. Sharp, 135 F.2d 303 (10th Cir. 1943)." Brief for Appellee, Mobil Oil Corp. (filed 8 Nov. 1974) at 27
 
 
 [69]
 See Affidavit of H. R. Hirsch at 9-11, appended to Brief for Appellee, Mobil Oil Corp. (filed 8 Nov. 1974)
 
 
 [70]
 Six-Company Stipulation at 2
 
 
 [71]
 Reply Brief for Appellant (filed 23 Dec. 1974) at 9-10 (footnote omitted)
 
 
 [72]
 Transcript of 13 Dec. 1973 Hearing, App. II at 431a. The "one exception" which the court provided for is discussed in more detail infra at note 76 and accompanying text, and pp. ---- - ---- of 180 U.S.App.D.C., pp. 881-882 of 555 F.2d
 
 
 [73]
 1974-1 Trade Cases P 74,964 (D.D.C.1974)
 
 
 [74]
 Stipulation, FTC v. Continental Oil Co., No. 74-1552 (D.C.Cir., filed 18 June 1974)
 
 
 [75]
 Supplemental Memorandum for Appellees Texaco Inc., Standard Oil Co. (Indiana), Shell Oil Co., Exxon Corp. and Mobil Oil Corp. (filed 12 April 1976) at 34
 
 
 [76]
 FTC Statement of Issues and Proposed Modifications re Superior (filed 19 May 1976) at 3 (emphasis added)
 
 
 [77]
 Supplemental Brief for Appellant on Rehearing En Banc (filed 31 March 1976) at 29-30
 
 
 [78]
 Affidavit of Theodore L. Lytle, Jr., App. IV at 633a
 
 
 [79]
 See our discussion of the FTC's delay theories infra at note 83 and accompanying text, and pp. ---- - ---- of 180 U.S.App.D.C., pp. 887-889 of 555 F.2d
 
 
 [80]
 In fact, the only expert testimony before the court indicates that "(o) nce a lease is purchased, . . . (d)rilling commences promptly . . . ." Affidavit of H. R. Hirsch at 13, appended to Brief of Appellee, Mobil Oil Corp. (filed 8 Nov. 1974)
 
 
 [81]
 App. III at 471a and App. IV at 810a
 
 
 [82]
 Transcript of 13 Dec. 1973 Hearing, App. II at 431a (quoted in its entirety in text accompanying note 72 supra )
 
 
 [83]
 The FTC's subpoena as modified by the District Court's order will still yield:
 (1) documents indicating the date drilling commenced in specific fields, portions of fields, leaseholds, and/or portions of leaseholds which underlie proved natural gas reserve estimates (specification H.5.d);
 (2) documents which refer, analyze, compare, comment on, set forth, and/or relate to any lease nominations or bids which underlie proved natural gas reserves (specification I.3); and
 (3) documents which refer, analyze, compare, comment on, set forth, and/or relate to any failures or delays, for whatever reason, in reporting proved reserves of natural gas to the AGA, including any failures or delays by personnel of the AGA to identify to subcommittee members all fields containing proved reserves (specification J.1.).
 The District Court did order that "only the immediate data used to make the (proved reserve) estimate need be submitted" (Six-Company Order P 2.a.), but we would not read this limitation to exclude any of the above documents; nor would we characterize any of the above information as "raw field data."
 
 
 [84]
 Supplemental Brief for Appellant on Rehearing En Banc (filed 31 Mar. 1976) at 31-32
 
 
 [85]
 Id. at 32
 
 
 [86]
 Id. at 32-33
 
 
 [87]
 In response to this argument made by the FTC in the District Court, Mobil undertook a search for any proved reserve data in its bid files and found none. Brief for Appellee Mobil Oil Corp. (filed 8 Nov. 1974) at 17-18; Transcript of 13 Dec. 1973 Hearing, App. II at 422a. At the 13 Dec. 1973 hearing counsel for Mobil also persuasively discounted the significance of any proved reserve data it or any other company might have for a tract leased by a competitor:
 (I)f somebody buys a tract next to a tract that we have developed, that means that they are going to develop that tract as quickly as they can because if there is an overlap in the reservoir between the two tracts and they don't immediately drill wells on it, then Mobil's developed tract will drain the contiguous tract. So in every situation where that may occur our reserve estimates would be immediately superseded (and) completely obsolete because whoever purchased the adjoining tract would drill wells on it themselves.
 Transcript of 13 Dec. 1973 Hearing, App. II at 422-23a.
 
 
 [88]
 Six-Company Stipulation at 2
 
 
 [89]
 Supplemental Memorandum for Appellees Texaco Inc., Standard Oil Co. (Indiana), Shell Oil Co., Exxon Corp. and Mobil Oil Corp. (filed 13 April 1976) at 39
 
 
 [90]
 Affidavit of H. R. Hirsch at 11, appended to Brief for Appellee, Mobil Oil Corp. (filed 8 Nov. 1974)
 
 
 [91]
 See definition of "proved reserves at note 2 supra. We recognize that "(t)he proved area of a reservoir may also include the adjoining portions not delineated by drilling but which can be evaluated as economically productive on the basis of geological and engineering data available at the time the estimate is made." (This, is, of course, the source of the FTC's adjacent tract argument discussed in the immediately preceding section of this dissent.) This, however, does not mean that drilling is not an essential ingredient in the definition of "proved reserves." As both the FTC and appellees agree, it is possible that the drilling of one portion of a field or reservoir will yield sufficient " geological and engineering data" to permit the calculation of proved reserves for an adjoining portion. It is nevertheless, impossible to come up with a proved reserve estimate without some drilling at least on an adjoining portion of the field or reservoir. It should also be noted that the AGA's proved reserve definition (accepted by all parties) requires the reporting of such adjacent-tract proved reserves : "(T)he reserves reported should include total proved reserves which may be in either the drilled or undrilled portions of the field or reservoir." (Emphasis added.) The important point, for our purposes, is that there always is a drilled portion. There may or may not be undrilled portions yielding proved reserve estimates
 
 
 [92]
 There is no consistently used or accepted definition for reserves other than "proved reserves." Various companies describe their data, at different stages, as "probable," "possible," "recoverable," and "ultimately recoverable."
 
 
 [93]
 The FTC's and the majority's reasoning presumes that there is some correlation between a producer's speculative estimates and its actual production history. No such correlation could, or does in fact, exist. On the contrary, the uncontradicted evidence on the record demonstrates that speculative reserve estimates have no "relationship with or bearing on proved reserve estimates made on the basis of drilled well data." Affidavit of H. R. Hirsch at 10, appended to Brief for appellee, Mobil Oil Corp. (filed 8 Nov. 1974)
 By definition "proved " reserves are those reserves whose existence has been established through well logs, core samples, and other concrete data obtained by actual drilling, whereas "speculative" reserve data (the only type of data found in most bid files) are based upon seismic studies, measurements of the changes in the earth's gravitational and magnetic fields, and other inferential geological techniques. Even after all inferential calculations are completed there is no way, apart from drilling, to determine whether hydrocarbons in any form are present and, if so, whether they exist in producible quantities. Nor is it possible to determine accurately, without drilling, the depth of the reservoir, its thickness, extent, and porosity factors which bear significantly upon whether, and to what extent reserves are present. Thus, even the use of the term "speculative reserves" or "unproved reserves" is itself "a misnomer because (by definition) no hydrocarbons have yet been found." See id. at 2, 5 and 11.
 
 
 [94]
 The total irrelevance of speculative preliminary reserve estimates to proved reserves is vividly demonstrated by Exhibits F and G to the Hirsch affidavit. Those exhibits show that, for the two tracts with which they deal, the original speculative estimate was, in one case, less than one-tenth of and, in the other case, more than double the eventual proved estimate. Another example is provided by Mobil's experience in the 1968 Texas Offshore lease sale. On the basis of what Mobil considered reliable inferential geological information with respect to so-called speculative reserves, it spent $32 million for certain offshore leases. Eighteen wells were drilled without any producible hydrocarbons being found, and Mobil subsequently relinquished all ownership rights in these tracts. See id. at 10 and Exhibits F and G
 
 
 [95]
 As demonstrated above, two of the premises underlying the FTC's erroneous theory are also mistaken. Appellees do not "regard their untested estimates to be of a comparable degree of certainty" with their proved reserve estimates, as the FTC asserts. Supplemental Brief for Appellant on Rehearing En Banc at 33 (filed 31 Mar. 1976). Nor do "the same or substantially similar underlying data" support both proved and unproved reserve estimates. Id. at 34. The inferential seismic and geophysical data underlying speculative reserve estimates are not comparable and bear no resemblance to the drilling results upon which proved reserve estimates are based
 
 
 [96]
 According to the Hirsch affidavit, "Once a lease is purchased, the bid files are of no further use whatsoever. Drilling commences promptly and a whole new set of hard data is obtained from the actual drilling." Affidavit of H. R. Hirsch at 13, appended to Brief for Appellee, Mobil Oil Corp. (filed 8 Nov. 1974). This comports with common economic sense, and there is certainly no evidence on the record to the contrary
 
 
 [97]
 Transcript of 13 Dec. 1973 Hearing, App. II at 431a (quoted at p. ----, at p. 912 of 555 F.2d supra )
 
 
 [98]
 This same provision was included in the order entered by Judge Hart in FTC v. Continental Oil Co., 1974-1 Trade Cases P 74,964 (D.D.C.1974), appeal dismissal, No. 74-1552 (D.C.Cir., 2 July 1974). Apparently, the FTC found the provision to be satisfactory since it dismissed its appeal. Stipulation, FTC v. Continental Oil Co., No. 74-1552 (D.C.Cir., filed 18 June 1974). See text accompanying note 65 supra
 
 
 [99]
 See supra at note 83 and accompanying text
 
 
 [100]
 Maj.Op. at ---- of 180 U.S.App.D.C., at 876 of 555 F.2d (emphasis added)
 
 
 [101]
 Id. at ---- n. 32, at 877 of 555 F.2d n. 32 (emphasis in original)
 
 
 [102]
 See note 3 supra
 
 
 [103]
 338 U.S. 632, 70 S.Ct. 357, 94 S.Ct. 401 (1950)
 
 
 [104]
 We noted earlier that the District Court may not have reached the issue of relevance with regard to all documents that do not relate to proved reserves. Although the bid files certainly fall within this larger category, throughout these proceedings they have been treated and discussed as if they were a discrete class of documents. The record clearly indicates that the District Court gave separate consideration to the bid files and ultimately based those portions of its final order concerned with bid files on a finding that these files lacked relevance. See Transcript at 13 Dec. 1973 Hearing, App. II at 431a
 
 
 [105]
 A fortiori, the FTC has not met the higher standard of relevance which must be established when such extremely sensitive documents as bid files are subpoenaed. See, e. g., Hartley Pen Co. v. United States District Court, 287 F.2d 324, 330 (9th Cir. 1961); E. B. Mueller & Co. v. FTC, 142 F.2d 511, 520 (6th Cir. 1944); Zenith Radio Corp. v. RCA, 106 F.Supp. 561, 565 n. 6 (D.Del.1952); British Oxygen Co., No. 8955 (FTC, 23 April 1974) (Slip op. at 8), aff'd, 29 May 1974; Seeburg Corp., 70 F.T.C. 1809, 1813 (1966); Puget Sound Salmon Canners, Inc., 53 F.T.C. 342, 353 (1956); Maico Co., 51 F.T.C. 1197, 1203 (1955). See generally Henke, Federal Trade Commission Hearings: Rights of a Non-Party to Protect Its Witnesses and Documents, 21 Am.L.Rev. 130, 143 (1971)
 Access to the documents reflecting appellees bid methodology and preliminary speculative reserve estimates is strictly limited to executive personnel. In fact, this information is kept in safe deposit boxes or vaults and is generally maintained in handwritten form to limit exposure to clerical personnel. See Affidavit of H. R. Hirsch at 11-12, appended to Brief for Appellee, Mobil Oil Corp. (filed 8 Nov. 1974).
 
 
 [106]
 United States v. Nixon, note 38, supra; FTC v. Lonning, note 39, supra
 
 
 [107]
 See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (quoted at p. ---- of 180 U.S.App.D.C. at p. 903 of 555 F.2d supra )
 
 
 [108]
 SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047, 1056 (2d Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); Adams v. FTC, 296 F.2d 861, 866-67 (8th Cir. 1961), cert. denied, 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83 (1962); Hunt Foods & Indus., Inc. v. FTC, 286 F.2d 803, 811 (9th Cir. 1960), cert. denied, 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190 (1961); Chapman v. Maren Elwood College, 225 F.2d 230 (9th Cir. 1955); Comet Electronics, Inc. v. United States, 381 F.Supp. 1233, 1242 (W.D.Mo.1974), aff'd, 420 U.S. 999, 95 S.Ct. 1439, 43 L.Ed.2d 758 (1975); Genuine Parts Co. v. FTC, 313 F.Supp. 855, 857 (N.D.Ga.1970), aff'd, 445 F.2d 1382 (5th Cir. 1971); In re United Shoe Mach. Corp., 6 F.R.D. 347 (D.Mass.1947). See also See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967)
 
 
 [109]
 FTC v. Lonning, 176 U.S.App.D.C. 200, 209, 539 F.2d 202, 211 (1976); NLRB v. Northern Trust Co., 148 F.2d 24, 29 (7th Cir.), cert. denied, 326 U.S. 731, 66 S.Ct. 38, 90 L.Ed. 435 (1945); FCC v. Cohn, 154 F.Supp. 899, 912 (S.D.N.Y.1957). See also Penfield Co. v. SEC, 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947) where all members of the Supreme Court (six in the majority, one concurring, and two dissenting) agreed that an abuse of discretion standard was the appropriate standard for appellate review of a district court's refusal to grant the coercive enforcement relief sought by the Agency. Justice Douglas, writing for the majority, held that in the absence of a finding by the district court (1) that the Commission's request had become moot, (2) that the documents produced satisfied the Agency's legitimate needs, or (3) that the additional documents sought were irrelevant to the SEC's statutory functions, the district court had committed an "abuse of discretion" in failing to grant the full remedial relief which the Securities Act of 1933 placed behind the Commission's orders. Id. at 592, 67 S.Ct. 918. Concurring, Justice Rutledge would have ". . . remanded to the District Court with directions to exercise its discretion in framing the relief adequate and appropriate to make effective the Commission's right to disclosure." Id. at 603, 67 S.Ct. at 928 (emphasis added). Dissenting for himself and Justice Jackson, Justice Frankfurter wrote,
 Bearing in mind that the District Court was not an automation which must unquestionably compel obedience to a subpoena simply because the Commission had issued it, we must consider whether the District Court had abused the fair limits of judicial discretion. . . .
 On the record before us, Judge Hall exercised allowable discretion in finding that the subpoena had spent its force, and in concluding not to compel obedience to it.
 Id. at 607-08, 67 S.Ct. at 930 (emphasis added).
 
 
 [110]
 FTC v. Lonning, 176 U.S.App.D.C. 200, 204, 539 F.2d 202, 206 (1976)
 
 
 [111]
 Id. at 209, 539 F.2d at 211 (footnotes and citations omitted) (emphasis added)
 
 
 [112]
 148 F.2d at 29
 
 
 [113]
 See our discussion of these FPC proceedings supra at pp. ---- - ---- of 180 U.S.App.D.C., at pp. 899-902 of 555 F.2d
 
 
 [114]
 See Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 70, 351 F.2d 762, 767 (1965); Application of Consumers' Union of the United States, Inc., 27 F.R.D. 251, 254 (S.D.N.Y.1961)
 
 
 [115]
 Cf. S & E Contractors, Inc. v. United States, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972); Safir v. Gibson, 432 F.2d 137 (2d Cir. 1970), cert. denied, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970)
 
 
 [116]
 Supplemental Brief for Appellee Standard Oil Co. of California on Rehearing En Banc (filed 15 April 1976) at 20
 
 
 [117]
 Affidavit of L. A. Swanson, App. IX at 1761a-62a. See also Affidavit of John T. Marshall (an employee of Mobil Oil Corp.), App. XI at 2035a-39a
 
 
 [118]
 See our discussion of "purpose" in section IV-A supra
 
 
 [119]
 As we demonstrated in Part II supra, the District Court's factual determination that, for the years covered by the FTC's subpoena, the Federal Power Commission had already (1) determined natural gas reserves and (2) considered and ruled upon the validity and accuracy of such reserves, was soundly based on evidence in the record
 
 
 [120]
 See Maj.Op. at ---- - ---- of 180 U.S.App.D.C., at 881-882 of 555 F.2d
 
 
 [121]
 Maj.Op. at ----, at 882 of 555 F.2d
 
 
 [122]
 See our discussion under Part I.B. supra, pp. ---- - ----, pp. 897-898 of 555 F.2d
 
 
 [123]
 Part III supra, pp. ---- - ----, pp. 903-905 of 555 F.2d
 
 
 [124]
 Joint Brief for Appellees Texaco, Inc., Standard Oil Co. (Indiana), Shell Oil Co., and Exxon Corp. (filed 5 Nov. 1974), at 3 (emphasis in original)
 
 
 [125]
 See note 18 supra
 
 
 [126]
 United States v. Utah Construction Co., 384 U.S. 394, 421-422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); Pacific Seafarers, Inc. v. Pacific Far E. Lines, Inc., 131 U.S.App.D.C. 226, 231, 404 F.2d 804, 809 (1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969) ("Principles of collateral estoppel may properly be applied in administrative cases.") accord, Fairmont Aluminum Co. v. Commissioner, 222 F.2d 622, 627 (4th Cir.), cert. denied, 350 U.S. 833, 76 S.Ct. 76, 100 L.Ed. 748 (1955); Tampa Phosphate R.R. v. Seaboard Coast Line R.R., 418 F.2d 387, 399 (5th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970); International Wire v. Local 38, Int'l Bhd. of Elec. Workers, 357 F.Supp. 1018 (N.D.Ohio 1972), aff'd, 475 F.2d 1078 (6th Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973)
 
 
 [127]
 384 U.S. at 421-22, 86 S.Ct. at 1559-1560
 
 
 [128]
 Sunshine Anthracite Coal Co. v. Adkins, supra, 310 U.S. at 402-03, 60 S.Ct. at 916-17. See also French v. Rishell, 40 Cal.2d 477, 254 P.2d 26 (1953) (en banc)
 Another requirement for the application of collateral estoppel is that "(t)he determination made of the issue in the prior action must have been necessary and essential to the resulting judgment." 1B J. Moore, Federal Practice P 0.443(1) (2d ed. 1974). Apparently acknowledging that a determination of the validity and accuracy of AGA proved reserve estimates was necessary and essential to the FPC's ratemaking task, the FTC does not argue this issue in this appeal.
 
 
 [129]
 113 F.2d 583 (8th Cir. 1940)
 
 
 [130]
 141 F.2d 141 (7th Cir. 1944)
 
 
 [131]
 432 F.2d 137 (2d Cir. 1970), cert. denied, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970)
 
 
 [132]
 Id. at 143 (citations omitted)
 
 
 [133]
 Six-Company Order, App. IV at 807a (P 2. (d)). For a similar "use" restriction formulated in another investigative subpoena enforcement proceeding, see Lynn v. Biderman, 536 F.2d 820 (9th Cir. 1976)
 
 
 [134]
 Supplemental Brief for Appellant on Rehearing En Banc (filed 31 March 1976) at 10
 
 
 [135]
 A. Duda & Sons Cooperative Ass'n v. United States, 495 F.2d 193, 197 (5th Cir. 1974), quoting from Painters Dist. Council No. 38, Bhd. of Painters, Decorators and Paperhangers v. Edgewood Contracting Co., 416 F.2d 1081 (5th Cir. 1969)
 
 
 [136]
 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943)
 
 
 [137]
 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946)
 
 
 [138]
 Such as FMC v. Port of Seattle, 521 F.2d 431 (9th Cir. 1975); SEC v. Savage, 513 F.2d 188 (7th Cir. 1975); SEC v. Brigadoon Distrib. Co., 480 F.2d 1047 (2d Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); FTC v. Gibson, 460 F.2d 605 (5th Cir.)
 
 
 [139]
 This, as the Supreme Court recognized in Oklahoma Press, was the gravamen in both Endicott Johnson and Oklahoma Press:
 (I)n the Endicott Johnson case . . . (we) hold that under the Walsh-Healy Act . . . the district court was not authorized to decide the question of coverage or, on the basis of its adverse decision, to deny enforcement to the Secretary's subpoena seeking relevant evidence on that question, because Congress had committed its initial determination to (the Secretary) . . ..
 We think . . . that Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations . . ..
 327 U.S. at 211 & 214, 66 S.Ct. at 507 & 508.
 
 
 [140]
 Endicott Johnson Corp. v. Perkins, 317 U.S. at 503, 63 S.Ct. at 340 (quoting from Walsh-Healy Act § 5)
 
 
 [141]
 Id. at 507, 63 S.Ct. at 342
 
 
 [142]
 Id
 
 
 [143]
 But even if the determination of the gas supply issue was not primarily the duty of the FPC, the Trade Commission should still be estopped from re-investigating and relitigating (i. e., collaterally attacking) the prior findings of fact of an equally (if not more) competent sister agency. On the facts of this case, application of collateral estoppel need not rest upon a primary jurisdiction-like policy. Indeed, before we could hold that the reserves question fell within the primary jurisdiction of the FPC (and correspondingly, outside the subject matter jurisdiction of the FTC), we would probably need to await an initial determination of this jurisdictional question by the FTC. See Safir v. Gibson, 432 F.2d at 144; cf. Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943)
 
 
 [144]
 432 F.2d at 143-44 (citations omitted) (emphasis added)
 
 
 [145]
 Dollar Vitamin Plan, Inc., 69 F.T.C. 933, 971 n.2 (1966)
 
 
 [146]
 532 F.2d 1092 (7th Cir. 1976)
 
 
 [147]
 532 F.2d 541 (6th Cir. 1976)
 
 
 [148]
 Regrettably, the majority opinion, at ---- of 180 U.S.App.D.C. n. 41, at 879 of 555 F.2d n. 41 and accompanying text, thoroughly confuses what it means by "these jurisdictional questions" and tries to lump in statutory coverage (jurisdiction) and collateral estoppel with the only "jurisdiction" argument the appellees made, i. e., "primary jurisdiction." Endicott Johnson and that entire line of cases relied on by the majority deal with "jurisdiction" as referring to a statutory coverage issue, which is properly held to be decided by the responsible agency and not subject to judicial review until after the administrative proceeding is completed. Utah Construction, Safir, and other decisions relied on in this dissent deal with collateral estoppel by a previous factual issue determination, do not deal with statutory coverage, and hold that administrative collateral estoppel must be considered at the outset of the proceeding, else the sole purpose and benefit of the doctrine will be lost. The issue of "primary jurisdiction" relates to none of the above, has been abandoned by appellees on this appeal, and all reference to it in the majority opinion is most unfortunately misleading and confusing
 
 
 [149]
 Compare Endicott Johnson Corp. v. Perkins, 317 U.S. at 508 and 509, 63 S.Ct. at 343 where the Court found that
 . . . the District Court refused to order . . . production, tried the issue of coverage itself, and decided it against the Secretary.
 . . . To perform her function (the Secretary of Labor) must draw inferences and make findings from the same conflicting materials that the District Court considered in anticipating and foreclosing her conclusions. (emphasis added)
 
 
 [150]
 The Trade Commission itself has relied on something closely akin to the doctrine of administrative collateral estoppel when it works to its advantage. See National Ass'n of Women & Children's Apparel Salesmen, Inc. v. FTC, 479 F.2d 139 (5th Cir.), cert. denied, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973), where, in a collateral proceeding, the FTC relied heavily on a previous NLRB holding
 
 
 [151]
 384 U.S. at 422, 86 S.Ct. at 1560 (emphasis added)
 
 
 [152]
 As mentioned earlier, a group of municipal distributor intervenors played a very active role in the proceedings. See So La I, 428 F.2d at 414 and n. 3
 
 
 [153]
 See So La II, 46 F.P.C. at 113 & 115. Examination of the transcript in So La II (admitted into the record of these proceedings by stipulation, App. III at 620a-21a) indicates that witnesses were vigorously cross-examined on the reliability of AGA data and the procedures used in the FPC's independent NGRS audit. See Transcript of So La II at 4126-61, 4170-93, 4303-34 and 4652-4753. The FPC staff members in charge of the NGRS audit appeared, testified in detail, and were cross-examined on the methods and procedures followed in performing the audit. See Transcript of So La II at 5190-5207A & 5421-72. Other oil and gas experts on the FPC staff testified and were cross-examined on the reliability of AGA reserve data. See Transcript of So La II at 4003, 4055, 4074-75, 4132, 4137 and 4166
 
 
 [154]
 Brief Reprinted in Hearings on Concentration by Competing Raw Fuel Industries in the Energy Market & Its Impact on Small Business Before the Subcomm. on Special Small Business Problems of the House Select Comm. on Small Business, 92d Cong., 1st Sess. at A72 (1971) (hereinafter 1971 House Concentration Hearings )
 
 
 [155]
 46 F.P.C. at 113
 
 
 [156]
 Id. at 116
 
 
 [157]
 K. Davis, Administrative Law Treatise, § 18.08 at 598 (1958) (footnote omitted and emphasis added)
 
 
 [158]
 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973)
 
 
 [159]
 See Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267 (1975)
 
 
 [160]
 A. Duda & Sons Cooperative Ass'n v. United States, 495 F.2d 193 (5th Cir. 1974)
 
 
 [161]
 Id. at 197 (emphasis added)
 
 
 [162]
 Id
 
 
 [163]
 46 F.P.C. at 116 (emphasis added)
 
 
 [164]
 See 1971 House Concentration Hearings at A56. See also id. at A72
 
 
 [165]
 In its supplemental reply brief the FTC states,
 This case touches upon two distinct questions which the companies repeatedly confuse or fail to distinguish: is there a natural gas shortage, and have natural gas companies taken action having the purpose or effect of misstating the extent of any such shortage? The questions are related but independent. While the first question is of primary concern to the FPC, the second is the one of particular concern to the FTC.
 Reply Supplemental Brief for Appellant on Rehearing En Banc (filed 13 April 1976) at 2. We agree with the FTC; the purpose of their investigation is to determine whether appellees have ". . . taken action having the purpose or effect of misstating (i. e., exaggerating through underreporting) the extent of any . . . shortage." See also id. at 14 where the FTC explains, "If a complaint were at issue, for example, the FTC (more particularly its staff) would be the proponent of a claim that some of the companies had engaged in concerted activities to underreport their proved reserves."
 Thus, if the FTC investigation is on reporting or misstating, then the FTC's only concern is with proved reserves, because these are the only reserves reported or about which statements have ever been made. (See our discussions of Relevance, Part IV, supra ).
 
 
 [166]
 In its supplemental brief on rehearing en banc, the FTC virtually concedes this point with the following admission:
 We do not dispute that one of the causes for the FTC's concern about the possibility of unlawful conduct concerning the reporting of reserves is that such conduct might result in artificial understatement of reserves which, because of the FPC's reliance upon such data, could result in higher rates.
 Supplemental Brief for Appellant on Rehearing En Banc (filed 31 March 1976) at 28-29. The Trade Commission then goes on to claim another "cause for concern":
 (I)t is quite possible that one or more of the companies has engaged in conduct concerning their development and reporting of reserves which has not yet sufficiently ripened so that it would have caused the AGA data to be substantially inaccurate. . . . Similarly, one or more of the companies may have attempted to engage in such unlawful conduct without success . . ..
 Id. at 29 (footnote omitted). This second alleged "cause for concern" is totally fallacious for at least three reasons. First, only proved reserve estimates are ever reported and the FTC does at least concede that its investigation is aimed in part at ". . . the possibility of unlawful conduct concerning the reporting of reserves . . .." (Emphasis added.) Second, since the only reserve data relied upon by the FPC are AGA proved reserve estimates, only these figures can ever have any effect on FPC-determined rates. Third, as we have painstakingly demonstrated in section IV supra, there is no correlation whatsoever between proved reserve estimates and the earlier, speculative, non proved reserve estimates. After drilling (and the immediately following determination whether any proved reserves are present), all former non proved reserve estimates become superseded, irrelevant, and probably misleading. Without some nexus between AGA proved reserve estimates and other non proved reserve data, the FTC's allegation that the producers may be engaged in ". . . conduct that may eventually affect, but has not yet affected, proved reserves data" makes utterly no sense.
 
 
 [167]
 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959)
 
 
 [168]
 In RCA the Supreme Court concluded,
 (T)he legislative history of the (Federal Communications) Act reveals that the Commission was not given the power to decide antitrust issues as such, and that Commission action was not intended to prevent enforcement of the antitrust laws in federal courts.
 Id. at 346, 79 S.Ct. at 464.
 
 
 [169]
 Reply Supplemental Brief for Appellant on Rehearing En Banc (filed 13 April 1976) at 8
 
 
 [170]
 Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930)
 
 
 [171]
 Reply Supplemental Brief for Appellant on Rehearing En Banc (filed 13 April 1976) at 8 (emphasis added)
 
 
 [172]
 Of course, on policy matters affecting the ultimate issue in its ratemaking proceedings (the just and reasonable area rate for gas), the FPC is always free to change its mind according to its current perception of "the public interest." This, however, does not preclude application of collateral estoppel to underlying findings of fact essential to a determination of the ultimate issue
 
 
 [173]
 Six-Company Order, App. IV at 809-10a (P 8); Superior Order, App. III at 469a-71a
 
 
 [174]
 16 C.F.R. §§ 3.45, 4.10 and 4.11 (1976). See also 15 U.S.C. § 46(f) (1970)
 
 
 [175]
 See note 3 supra. The action of the Trade Commission, in acceding to the telephoned demand of a Congressman for immediate access to the documents in so short a period of time as to preclude resort to a court, underlines the wisdom and reasonableness of the District Court's protective order on confidentiality. The Federal Rules on Civil Procedure currently provide for motions to quash duly authorized subpoenas, but not telephone calls
 
 
 [176]
 In order to protect confidential commercial information and trade secrets, District Courts frequently have required appropriate protection as a precondition to enforcement of FTC investigative subpoenas. See, e. g., FTC v. St. Regis Paper Co., 304 F.2d 731, 732 n. 1 (7th Cir. 1962); Graber Mfg. Co. v. Dixon, 223 F.Supp. 1020 (D.D.C.1963); FTC v. Bowman, 149 F.Supp. 624 (N.D.Ill.) aff'd, 248 F.2d 456 (7th Cir. 1957); FTC v. Menzies, 145 F.Supp. 164, 171 (D.Md.1956), aff'd, 242 F.2d 81, 84 (4th Cir.), cert. denied, 353 U.S. 957, 77 S.Ct. 863, 1 L.Ed.2d 908 (1957). Accord, FTC v. Lonning, 176 U.S.App.D.C. 200, 539 F.2d 202 (1976)
 
 
 [177]
 Six-Company Stipulation (filed 19 May 1976) at 3-4
 
 
 [178]
 353 U.S. 322, 323, 77 S.Ct. 804, 805, 1 L.Ed.2d 852 (1957)
 
 
 [179]
 Walling v. American Rolbal Corp., 135 F.2d 1003, 1005 (2d Cir. 1943)
 
 
 [180]
 The Trade Commission's and the majority's arguments notwithstanding, it is common for a district court to require the administrative agency to inspect subpoenaed records or documents at the place where they are stored. NLRB v. Friedman, 352 F.2d 545 (3d Cir. 1965); Hunt Foods & Indus., Inc. v. FTC, 286 F.2d at 812; FTC v. Bowman, 149 F.Supp. at 630; FTC v. Menzies, 145 F.Supp. at 171. In addition, the parties have agreed that
 . . . each company shall designate no more than one corporate office in each state in which documents located within that state shall be produced for inspection and copying.
 Six-Company Stipulation (filed 19 May 1976) at 3.